Page 1

1   UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

2   ----------------------------------------------------X

JAMES BENBOW,

3

PLAINTIFF,

4

5       -against-        Case No.:

17-CV-6457

6

7   CITY OF NEW YORK; POLICE OFFICER BRIAN W. FEELY; POLICE

OFFICER MATTHEW J. ROSIELLO; POLICE OFFICER KENNETH L.

8   ANDERSON; SERGEANT WILLIAM A. DAIB; POLICE OFFICER

SHANIEL J. MITCHELL; and POLICE OFFICER STEPHEN J. MINUCCI,

9

DEFENDANTS.

10  ----------------------------------------------------X

11

12                  DATE:  September 17, 2020

13                  TIME:  10:02 A.M.

14

15

16              DEPOSITION of the Plaintiff, JAMES BENBOW,

17  taken by the Defendant, pursuant to a Court Order and to

18  the Federal Rules of Civil Procedure, held via Zoom

19  videoconference, before Caitlin M. Zakik, a Notary Public

20  of the State of New York.

21

22

23

24

25

Page 2

1    A P P E A R A N C E S:

2

3    THE ABOUSHI LAW FIRM
          Attorneys for the Plaintiff
4         JAMES BENBOW
          1441 Broadway, 5th Floor
5         New York, New York 10018
          BY: AYMEN A. ABOUSHI, ESQ.

6

7

8    JAMES E. JOHNSON
     CORPORATION COUNSEL
9    NEW YORK CITY LAW DEPARTMENT
          Attorneys for the Defendants
10        CITY OF NEW YORK; POLICE OFFICER BRIAN W. FEELY;
          POLICE OFFICER MATTHEW J. ROSIELLO; POLICE OFFICER
11        KENNETH L. ANDERSON; SERGEANT WILLIAM A. DAIB;
          POLICE OFFICER SHANIEL J. MITCHELL; and POLICE
12        OFFICER STEPHEN J. MINUCCI,
          100 Church Street
13        New York, New York 10007
          BY: JOSHUA WEINER, ESQ.
14        AARON DAVISON, ESQ.
        File #: 2017-066702
15        Control #: 20-1781

16

                    *          *          *

17

18

19

20

21

22

23

24

25

Page 3

1          F E D E R A L   S T I P U L A T I O N S

2

3

4          IT IS HEREBY STIPULATED AND AGREED by and between

5     the counsel for the respective parties herein that the

6     sealing, filing and certification of the within deposition

7     be waived; that the original of the deposition may be

8     signed and sworn to by the witness before anyone authorized

9     to administer an oath, with the same effect as if signed

10    before a Judge of the Court; that an unsigned copy of the

11    deposition may be used with the same force and effect as if

12    signed by the witness, 30 days after service of the

13    original & 1 copy of same upon counsel for the witness.

14

15          IT IS FURTHER STIPULATED AND AGREED that all

16    objections except as to form, are reserved to the time of

17    trial.

18

19                    *    *    *    *

20

21

22

23

24

25

JAMES BENBOW

Page 4

1   J A M E S   B E N B O W, called as a witness, having been

2   first duly sworn by a Notary Public of the State of New

3   York, was examined and testified as follows:

4   EXAMINATION BY

5   MR. WEINER:

6       Q.      Please state your name for the record.

7       A.      James Benbow.

8       Q.      What is your address?

9       A.      177 Sands Street, Apartment 7D, Brooklyn,

10  New York 11201.

11      Q.      Good morning, Mr. Benbow.  My name is Joshua

12  Weiner.  I represent the defendants in the case you've

13  brought in the caption 17-CV-6457 in the Eastern District

14  of New York.

15              Do you understand that you've just taken an oath

16  to tell the truth?

17      A.      Yes, sir.

18      Q.      Rules about how a deposition works in case you're

19  not familiar:  Your answers need to be verbal.  So if I ask

20  you a question it needs to be a yes or a no as opposed to a

21  shake of the head.  I'd also ask you to say a yes or a no

22  instead of uh-huh or uh-uh because when the Court Reporter

23  puts it in the transcript it's more clear that way.

24              Okay?

25      A.      Got you.

JAMES BENBOW

Page 50

1    younger?

2        A.      Yeah.

3                MR. ABOUSHI:   Just note my objection.

4        Q.      What was the answer?

5        A.      Yes.

6        Q.      How young were you?

7        A.      Probably like 12.  Like 12.

8        Q.      If I have a record that says you were arrested

9    for possession of a handgun in 1994, would you agree with

10   that?

11       A.      I guess if you got it.  I don't know.

12       Q.      Any other times besides for the two we've

13   mentioned in 2015 and in 1994 that you've been arrested for

14   possessing a handgun?

15       A.      No.

16       Q.      Have you been arrested for possessing any other

17   type of gun?

18       A.      No.

19       Q.      Did you submit a notice of claim to the City of

20   New York for this incident?

21       A.      Yeah.

22       Q.      Do you remember when you submitted it?

23       A.      No.  I can't recall.

24       Q.      Did you ever testify regarding the notice of

25   claim you submitted to the City of New York for this

JAMES BENBOW

Page 51

1    incident?

2       A.      No.  I don't believe so.

3       Q.      Do you know if you were scheduled to testify

4    regarding the notice of claim?

5       A.      No.  I had a lawyer that was handling that stuff

6    so I wasn't -- I'm not aware of any -- I never saw

7    anything.

8       Q.      Did you ever learn that -- so you never learned

9    that you were scheduled to testify regarding the notice of

10   claim?

11      A.      No.  Uh-uh.  He basically railroaded me.

12      Q.      He railroaded you.  How so?

13      A.      Because I didn't know nothing about it.  Like

14   once he did that I didn't know I was supposed to testify or

15   nothing of that.  I had no idea.

16              MR. ABOUSHI:  I'm going to object on the

17              grounds that these conversations he had with his

18              previous lawyer may be protected by

19              attorney-client privilege and any conversation or

20              interaction between them might be protected by

21              same.  I don't know if we can get into that.

22              MR. WEINER:  I'll try to work around it,

23              Aymen.  Okay?

24              MR. ABOUSHI:  All right.  I'm just going to

25              listen thoughtfully to the questions and I may

```
                                                              Page 61

  1              question.

  2                   MR. WEINER:  Understood, but I have to be

  3              able to ask about the events of that night.

  4                   MR. ABOUSHI:  You can ask subject to

  5              everything I just said on the record.  I'm not

  6              saying not to answer.

  7                   MR. WEINER:  No problem.

  8      Q.      At some point on March 7, 2015, did you go to

  9  Amarachi Prime?

 10      A.      Yes.

 11      Q.      What is Amarachi Prime?

 12      A.      It's a restaurant.

 13      Q.      What day of the week was March 7, 2015?

 14      A.      I don't know.  I don't know what day.

 15      Q.      Before getting to the restaurant, when I -- is it

 16  also a bar, Amarachi Prime?

 17      A.      It's like every -- I guess every restaurant has

 18  like a bar to it or whatever, so yes.  I guess it's a

 19  restaurant/bar.

 20      Q.      So going forward, when I say "bar" or

 21  "restaurant," I'm speaking about Amarachi Prime.

 22              Okay?

 23      A.      Yes.

 24      Q.      What did you do on March 7, 2015, before you got

 25  to the restaurant?
```

JAMES BENBOW

Page 62

1      A.      I can't recall.  I can't recall.

2      Q.      Who did you see that day before you got to

3   Amarachi Prime?

4      A.      I can't recall.  I can't recall.

5      Q.      Did you drink any alcohol before you got to

6   Amarachi Prime?

7      A.      No.

8      Q.      Did you do any drugs before you got to Amarachi

9   Prime?

10      A.      No.

11      Q.      When you arrived at Amarachi Prime, were you in

12   possession of a gun?

13      A.      No.

14      Q.      As of March 7, 2015, did you have a license or a

15   permit to possess a gun?

16      A.      No.

17      Q.      As of March 7, 2015, were you familiar with an

18   individual known as Eric Bradley?

19      A.      Yes.

20      Q.      How did you know Eric Bradley?

21      A.      Next door neighbor.

22      Q.      When did you first meet him?

23      A.      Probably like '09 or '10 or something like that.

24   '09 or '10.

25      Q.      As of the date of the incident, would you

JAMES BENBOW

Page 63

```
 1   consider him a friend?

 2       A.    No.  Not really, no.

 3       Q.    I'm sorry.  I missed that answer.

 4       A.    No.

 5       Q.    How would you categorize your relationship with

 6   him as of the date of the incident?

 7       A.    A neighbor.

 8       Q.    As of the date of the incident, how often would

 9   you see him?

10       A.    I guess taking the garbage out and going to the

11   store.  I mean, we live right next door.

12       Q.    Would you speak to him typically when you would

13   see him?

14       A.    Yeah.  Regular neighbors and stuff, "hi" and

15   "what's up?"

16       Q.    As of 2015, did you have his number in your

17   phone?

18       A.    Not that I can recall.

19       Q.    As of 2015, would you go out to hang out with

20   him?

21       A.    Not really.  Not that I can recall.  He wasn't my

22   hangout partner.  He's a younger guy.  I don't really --

23   you know, no.  Uh-uh.

24       Q.    You said you know him since 2009 to 2010.  Was

25   that when he moved into the building?
```

JAMES BENBOW

Page 64

1      A.      No.   That's when I came to the building.   He's

2    been living there, I guess, his whole life off and on.

3    Like, I don't know.

4      Q.      When was the last time you saw him?

5      A.      I don't even know.   It's been a while.

6      Q.      Have you seen him since after the incident?

7      A.      Yes.

8      Q.      When was the first time you saw him after the

9    incident?

10     A.      I don't know.   I can't recall.

11     Q.      Can you approximate how many times you've seen

12   him since after the incident?

13     A.      I don't know.

14     Q.      Is it more than ten?

15     A.      I don't know.

16     Q.      Is it more than five?

17     A.      I have no idea.   I don't know.

18     Q.      Is it more than one?

19     A.      I have no idea.

20     Q.      I'm sorry.

21             Is it more than one?

22     A.      I have no idea.

23     Q.      Did you hang out with him on the night of the

24   incident?

25     A.      No.   I didn't hang out with him, but he was in

JAMES BENBOW

Page 65

1    the restaurant when I got there.

2        Q.    Describe your interactions with him on the night

3    of the incident.

4            MR. ABOUSHI:  Objection.  You can answer.

5        A.    I can't recall.  I think regular.  We see an

6    associate or neighbor in the bar that you know.  Regular, I

7    guess.

8        Q.    How much time did you spend with him inside the

9    bar that night?

10       A.    Well, I was there -- I was there not spending

11   time with him.  I was there just, you know, enjoying

12   myself.  He just happened to be there also.  So the time I

13   can't recall how long, you know, I was in there for.

14       Q.    Would you say that you hung out with him for less

15   than an hour that night?

16       A.    I don't know the time frame and all of that.  I

17   know he was there and I was there, you know.  I do know

18   that.  He was there.

19       Q.    Is it your testimony that you don't remember how

20   long you hung out with him that night?

21       A.    I didn't hang out with him.  I was in the bar by

22   myself.  You're putting me with him.  I wasn't there with

23   him.  I didn't come in there with him, you know.  When I

24   was leaving out, yeah, because we live right down the

25   block, but I didn't come in there with him.  I didn't come

JAMES BENBOW

Page 66

1  there to hang out with him.

2      Q.     Who did you hang out with at the bar that night?

3      A.     Everybody.  Females.  Majority of the females.

4  There's some hot girls in there.

5      Q.     Do you remember the names of the people you hung

6  out with at the bar that night?

7      A.     Well, to be honest with you, I was hanging out

8  with the owner.

9      Q.     What's the owner's name?

10     A.     I think his name was Sam.  He got a Nigerian

11 African name.

12     Q.     So you think his first name was Sam?

13     A.     Yeah.  Something like -- I don't know.  Something

14 of that nature.

15     Q.     Who else did you hang out with besides for Sam

16 that night?

17     A.     That was about it that I can recall.  That and

18 talking to a female bartender.

19     Q.     Did you go to the bar with anybody else?

20     A.     Yes.  When I first came, I was with somebody.  I

21 was with a female.

22     Q.     Who were you with?

23     A.     I was with a female, Ms. Williams.

24     Q.     Kate Williams?

25     A.     Yeah.

JAMES BENBOW

Page 67

```
 1      Q.      And you also said you were talking to a bartender
 2   when you were there?
 3      A.      Yeah.  After she left.
 4      Q.      What's the name of the bartender?
 5      A.      I forgot her name.  I ain't going to lie.
 6      Q.      On the night of the incident, did you sell
 7   Mr. Bradley anything?
 8      A.      No.
 9      Q.      On the night of the incident, did you give
10   Mr. Bradley a bag of any kind?
11      A.      Yes.  I think when I was leaving.
12      Q.      Why did you give him a bag?
13      A.      It was his bag.
14      Q.      Why did you have his bag?
15      A.      It was in my car.  He didn't have a car at the
16   end of the day.
17      Q.      So he had left a bag in your car?
18      A.      Yeah.
19      Q.      Why did he leave a bag in your car?
20      A.      I don't know.
21      Q.      Prior to the night of the incident, do you
22   remember when was Mr. Bradley in your car?
23      A.      Maybe like the day before or so.
24      Q.      Why was he in the car?
25      A.      Like I said, he's not a person that I hang out
```

JAMES BENBOW

Page 73

1    he just took off or he may have slid off with a girl.  I

2    can't remember that.  Do you know what I'm saying?  He may

3    have slid off with a girl.  I don't know.  I can't recall

4    that.

5        Q.     So where did you give him a ride?  From Atlantic

6    Avenue to where?

7        A.     I told you we started drinking and I can't recall

8    at the end of the day.  You're talking about five years

9    ago.

10       Q.     Where is Amarachi Prime located?

11       A.     On Nassau Street.  189 Bridge, I think.

12       Q.     So the corner of Bridge and Nassau?

13       A.     Yeah.

14       Q.     How far from your home is it?  How far from 177

15   Sands to Amarachi Prime?

16       A.     Two blocks.  About two blocks.  Two to three

17   blocks.

18       Q.     On the night of the incident, how did you get to

19   Amarachi Prime?

20       A.     I was in a car.

21       Q.     Was it your car?

22       A.     Nope.

23       Q.     Whose car was it?

24       A.     It was Ms. Williams.  I was driving.  Basically I

25   drive her car at the end of the day.  So she was letting me

JAMES BENBOW

Page 76

1    Amarachi Prime?

2        A.      No.  I was just eating.

3        Q.      Those two previous times, who did you hang out

4    with?

5        A.      It was like a female.  What female, I have no

6    idea.

7        Q.      Those two previous times, did you ever interact

8    with the owner of the bar?

9        A.      Besides getting introduced to him from my nephew,

10   then, you know, yeah.  As far as him saying like, "Uncle,

11   this is such and such and boom, boom, boom," that was it.

12       Q.      On any of those occasions, did you ever tell the

13   owner of the bar that you wanted to invest in the bar?

14       A.      I can't recall.

15       Q.      Those two previous times you'd been to Amarachi

16   Prime before the night of the incident, did you ever

17   interact with any of the security personnel at Amarachi

18   Prime?

19       A.      No.  Not that I can recall.

20       Q.      Are you familiar now with a person named Jason

21   Marshall?

22       A.      Yes.

23       Q.      When was the first time you interacted with him?

24       A.      On that night.

25       Q.      Can you describe his appearance?  What does he

JAMES BENBOW

Page 77

 1   look like?

 2       A.     I think he's like a short, light-skinned

 3   brown-skinned guy.

 4       Q.     He's short and he's African American?

 5       A.     Yes.  He's African American.

 6       Q.     Did he have any facial hair?

 7       A.     Not that I can recall.  I can't recall like that.

 8       Q.     What's his build?  Skinny?  Fat?  Medium?

 9   Something else?

10       A.     I guess he's medium.  I'd give him like

11   five-seven or five-eight.

12       Q.     On the night of the incident, what time did you

13   get to Amarachi Prime?

14       A.     I want to say approximately 7:00 or 8:00, yeah.

15       Q.     If I have video showing that you got there at

16   around 8:18 p.m., would that sound correct to you?

17       A.     If that's it, yeah.  I mean, I don't know.

18       Q.     What were you wearing that night?

19       A.     Black jacket, glasses, sweat suit.  I had a sweat

20   suit on.

21       Q.     What color was the sweat suit?

22       A.     Nike Tech sweat suit.

23       Q.     What color?

24       A.     Black.

25       Q.     Were you wearing anything on your head?

JAMES BENBOW

Page 78

1      A.      Yes.  A knit hat or whatever.  A skully.

2      Q.      Was it a knit hat or was it a du-rag or something

3   else?

4      A.      No.  It was a skully.  Like a skully or like a

5   knit hat.  I don't know what you would call it.  A skully.

6              MR. WEINER:  I want to show you an exhibit.

7              Okay?  This is going to be Exhibit 1.  All right?

8              The exhibit is Defendant 2384 and the exhibit is

9              going to be the video file numbered 08250400.

10             MR. ABOUSHI:  Josh, this is a video, right?

11             MR. WEINER:  Yes.

12             MR. ABOUSHI:  Are you going to play it on

13             your screen first?

14             MR. WEINER:  Yes.  Just bear with me.

15             MR. ABOUSHI:  No problem.

16             (Whereupon, a video was marked as

17             Defendants' Exhibit 1 for identification as of

18             this date by the Reporter.)

19             MR. WEINER:  Let's go off the record now.

20             (Whereupon, an off-the-record discussion was

21             held.)

22     Q.      Mr. Benbow, I'm going to start playing you

23   Exhibit 1 at 8:29:43 p.m.

24             Okay?

25     A.      Okay.

JAMES BENBOW

Page 99

1   guy once.  Like, that was it.

2       Q.    When was the first time that you met Jason

3   Marshall?

4       A.    I can't -- I don't know.  I can't recall.

5                  MR. ABOUSHI:  Objection.

6       Q.    Was it previous to March 7, 2015?

7       A.    No.  I don't know.  I don't think so.

8       Q.    Do you think you met him on the night of the

9   incident?

10      A.    I can't recall.

11      Q.    At a certain point the night of the incident, did

12  you leave Amarachi Prime?

13      A.    Yeah.

14      Q.    Did you leave with anybody?

15      A.    Yeah.  With Eric Bradley, I believe, yeah.

16      Q.    Do you have any understanding of where Eric

17  Bradley was going?

18      A.    No.

19      Q.    Did he ever tell you where he was going?

20      A.    Not that I can recall, no.

21      Q.    Did you and he decide to leave the bar together?

22      A.    Not that I recall.

23      Q.    What was the reason why you left the bar that

24  night?

25      A.    I was going home.

JAMES BENBOW

Page 100

 1              MR. WEINER:  I want to show you another

 2         video.  I think this will be the last video I

 3         show you.  Let's mark it Exhibit 5 and Exhibit 5

 4         is the video that's contained in Defendant 2381

 5         and it's the file that's entitled 100 Nassau

 6         Street.  I'll represent to you that this video

 7         was taken on the night of the incident.

 8              (Whereupon, a video was marked as

 9         Defendants' Exhibit 5 for identification as of

10         this date by the Reporter.)

11    Q.    I'll begin the video at 12:45 a.m.

12         Mr. Benbow, is 12:45 approximately the time that

13    you left Amarachi Prime the night of the incident?

14    A.    I can't recall.  I don't know.

15    Q.    I'm stopping the video at 12:45:32 a.m.

16         Now, Mr. Benbow, can you now see my screen?

17    A.    Yeah.

18    Q.    What street is depicted on my screen?

19    A.    I don't know.  It looks like Nassau.

20    Q.    Do you see yourself in this video?

21    A.    I see two shadows, two people.  I can't make it

22    out like that.

23    Q.    Is there a person to the right and a person to

24    the left?

25    A.    Yeah.

JAMES BENBOW

Page 101

1      Q.     Have you seen this video before?

2      A.     Not that I can recall, no.

3      Q.     I'm going to play it.

4             It's now stopped at 12:45:32 a.m. and I'm going

5      to play it and it's stopped at 12:45:34.

6             Do you see yourself on this video?

7      A.     No.  I just see two shadows.  I can't see

8      nothing.  You're not letting it play out so I can really

9      see.

10     Q.     I'll play the whole thing through for you.

11            Okay?

12     A.     Yeah.

13     Q.     I'm now stopped at 12:45:45.

14            Did you recognize yourself in the portion of the

15     video that I played?

16     A.     Yeah.  I remember me running.  I remember that

17     situation happening.

18     Q.     So let me go back to where the video started.

19     Just a second.  I'm going to get the video back to

20     12:45:30.

21     A.     Can you play it one more time again?

22     Q.     You want me to play it the whole way through?

23     A.     Yes.

24     Q.     Okay.  I'm happy too.

25            I stopped it at 12:45:29 and now I'm going to hit

JAMES BENBOW

Page 102

```
 1   play.
 2           I've hit pause at 12:45:48.  I'm going to go back
 3   to 12:45:30 and stop it then.
 4           I've stopped at 12:45:31.
 5           Mr. Benbow, having viewed this video, now do you
 6   recall if you are now depicted on the screen that's paused
 7   at 12:45:31?
 8   A.      Yes.
 9   Q.      Where are you depicted in this video?
10   A.      To the right.
11   Q.      Was it fair to say that you're walking alongside
12   somebody on the sidewalk of Nassau Street?
13   A.      Yes.
14   Q.      And you're to the right of that person?
15   A.      Correct.
16   Q.      From your own recollection, what happened when
17   you left -- well, when you left Amarachi Prime, what street
18   did you exit on?
19   A.      I think it was Bridge Street and then I made a
20   right turn on Nassau, which is that street right there.
21   Q.      When you left the bar, did you go right or left
22   on Bridge Street?
23   A.      Right.
24   Q.      And then when you got to Nassau from Bridge, did
25   you go right or left on Nassau?
```

JAMES BENBOW

Page 103

```
 1      A.      Right.

 2      Q.      And what happened -- just take me back through

 3   your own memory what happened next.

 4      A.      I was walking down the street and I was just

 5   talking to Bradley and then when I looked to the left of me

 6   I see like guns like was out the window so --

 7      Q.      Mr. Benbow, you cut out there.  I lost you at

 8   "the left of me."  I have to ask you a question again.  I'm

 9   sorry.  The Internet on your end paused.

10           Can you just go back from when you turned onto

11   Nassau Street what happened?

12      A.      When I turned onto Nassau Street, I'm walking

13   down Nassau Street and I look to the left of me.  At first

14   I was just looking straight.  I didn't even notice the car

15   creeping behind me.  When I looked to the left of me, I

16   seen guns out the window so I tapped Eric Bradley like,

17   "Yo, run," and I turned around and I started running and

18   that was that and then I got shot in my back at the end of

19   the day.  I mean, the people that exited the car nobody

20   said nothing.  I didn't know who they were at that point in

21   time.  There were no police lights.  There wasn't no

22   "whoop, whoop" or none of that to make me realize who they

23   were.

24      Q.      Let me break that down.

25           When you were walking along Nassau Street, do you
```

JAMES BENBOW

Page 104

1    know what direction you were walking?  Was it east or west?

2        A.    I don't know.

3        Q.    For the record, I believe it's east, but when you

4    were walking on Nassau Street you said you saw a car?

5        A.    Yeah.

6        Q.    And which way was the car traveling?

7        A.    The opposite direction.

8        Q.    So the opposite direction from where you were

9    walking?

10       A.    Yes.

11       Q.    And then you said you saw guns pointed outside of

12   the car?

13       A.    Yeah.  When I looked to the left in the street to

14   see what was going on, I seen guns and that's when I tapped

15   Eric Bradley and I turned around and I ran and I was shot

16   like three times.

17       Q.    Did you hear anybody in the car say anything to

18   you?

19       A.    No.

20       Q.    Did you hear anybody in the car say anything at

21   all?

22       A.    No.  They just hopped out.

23       Q.    So nobody said "stop," "freeze," or anything like

24   that?

25       A.    No.  No hit the sirens or nothing.

JAMES BENBOW

Page 105

1    Q.    Did anybody say "freeze"?

2    A.    No.

3              MR. ABOUSHI:  Objection.  Asked and

4         answered.

5    Q.    Did anybody say "stop"?

6    A.    No.

7    Q.    Did anybody say "police"?

8    A.    No.

9    Q.    So you said at that point you turned around and

10   ran the other direction?

11   A.    Yes.

12   Q.    So you ran the opposite on Nassau Street.

13         At that point after you ran opposite -- the

14   opposite direction, did you make any turns at all?

15   A.    No.  Not that I can recall.  I think I ran

16   straight.  I think I ran between cars it looked like.

17   Q.    So you ran the opposite direction on Nassau

18   Street and then you made a turn into the street?

19   A.    Yes.

20   Q.    So the opposite direction -- so did you turn into

21   the street to your right or to your left?

22   A.    That was to my -- when I'm running back, it's

23   going to be towards my right.

24   Q.    And did you make -- was it like a 90-degree turn

25   or did you turn on an angle?

JAMES BENBOW

Page 106

1    A.    I don't know.

2         MR. ABOUSHI:  Objection to the form.  An

3         angle is a 90-degree shape.

4         MR. WEINER:  That's a good point.

5    Q.    Do you remember what angle you turned onto the

6    street if it was a 90-degree angle or some other angle?

7    A.    No.  It was, I guess, 90.

8    Q.    So you think it was a 90-degree turn that you

9    made?

10    A.    Uh-huh.

11    Q.    Is that yes?

12    A.    Yeah.

13    Q.    At any point when you were running the opposite

14    direction on Nassau Street, did you reach into your

15    waistband?

16    A.    No.

17    Q.    You did not reach into your waistband?

18    A.    No.

19    Q.    I'm going to play the video beginning at

20    12:45:31.

21         I stopped at 12:45:38.

22         In this video on the screen on your computer now,

23    are you turning around running the opposite direction on

24    Nassau?

25    A.    Correct.

JAMES BENBOW

Page 107

```
 1      Q.     I'm going to play the video now from 12:45:38.

 2             I stopped it at 12:45:40.

 3             Does the screen depict you reaching into your

 4   waistband?

 5      A.     No.

 6      Q.     I'm going to play those two seconds one more time

 7   and you can tell me whether you see yourself reaching into

 8   your waistband.

 9                  MR. ABOUSHI:  Objection.  Asked and

10             answered.

11                  MR. WEINER:  I'm going to play more of the

12             video and see if he can tell.

13      Q.     I stopped the video at 12:45:32 and I'm going to

14   play it.

15             I've stopped it at 12:45:41.

16             In the video, did you see yourself reach into

17   your waistband?

18      A.     No.

19      Q.     Did you see yourself take out a gun in the video?

20      A.     No.

21      Q.     Does the portion of the video I just played

22   refresh your recollection as to whether you made a

23   90-degree turn into the street?

24      A.     I guess so, yeah.

25      Q.     You believe that the video shows you making a
```

JAMES BENBOW

Page 108

1    90-degree turn?

2              MR. ABOUSHI:  Objection.  You can answer if

3              you can.  The question seems a little convoluted.

4              I'll let the witness answer, but I would just

5              request you rephrase if you can.

6    A.    I made a turn -- a right turn into the street.

7    Like, I mean --

8    Q.    So you turned right into the street?

9    A.    Yes.

10   Q.    After you turned right into the street -- after

11   you got into the street, what is the next thing that

12   happened?

13   A.    I remember me running and then I just collapsed.

14   I heard gunshots and I collapsed.  I fell straight to the

15   floor.  I slid on the floor.

16   Q.    How many gunshots?

17   A.    I would say like seven or eight it sounded like.

18   I mean, I was running for my life.  I heard gunshots.  I

19   can't recall like how many gunshots, but I know it was a

20   lot.  It was a lot.  They were rapid so next thing you know

21   I was on the floor.

22   Q.    Did you see any gun flash?  Did you see a flash

23   of any gun?

24   A.    No.  Uh-uh.  I just heard them.  Like I heard --

25   I think it was like one shot like whizzed by my head.  It

JAMES BENBOW

Page 111

1      A.      I can't testify to that.  I don't know.  I know

2   that it happened rapidly.  It was like going off.

3      Q.      So it happened within seconds?

4      A.      I wouldn't say that, but it was -- because you

5   have to realize it was -- like I said, I heard at least

6   about seven or eight shots.  I only got hit three times --

7   twice in my lower back and once in my arm -- my left arm,

8   you know.

9      Q.      So how long was it between the first and last

10  shots?

11     A.      I can't really recall.  Seconds.

12     Q.      Was it less than ten seconds?

13     A.      I can't say it's less than ten seconds or more.

14     Q.      I'm going to play the video.  All right?

15             Okay.  I just played until 12:45:46.

16             At this point in the video, are you down on the

17  ground?

18     A.      I don't know because I'm not in the video, but

19  you can see that there's officers pointing guns towards the

20  direction that I ran.  I see two of them in the street

21  right there pointing guns.  If you play back, you can see.

22  It's two of them aiming.  It looks like they were aiming.

23             MR. WEINER:  I'm going to stop sharing my

24        screen for a second.  Bear with me.  I'm going to

25        share my screen again and we are going to go to

JAMES BENBOW

Page 128

1    that you were being strongly observed by an individual who

2    was later revealed to be a police officer?  Did you see any

3    part about that?

4         A.    No.

5         Q.    I want to go to the end of the first page.  Just

6    start over here with the word "on."

7         A.    Yeah.  I see it.

8         Q.    Now, do you see anything in the complaint report

9    about you mentioning being strongly observed by an

10   individual who was revealed to be a police officer?

11        A.    That's what it says, yes.  It says later on found

12   out that it was a police officer.

13        Q.    Does this help refresh your recollection about

14   any interactions you had inside of Amarachi Prime on the

15   night of the incident?

16        A.    Yeah.  After reading paperwork, yeah.

17        Q.    What do you remember now?

18        A.    I remember being approached by somebody.

19        Q.    Who approached you?

20        A.    I think Jason Marshall, yeah.

21        Q.    When Jason Marshall approached you, what

22   happened?

23        A.    He approached me about a female bartender.

24        Q.    What do you mean he approached you about a female

25   bartender?

JAMES BENBOW

Page 129

1       A.      He approached me about a female bartender telling

2   me that I can't be talking to her or, like, fraternizing

3   with her.

4       Q.      Do you remember when?  Was this -- how long

5   before you left was this interaction with him?

6       A.      I can't recall.

7       Q.      Did he say why he didn't want you to interact

8   with the female bartender?

9       A.      No.  Uh-uh.

10      Q.      Did you say anything to him?

11      A.      No.

12      Q.      Did you make any physical contact with him?

13      A.      Not that I can recall, no.

14      Q.      Did he make any physical contact with you?

15      A.      Not that I can recall, no.

16      Q.      What else do you remember about your interaction

17  with Jason Marshall?

18              MR. ABOUSHI:  Objection.

19      A.      Not that much.  It was just a quick encounter

20  about a female and that was just that.  After that it

21  was -- you know, I was probably in there for maybe

22  approximately an hour or two.

23      Q.      When Jason Marshall told you not to interact with

24  the female bartender, you didn't say anything to him?

25      A.      What am I saying to him?

JAMES BENBOW

```
                                                        Page 172

 1            going to go to page 6.

 2                 (Whereupon, notice of claim documents were

 3            marked as Defendants' Exhibit 11 for

 4            identification as of this date by the Reporter.)

 5    Q.      Mr. Benbow, do you see what's on the screen as

 6  page 6?

 7    A.      Uh-huh.

 8    Q.      Do you see it says at the top of the screen

 9  "notice of 50-h hearing"?

10    A.      Yeah.

11    Q.      This document is dated 6/23/2015.

12            Do you see that?

13    A.      Uh-huh.

14    Q.      Is that yes?

15    A.      Yes.

16                 MR. ABOUSHI:  Can you scroll down a little?

17                 MR. WEINER:  Absolutely.

18    Q.      This letter says your name on it, correct?

19    A.      Yes.

20    Q.      And it says specifically:  Claimant name James

21  Benbow."  Do you see where it says that in the middle top

22  of it?

23    A.      Yes.

24    Q.      Can you read -- underneath where it says "dear

25  sir/madam," can you read that paragraph?
```

JAMES BENBOW

Page 173

1    A.      "Please take notice that, pursuant to Section

2    50-h of the general municipal law, claimant is mandated by

3    law to appear at the following location, at the date and

4    time specified below, to be orally examined under oath

5    relative to the occurrence and extent of injuries for which

6    the above claim is made."

7    Q.      And what does it say underneath there?

8    A.      8/27/2015 at 12:00 p.m.

9    Q.      Who is this letter addressed to?

10            MR. ABOUSHI:  Just note my objection to this

11            document.

12    A.      It's addressed to Kenneth Montgomery.

13    Q.      Who is Kenneth Montgomery?

14    A.      He was my lawyer at the time.

15    Q.      Did he ever inform you that you had a notice of

16    hearing scheduled for August 27, 2015?

17    A.      No.  I was in jail.

18            MR. WEINER:  No further questions.

19            MR. ABOUSHI:  Mr. Benbow, just a few

20            follow-up questions.

21    EXAMINATION BY

22    MR. ABOUSHI:

23    Q.      Did the city ever send you this notice?

24    A.      No.

25    Q.      Did the city ever attempt to schedule your 50-h