

2017-0867
SF-J. we  w

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - x
JAMES BENBOW,

                            Plaintiff,

         -against-    Civ. No.: 17-CV-6457(EK)(LB)

CITY OF NEW YORK; POLICE OFFICER BRIAN W.
FEELEY; POLICE OFFICER MATTHEW J. ROSIELLO;
POLICE OFFICER KENNETH L. ANDERSON; SERGEANT
WILLIAM A. DAIB; POLICE OFFICER SHANIEL J.
MITCHELL; and POLICE OFFICER STEPHEN J. MINUCCI,

                            Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - x

                        VIDEOCONFERENCE VIA ZOOM
                        Conducted by:
                        LEX REPORTING SERVICE
                        160 Broadway
                        New York, New York

                        November 19, 2020
                        2:05 p.m.

        **DEPOSITION** of **DETECTIVE RUBEN CESPEDES**, a Non-Party Witness in the above-entitled action, held remotely via Zoom videoconference, pursuant to Order, taken before Tania C. Pedrosa, a shorthand reporter and Notary Public within and for the State of New York.



LEX#160688-B

LEX REPORTING SERVICE, INC.
PROFESSIONAL REPORTING SINCE 1980
TOLL FREE 800.608.6085

```
 1                                                                    2
 2        A p p e a r a n c e s:
 3
 4            THE ABOUSHI LAW FIRM, PLLC
                 Attorneys for Plaintiff
 5               1441 Broadway, Fifth Floor
                 New York, New York 10018
 6          BY:  AYMEN A. ABOUSHI, ESQ.
 7
 8            JAMES E. JOHNSON, ESQ.
                 Corporation Counsel
 9               Attorney for Defendants
                 100 Church Street
10               New York, New York 10007
            BY:  JOSHUA A. WEINER, ESQ.
11               FILE No.:  2017-066702
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
                                                        3

                    S T I P U L A T I O N S


            IT IS HEREBY STIPULATED AND AGREED
       by and between the attorneys for the
       respective parties herein, that filing,
       sealing and certification be and the
       same are hereby waived.


            IT IS FURTHER STIPULATED AND AGREED
       that all objections, except as to the
       form of the question shall be reserved
       to the time of the trial.


            IT IS FURTHER STIPULATED AND AGREED
       that the within deposition may be signed
       and sworn to before any officer
       authorized to administer an oath, with
       the same force and effect as if signed
       and sworn to before the Court.
```

```
 1                                                    4
 2              THE REPORTER:  This
 3     deposition is being conducted via
 4     Zoom videoconferencing.  All
 5     parties present are appearing
 6     remotely and are confirming that
 7     they can hear and see through the
 8     video without any technical
 9     issues.
10              Would counsel and the
11     witness please confirm.
12              THE WITNESS:  Yes.
13              MR. WEINER:  Confirmed.
14              MR. ABOUSHI:  We can confirm
15     for now given what happened
16     earlier.  It might be touch and
17     go.
18              THE REPORTER:  Before I
19     swear in the witness, I will ask
20     counsel to stipulate on the
21     record that due to the national
22     emergency pandemic, the court
23     reporter may swear in the
24     deponent even though they are not
25     in the physical presence of the
```

```
                                                           5
          deponent, and that there is no
          objection to that at this time,
          nor will there be an objection to
          it at a future date.
                  MR. WEINER:  Confirmed.
                  MR. ABOUSHI:  Yes, agreed.
                  THE REPORTER:  And, Counsel,
          can you represent that to the
          best of your knowledge and
          belief, the witness appearing
          today via videoconference is
          indeed Officer Cespedes?
                  MR. WEINER:  Yeah.
          Detective Ruben Cespedes is the
          -- is the witness today to the
          best of my knowledge.
  R U B E N    C E S P E D E S, the witness
          herein via videoconference, having
          first been duly sworn by a Notary
          Public of the State of New York, was
          examined and testified as follows:
EXAMINATION BY
MR. ABOUSHI:
          Q     State your name for the record,
```

```
1                    R. Cespedes                    52
2   first spoke to them in regards --
3        Q    Okay.
4        A    -- to the initial...
5        Q    Okay.  Were you working on the
6   night of the incident?
7        A    I was actually leaving work.
8        Q    Okay.  And what was your tour of
9   duty that day?
10       A    I don't remember, sir.
11       Q    Okay.  Did you have a regular
12  tour of duty when you were a FIO?
13       A    You -- yeah.  You kind of went
14  back and forth depending on what you were
15  doing.  So some days you worked late and some
16  days you did -- some days you did 11:00 to
17  7:00, some days 12:00 to 8:00.  It depended
18  on the day -- what you were doing that day.
19       Q    And you testified that that -- on
20  that day you were leaving work?
21       A    Yes.
22       Q    Okay.  And what happened when you
23  were leaving work?
24       A    I received a phone call from a
25  particular person by the name of Jason
```

```
1                    R. Cespedes                    53
2    Marshall.
3         Q    And how did you know Jason
4    Marshall?
5         A    I knew him from the precinct.  He
6    was -- at the time he was an auxiliary at the
7    precinct.
8         Q    Okay.  And did you give him your
9    phone number?
10        A    Yeah.  I know him.  I know him,
11   yeah.
12        Q    How do you know him?
13        A    Because I said he was an
14   auxiliary at the time here and, like I said,
15   I know him from just a regular conversation,
16   you know.
17        Q    So you know him from work or you
18   know him from outside of work or something
19   else?
20        A    Kind of both things.  Because,
21   like I said, I was an auxiliary myself so --
22   prior to becoming a police officer so, yeah,
23   I -- I -- you know, I -- I would say I know
24   him.
25        Q    Okay.  And did you hang out with
```

```
1                R. Cespedes                    90
2    like, whether I took it and put it into my
3    phone or he sent it to me or I sent it to
4    him, I don't --
5         Q    Prior to the night that
6    Mr. Benbow was shot, did you communicate with
7    Mr. Marshall over the phone or through text
8    messages?
9              MR. WEINER: Objection.
10        A    I don't recall.
11        Q    So he calls you as you're leaving
12   work, correct? That's your testimony?
13        A    Yes.
14        Q    And what does he say? Do you
15   remember?
16        A    He said he was -- that a guy
17   tried to get into the club that he was
18   working at with a gun and he turned him away
19   or something like that.
20        Q    Okay. Did he say anything else?
21        A    That's as much as I could
22   remember right now.
23        Q    What, if anything, happened after
24   that conversation? What did you do?
25        A    Say again.
```

```
1                    R. Cespedes                      91
2     Q    What did you do after that
3  conversation?  Was that it?  I mean, he said
4  someone tried to get in the club with a gun
5  and turned them away.  He hung up?  Is that
6  what happened?
7     A    I told him I'll call him back.
8     Q    Okay.  What did you do next?
9     A    I called my boss, Sergeant Jones.
10    Q    And what did you tell him?
11    A    I told him basically what it was,
12 you know, what Jason told me.  And he told me
13 to reach out to Sergeant Diab.
14    Q    Did you do that?
15    A    For some reason I wasn't able to
16 get in contact with Sergeant Diab but I spoke
17 to Mitchell who was on Diab's team and
18 basically Mitchell was with Diab.
19    Q    How did you get ahold of
20 Mitchell?
21    A    I called Mitchell.
22    Q    How did you get his number?
23    A    I've had -- I have Mitchell's
24 number.  I was a FIO.
25    Q    Just within the context of your
```

```
                        R. Cespedes                       92
```

```
 2   duty as the FIO?
 3        A    Yeah.  You have the guys that
 4   work anti-crime who deals with these -- you
 5   have their numbers.
 6        Q    Okay.  And so you called Mitchell
 7   and told him what?
 8        A    I don't remember exactly my words
 9   to Mitchell but I do remember telling him,
10   "Do you mind if I gave your number to Jason?"
11        Q    And what did he say?
12        A    He says okay.
13        Q    All right.  And what did you do
14   after your phone call with Mitchell?
15        A    I -- I sent Jason Mitchell's
16   number to call him.
17        Q    Okay.
18        A    Either I sent it -- I don't
19   remember if I sent it via text message or I
20   called Jason and told him.  But either way, I
21   relayed the message to Jason to get in
22   contact with Mitchell.
23        Q    And were you using a work-issued
24   phone?
25        A    No.  My personal phone.
```