# EXHIBIT 2

Page 1

1   UNITED STATES DISTRICT COURT

    EASTERN DISTRICT OF NEW YORK

2   ----------------------------------------------------X

    JAMES BENBOW,

3

                                    PLAINTIFF,

4

5           -against-            Case No.:

                                 17-CV-6457

6

7   CITY OF NEW YORK; POLICE OFFICER BRIAN W. FEELY; POLICE

    OFFICER MATTHEW J. ROSIELLO; POLICE OFFICER KENNETH L.

8   ANDERSON; SERGEANT WILLIAM A. DAIB; POLICE OFFICER

    SHANIEL J. MITCHELL; and POLICE OFFICER STEPHEN J. MINUCCI,

9

                                    DEFENDANTS.

10  ----------------------------------------------------X

11

12                      DATE:  September 17, 2020

13                      TIME:  10:02 A.M.

14

15

16              DEPOSITION of the Plaintiff, JAMES BENBOW,

17  taken by the Defendant, pursuant to a Court Order and to

18  the Federal Rules of Civil Procedure, held via Zoom

19  videoconference, before Caitlin M. Zakik, a Notary Public

20  of the State of New York.

21

22

23

24

25

JAMES BENBOW

Page 55

```
 1              give me like two minutes to pull up the court's
 2              order on the docket real quick?
 3                   MR. WEINER:  You can do that.  Go ahead.
 4              I'll tell you what it says.  It says that --
 5              actually, you know what?  You pull it up and we
 6              can look at it together.
 7                   Off the record.
 8                   (Whereupon, an off-the-record discussion was
 9              held.)
10                   MR. ABOUSHI:  Subject to our conversation
11              amongst counsel regarding the firearm and subject
12              to the reservation of rights and our objection,
13              which we're not waiving, I will maintain those
14              objections and reservations of rights regarding
15              this line of questioning and that's what I want
16              to make a record of.
17         Q.    Did you ever plead guilty to having a gun on the
18    night of the incident?
19         A.    Yes.  But I didn't have a gun though, but I did
20    plead guilty, yes.
21         Q.    Your testimony is that you pled guilty even
22    though you didn't have a gun?
23         A.    Yes.
24         Q.    Can you tell me why?
25         A.    Basically I was coerced.  I mean, if you look at
```

Page 56

1    the paperwork on how they did me when I went to my

2    pretrial, I mean, it will be pretty obvious on how they

3    just, you know, told me they were going to give me all this

4    time if I didn't take this plea and that if I take this

5    plea that I will walk right out of the courtroom.  I don't

6    have to worry about parole.  I don't have to worry about,

7    you know, doing 15 years in a prison and stuff like that

8    even though I didn't have a gun and, you know, I told my

9    lawyer this.

10                MR. ABOUSHI:  Just objection in terms of

11                whatever he told his lawyer.  It's protected by

12                the privilege, but please proceed with your

13                answer.

14    Q.    Mr. Benbow, don't tell me anything that you told

15    your lawyer, but you can explain to me why it was that you

16    pled guilty.

17    A.    Okay.  I wanted to go home.  At that time I think

18    I had gave the system my four years.  They were offering me

19    a one and a half to three.  If I blew trial, they were

20    threatening me with giving me 15 years in prison.  And my

21    family and everybody was like, "Yo, just, you know, just

22    come home," you know, and they brought the parole in there.

23    You know, because as you know that I'm currently on parole

24    for the situation that happened.

25                So regardless of what would have happened to me

JAMES BENBOW

Page 57

1    if I took that plea, parole still would have been able to

2    give me more time and my expiration date on that is like

3    forever.  So what they did was they brought parole and

4    everybody in there and offered me this sweet deal not to,

5    you know, go all the way to trial, which I wanted to do.

6           I mean, the gun didn't have no fingerprints, no

7    DNA on this gun, but they're saying I had a gun.  How did I

8    have a gun in my hand if there's no fingerprints or DNA?  I

9    wanted to go to trial, but being threatened with that much

10   time and being coerced by the judge on this plea deal I

11   think anybody in that type of situation whether or not

12   guilty would have took that, you know.

13          And I got an appeal on the situation now because

14   of that because of the things that happened to me up until

15   trial and this was like my pretrial, you know.  So I went

16   all the way to my pretrial and after my pretrial they

17   offered me a better deal than before the pretrial.  You

18   know, for that reason, I don't know.  That's something --

19   you know, maybe because they know that I didn't have a gun.

20   Q.    So is it your testimony that you were coerced

21   into pleading guilty to having the gun by the judge?

22   A.    Yes.  I was coerced.  I was coerced by the

23   lawyer.  I filed ineffective assistance with counsel and

24   all of that, yes.

25   Q.    What was the name of the lawyer?

JAMES BENBOW

                                                              **Page 91**

```
 1      A.      No.  I wasn't drunk.

 2      Q.      I want to just be clear.

 3              You have no recollection of interacting with

 4   Jason Marshall on the night of the incident?

 5                   MR. ABOUSHI:  Objection.  Asked and answered

 6              like four times now.

 7                   MR. WEINER:  Well, it's kind of

 8              surprising -- it's very surprising testimony so I

 9              just need to be clear.

10                   MR. ABOUSHI:  You can be as surprised as you

11              want.  He doesn't have to answer the question

12              four times.

13                   MR. WEINER:  I'm sorry.  I'm going to ask

14              him one more time.

15      Q.      On the night of the incident -- do you have a

16   recollection on the night of the incident of interacting

17   with Jason Marshall?

18      A.      No.  Not that I can recall, no.

19      Q.      Do you have a recollection from the night of the

20   incident of interacting with any security personnel at

21   Amarachi Prime?

22      A.      No.

23      Q.      You have no recollection?

24      A.      No.

25      Q.      Do you have any recollection of interacting with
```

JAMES BENBOW

Page 103

1     A.     Right.

2     Q.     And what happened -- just take me back through

3     your own memory what happened next.

4     A.     I was walking down the street and I was just

5     talking to Bradley and then when I looked to the left of me

6     I see like guns like was out the window so --

7     Q.     Mr. Benbow, you cut out there.  I lost you at

8     "the left of me."  I have to ask you a question again.  I'm

9     sorry.  The Internet on your end paused.

10           Can you just go back from when you turned onto

11    Nassau Street what happened?

12    A.     When I turned onto Nassau Street, I'm walking

13    down Nassau Street and I look to the left of me.  At first

14    I was just looking straight.  I didn't even notice the car

15    creeping behind me.  When I looked to the left of me, I

16    seen guns out the window so I tapped Eric Bradley like,

17    "Yo, run," and I turned around and I started running and

18    that was that and then I got shot in my back at the end of

19    the day.  I mean, the people that exited the car nobody

20    said nothing.  I didn't know who they were at that point in

21    time.  There were no police lights.  There wasn't no

22    "whoop, whoop" or none of that to make me realize who they

23    were.

24    Q.     Let me break that down.

25           When you were walking along Nassau Street, do you

JAMES BENBOW

Page 104

1    know what direction you were walking?  Was it east or west?

2        A.      I don't know.

3        Q.      For the record, I believe it's east, but when you

4    were walking on Nassau Street you said you saw a car?

5        A.      Yeah.

6        Q.      And which way was the car traveling?

7        A.      The opposite direction.

8        Q.      So the opposite direction from where you were

9    walking?

10       A.      Yes.

11       Q.      And then you said you saw guns pointed outside of

12   the car?

13       A.      Yeah.  When I looked to the left in the street to

14   see what was going on, I seen guns and that's when I tapped

15   Eric Bradley and I turned around and I ran and I was shot

16   like three times.

17       Q.      Did you hear anybody in the car say anything to

18   you?

19       A.      No.

20       Q.      Did you hear anybody in the car say anything at

21   all?

22       A.      No.  They just hopped out.

23       Q.      So nobody said "stop," "freeze," or anything like

24   that?

25       A.      No.  No hit the sirens or nothing.

JAMES BENBOW

Page 105

1    Q.    Did anybody say "freeze"?

2    A.    No.

3              MR. ABOUSHI:  Objection.  Asked and

4          answered.

5    Q.    Did anybody say "stop"?

6    A.    No.

7    Q.    Did anybody say "police"?

8    A.    No.

9    Q.    So you said at that point you turned around and

10   ran the other direction?

11   A.    Yes.

12   Q.    So you ran the opposite on Nassau Street.

13             At that point after you ran opposite -- the

14   opposite direction, did you make any turns at all?

15   A.    No.  Not that I can recall.  I think I ran

16   straight.  I think I ran between cars it looked like.

17   Q.    So you ran the opposite direction on Nassau

18   Street and then you made a turn into the street?

19   A.    Yes.

20   Q.    So the opposite direction -- so did you turn into

21   the street to your right or to your left?

22   A.    That was to my -- when I'm running back, it's

23   going to be towards my right.

24   Q.    And did you make -- was it like a 90-degree turn

25   or did you turn on an angle?

JAMES BENBOW

Page 106

1      A.      I don't know.

2              MR. ABOUSHI:  Objection to the form.  An

3          angle is a 90-degree shape.

4              MR. WEINER:  That's a good point.

5      Q.      Do you remember what angle you turned onto the

6      street if it was a 90-degree angle or some other angle?

7      A.      No.  It was, I guess, 90.

8      Q.      So you think it was a 90-degree turn that you

9      made?

10     A.      Uh-huh.

11     Q.      Is that yes?

12     A.      Yeah.

13     Q.      At any point when you were running the opposite

14     direction on Nassau Street, did you reach into your

15     waistband?

16     A.      No.

17     Q.      You did not reach into your waistband?

18     A.      No.

19     Q.      I'm going to play the video beginning at

20     12:45:31.

21              I stopped at 12:45:38.

22              In this video on the screen on your computer now,

23     are you turning around running the opposite direction on

24     Nassau?

25     A.      Correct.

JAMES BENBOW

1      Q.      I'm going to play the video now from 12:45:38.

2              I stopped it at 12:45:40.

3              Does the screen depict you reaching into your

4      waistband?

5      A.      No.

6      Q.      I'm going to play those two seconds one more time

7      and you can tell me whether you see yourself reaching into

8      your waistband.

9              MR. ABOUSHI:   Objection.  Asked and

10             answered.

11             MR. WEINER:   I'm going to play more of the

12             video and see if he can tell.

13     Q.      I stopped the video at 12:45:32 and I'm going to

14     play it.

15             I've stopped it at 12:45:41.

16             In the video, did you see yourself reach into

17     your waistband?

18     A.      No.

19     Q.      Did you see yourself take out a gun in the video?

20     A.      No.

21     Q.      Does the portion of the video I just played

22     refresh your recollection as to whether you made a

23     90-degree turn into the street?

24     A.      I guess so, yeah.

25     Q.      You believe that the video shows you making a

JAMES BENBOW

Page 109

1    went right by.  I heard it.  And then the next one I think

2    I had felt it on my arm and then I just collapsed after

3    that.  I guess that's when I got shot in my lower part of

4    my back.  My legs gave out on me.

5                    MR. ABOUSHI:  Don't guess.  Just testify to

6            what you know.

7        Q.    So you felt gunshots in your arm and your back?

8        A.    Because I was running.  When I was running, I

9    felt a burning and then right after that I got hit in my

10   lower part of my back and it made me collapse.  I got shot

11   twice in my lower part and then collapsed.

12       Q.    Let me just get the order.

13             So first you said you felt a gunshot whiz by you?

14       A.    Yeah.  I heard it whiz by and then the next one I

15   just felt like a burning on my arm and then after that I

16   dropped because I got shot in the lower part of my back.

17       Q.    Where did you feel the first gunshot whiz by you?

18       A.    That was like -- I think it probably more than

19   likely it was the first shot that whizzed by my head.

20       Q.    Do you remember what side of your head it was by?

21       A.    I think the left side.

22       Q.    And the second shot, you said it hit you in your

23   arm?

24       A.    Yes.

25       Q.    Which arm did it hit you in?

JAMES BENBOW

Page 110

1      A.      My left.

2      Q.      And then you said after that you felt a gunshot

3   in your back?

4      A.      Yeah.  I collapsed.  That one, it just knocked me

5   right to the floor.

6      Q.      Do you remember what side of your back you felt

7   the gunshot in?

8      A.      No.  Well, both sides.

9      Q.      So you felt the gunshots in both sides of your

10  back?

11     A.      Yeah.  When I'm laying on the floor, I felt both

12  of them.

13     Q.      Do you remember which side of your back you were

14  hit first?

15     A.      No, I can't.  All I know I was hit in my lower

16  back.  I don't know which was the first shot to my lower

17  back that dropped me.  All I just know that I was dropped

18  by that lower back shot.  I don't know which one at the end

19  of the day.  I can't testify to that.

20     Q.      Between the first gunshot you felt whiz by your

21  head until when you were hit -- the last gunshots when you

22  were hit, you say, in your back, how much time was there

23  between those two events?

24     A.      I would say not that much.  Not that much time.

25     Q.      Was it less than five seconds?

JAMES BENBOW

Page 117

1    straight line or if you ran across Nassau on any angle?

2       A.    I would say straight line just assuming purpose.

3       Q.    Not for assuming purpose.  I'm asking what your

4    recollection is.

5             Did you run on a straight line or did you run at

6    an angle or do you not remember?

7       A.    I ran at, I guess, an angle because I cut in

8    between cars.

9       Q.    Were you angled to the left or running on an

10   angle to the right?

11      A.    In the middle.

12      Q.    My question is did you run straight across the

13   street or did you run across the street on an angle?

14            MR. ABOUSHI:  Objection.  Asked and

15            answered.

16            MR. WEINER:  He hasn't answered the

17            question.

18      A.    I just told you I was in the middle in between

19   two cars.  Judging where the two cars are at and I'm

20   between it, yes, I ran in the middle.

21      Q.    So were you running straight across the street?

22            That's what I'm trying to get at.

23      A.    Yeah.  At an angle though.  You're confusing me

24   because this picture right here -- I cut in between the

25   cars at the end of the day.  At some point, yes, it is at

JAMES BENBOW

Page 119

1    purpose of you asking this question.  I ran in between two

2    cars.  I ran in the street and I was shot in my lower back.

3    That's not for me to, you know, try to figure out like was

4    I more to the right or to the left.  Like, I don't get it.

5        Q.     That's my question.

6               Do you remember if you were running straight

7    across the street or sort of -- or diagonal across the

8    street?

9        A.     For the third time, I ran in between two cars and

10   I was shot in my lower back.

11               MR. WEINER:  That's not responsive.

12               MR. ABOUSHI:  It is responsive.

13               MR. WEINER:  He either remembers or he

14               doesn't whether he was running straight across

15               the street or on a diagonal and I'm asking what

16               is the answer.

17               MR. ABOUSHI:  Well, he testified he

18               remembers what happened.  He testified to what

19               happened and you are trying to explain your

20               question and the problem is your question.

21               You're telling him at an angle and you're telling

22               him straight.  He told you what he did.  The fact

23               that he didn't use your words or give you a

24               response that you like doesn't mean he's not

25               responsive.

JAMES BENBOW

Page 120

1              MR. WEINER:  Let's try this one more time.

2      Q.     When you cut across Nassau Street, were you

3    running straight across the street from north to south or

4    were you running at a diagonal?

5              MR. ABOUSHI:  Objection.

6      A.     I ran in between two cars and I was shot, once

7    again, in my lower back.

8      Q.     As to my question, what is the answer?

9              MR. ABOUSHI:  That is his answer.

10     A.     That is my answer, Mr. Weinstein [sic].

11             MR. WEINER:  Off the record.

12             (Whereupon, an off-the-record discussion was

13             held.)

14             MR. WEINER:  Back on the record.

15             The next exhibit is going to be Exhibit 7.

16             I'm going to share my screen.  The next exhibit

17             is Exhibit 7 and it's been produced to plaintiff

18             as Defendant 1265.

19             (Whereupon, a NYPD crime scene unit report

20             was marked as Defendants' Exhibit 7 for

21             identification as of this date by the Reporter.)

22     Q.     Mr. Benbow, do you see the Exhibit 7 up on the

23    screen?

24     A.     Yes.

25     Q.     I'll represent to you that this is a crime scene

JAMES BENBOW

Page 122

1       Q.      Mr. Benbow, we're looking at Exhibit 7.

2               Okay?

3       A.      Yes.

4       Q.      Do you see the second figure to the right?

5       A.      Yes.

6       Q.      On the second figure to the right, do you see

7   that there's an "X" on the inner arm of the animated

8   picture?  Do you see that?

9       A.      Yes.

10      Q.      Does that accurately represent where you were

11  shot in your left arm?

12      A.      Yes.

13      Q.      A little bit on the same figure there's an "X" on

14  sort of the right side of that figure.

15              Does that represent where -- a location of where

16  you were shot on your body?

17      A.      No.

18      Q.      So your testimony is that's an inaccurate

19  depiction of where you were shot on your body?

20      A.      From what I'm looking at, both gunshot wounds to

21  the back is not accurate, but the one to that part, yes.

22  To the arm, yes.  That part is accurate, yes.

23      Q.      The one to the arm is accurate, but the one --

24      A.      To the back, yeah.  Both shots to the back is

25  not.

JAMES BENBOW

Page 123

1    Q.    Let's just continue with the second figure from

2    the left.  That's what we're talking about.

3          So the depiction of the gunshot wound on that

4    figure's right side you're saying that's inaccurate?

5    A.    Yes.

6    Q.    How is that inaccurate?

7    A.    Because I was hit lower.

8    Q.    Lower?

9    A.    Yeah.

10   Q.    How much lower?

11   A.    Into the middle.  That's more like to the side.

12   Q.    What do you mean into the middle?

13   A.    To the middle of my back.

14   Q.    You're saying you were hit more towards your back

15   as opposed to on the side?

16   A.    Yes.

17   Q.    And now I'm looking -- how much more towards your

18   back were you hit?

19   A.    I'm not an expert.  I don't know.  I know it's

20   not right there.

21   Q.    Now, let's go to the third figure from the left.

22         Okay?

23   A.    Uh-huh.

24   Q.    Does that depict the location where you were shot

25   on your left side?

JAMES BENBOW

Page 135

1    came out of the car, do you know if Eric Bradley ran or got

2    on the ground?

3        A.    I don't know.  I know I ran and I was shot in my

4    lower back twice.

5        Q.    I want to get to right after you were shot.

6              Okay?

7              Right after you were shot, what's the next thing

8    that happened?

9        A.    I dropped to the floor.  I was laying on the

10   floor.  I was scared for my life.  I was basically playing

11   dead.  A person walked up to the side of me, kicked the

12   side of my body to check was I dead or not.  I heard a

13   walkie-talkie sound and that's how I knew that it was the

14   police.  That's how I knew.  I said, "Why did you shoot

15   me?" and then he just backed up and next thing I know I was

16   being cuffed.

17       Q.    Can you describe the person who you asked why did

18   you shoot me?

19       A.    It was one of the officers.  At that time I

20   didn't know who shot me, but I know it had to have been the

21   person that's lurking over my body that just kicked the

22   side of my body to see whether or not I was dead.

23       Q.    Do you have a physical description of the person

24   who you asked why did you shoot me?

25       A.    No.

JAMES BENBOW

Page 147

1      A.      No.

2      Q.      Are you saying that you would only see doctors

3   for regular checkups?

4      A.      Yeah.

5      Q.      You eventually went to Rikers.

6              How long were you in Rikers for?

7      A.      Altogether about four years.

8      Q.      You went from Bellevue to Rikers, right?

9      A.      Yes.

10     Q.      Were you eventually released from Rikers after

11   that?

12     A.      Yes.  October 16, 2016.  Like 18 months or

13   something like that.

14     Q.      So from about April of 2016 to October of 2017?

15     A.      Yeah.

16     Q.      Describe what it was like to be in Rikers during

17   that period.

18     A.      It was hell.  It was like a living nightmare.  I

19   mean, you would think that, you know, you're in a medical

20   part and stuff like that that everything would be, you

21   know, smooth, but it was fights and me being in a

22   wheelchair.  Do you know what I'm saying?  It was

23   difficult, you know, going to physical therapy and

24   everything.  It was different from being outside.  Like,

25   you were treated a certain type of way in there.  They

JAMES BENBOW

Page 170

1     Q.    Did the city ever send you a notice for any sort

2  of 50-h hearing to testify?

3     A.    No.

4     Q.    Did you ever reach out to the city regarding your

5  notice of claim?

6     A.    No.

7     Q.    Did the city ever send your attorney any notice

8  for you to come in and testify about your notice of claim

9  or what happened?

10     A.    No.

11     Q.    Did you call the city at any point to ask about

12  your notice of claim and they told you that they didn't

13  have information for you?

14     A.    Yes.  They didn't have any information for me.

15     Q.    At or about the time your notice of claim was

16  filed, were you at Rikers Island?

17     A.    The whole time, yes.

18     Q.    They never sent anything to Rikers Island

19  regarding your notice of claim or a request to do a 50-h

20  hearing or testifying?

21     A.    No.

22          MR. ABOUSHI:  I have no further questions at

23          this time.

24          MR. WEINER:  I have some questions based on

25          the follow up of what you just asked, Aymen.

JAMES BENBOW

Page 171

1    EXAMINATION BY

2    MR. WEINER:

3        Q.      Mr. Benbow, you said that you called the city to

4    get information on your notice of claim?

5        A.      Yes.  They said they didn't have no information

6    for me.

7        Q.      When did you make that phone call?

8        A.      I can't recall.

9        Q.      Where were you when you made the phone call?

10       A.      Rikers Island.

11       Q.      Was it the period while you were in Rikers Island

12   that went from April 2015 until October 2016?

13       A.      I guess so, yeah.

14       Q.      You guess so or do you know?

15       A.      I mean, yeah.

16       Q.      Do you know it was that time or are you just

17   guessing?

18       A.      I mean, it would have to be somewhere around that

19   time I'm assuming, yeah.

20              MR. WEINER:  I want to mark Exhibit 11.

21              Exhibit 11 is going to be a packet of documents

22              that have to do with Mr. Benbow's notice of

23              claim.  This will be Exhibit 11.  Exhibit 11 is a

24              seven-page PDF, again, that has documents

25              relating to Mr. Benbow's notice of claim.  I'm

JAMES BENBOW

Page 176

1  and date and all pertinent information regarding the

2  incident?

3      A.      Yes.

4      Q.      And did you tell them what your injuries were?

5      A.      Yes.

6      Q.      At any point in time after you were released from

7  the custody and control of the City of New York by and

8  through the Department of Corrections, did the City of New

9  York ever try to schedule a 50-h hearing?

10     A.      No.

11     Q.      Did they reach out to you regarding a 50-h

12 hearing?

13     A.      No.

14     Q.      When you filed your lawsuit in this case, did the

15 City of New York reach out to you regarding a 50-h hearing?

16     A.      No.

17     Q.      Did they correspond with you at all regarding a

18 50-h hearing?

19     A.      No.

20     Q.      At any point in time while this matter was

21 pending, has the City of New York tried to schedule a 50-h

22 hearing for you?

23     A.      No.

24             MR. WEINER:  Objection to the form of the

25             question.