# EXHIBIT 4

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - x
JAMES BENBOW,

                            Plaintiff,

            -against-   Civ. No.:  17-CV-6457(EK)(LB)

CITY OF NEW YORK; POLICE OFFICER BRIAN W. FEELY;
POLICE OFFICER MATTHEW J. ROSIELLO; POLICE
OFFICER KENNETH L. ANDERSON; SERGEANT WILLIAM
A. DAIB; POLICE OFFICER SHANIEL J. MITCHELL;
and POLICE OFFICER STEPHEN J. MINUCCI,

                            Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - x
                            VIDEO CONFERENCE VIA ZOOM
                            Conducted by:
                            LEX REPORTING SERVICE
                            160 Broadway
                            New York, New York

                            October 27, 2020
                            10:02 a.m.


          **DEPOSITION** of **DETECTIVE MATTHEW J.**

**ROSIELLO**, sued herein as **POLICE OFFICER MATTHEW**

**J. ROSIELLO,** a Defendant in the above-entitled

action, held remotely via Zoom videoconference,

pursuant to Order, taken before Tania C.

Pedrosa, a shorthand reporter and Notary Public

within and for the State of New York.

                            LEX#159899



**LEX**
**REPORTING SERVICE, INC.**
PROFESSIONAL REPORTING SINCE 1980
TOLL FREE 800.608.6085

```
1                    M. J. Rosiello                15
2    while executing a search warrant.  I had -- I
3    had gotten hurt.  I blew out my ACL and my
4    meniscus.
5         Q    So you're on IR?
6         A    No.
7         Q    Now, in what cases -- how many
8    cases were you a defendant?
9         A    A defendant?  I don't know the
10   exact number.
11        Q    Okay.  And can you approximate
12   for me?
13        A    I mean, I can say probably more
14   than ten maybe.
15        Q    Okay.
16        A    I couldn't give you an exact
17   number.
18        Q    That's okay.  And ten in the span
19   of what?  Four years?  Five years?
20        A    Honestly, within, like, the last
21   -- within the last, like, you know, three
22   years.  I really can't recall any off the top
23   of my head but, you know, it was all earlier
24   so --
25        Q    Okay.
```

```
 1                    M. J. Rosiello              16

 2       A      -- you know.

 3       Q      So at or about the time of the

 4  shooting or before then?

 5       A      For the most part.  I mean, that

 6  was, like, you know, a very active part of my

 7  career.

 8       Q      Okay.  And the ten lawsuits --

 9  approximately ten or maybe more lawsuits in

10  which you were named a defendant, were all of

11  those in your capacity as a police officer?

12       A      Yes.

13       Q      Did any of those lawsuits go to

14  trial?

15       A      I don't recall.

16              MR. ABOUSHI:  Josh, can we

17              continue?  I don't see your --

18              MR. WEINER:  Yeah.

19              MR. ABOUSHI:  -- video up?

20              MR. WEINER:  Yeah.  I just

21              had to get a pen.

22              MR. ABOUSHI:  Oh, that's

23              cool.

24              MR. WEINER:  Mine ran out

25              but yeah, please.
```

```
1                    M. J. Rosiello              25

2    performance?

3          A     No.

4                    MR. WEINER:  Objection.

5                    Objection to that question but

6                    you can answer.

7          Q     Have you ever been counseled

8    about your work performance in a negative

9    perspective, like "Officer Rosiello, you

10   know, you need to do better?"

11                   MR. WEINER:  Objection but

12                   you can answer.

13         A     No.

14         Q     Has anyone ever talked to you

15   about the amount of CCRB complaints against

16   you?

17                   MR. WEINER:  Objection.

18                   You can answer.

19         A     No.

20         Q     Has anyone ever talked to you

21   about your lawsuit history as a police

22   officer?

23         A     Not other than like this.

24         Q     Okay.  Yeah.  I mean -- when I

25   ask these questions -- and I'll clarify -- I
```

1                    M. J. Rosiello                26

2      mean, like, anyone from the NYPD in terms of

3      any discipline --

4            A      Oh, no, no.

5            Q      -- or admonishment or any sort

6      of, "Rosiello, you need to do better and not

7      get -- you know, not be sued or not have

8      complaints lodged against you," any of that

9      sort of corrective action or discussion with

10     you about those issues?

11                      MR. WEINER:  Objection.

12                      Go ahead.

13           A      No.

14           Q      I'm not talking about, like, a

15     deposition or a meeting with the law

16     department about lawsuits and stuff like

17     that.  I'm talking strictly about NYPD

18     supervisors talking to you about these

19     things.  Anyone?

20           A      No.

21           Q      Okay.  Have you ever had any CCRB

22     complaints lodged against you?

23           A      Yes.

24           Q      Do you know how many?

25           A      I don't recall an exact number.

```
 1                    M. J. Rosiello              27

 2        Q      More than ten?  More than 20?

 3   More than 30?

 4        A      Maybe around, like -- maybe --

 5   maybe a couple more than ten.

 6        Q      Okay.

 7        A      Like I said, an exact number, I

 8   -- I don't know.  I mean, if you want to go

 9   through them one by one, we could.  I don't

10   know, though.

11        Q      Do you know them offhand?  Do you

12   have them handy?

13        A      No.  Some of them I -- well, if

14   we start to talk of them, I -- I may remember

15   them but...

16        Q      Okay.  And those ten-plus CCRB

17   complaints pertain to earlier in your career

18   when you were in the anti-crime and

19   conditions team?

20                    MR. WEINER:  Objection.

21                    You can answer.

22        A      Some of them may.  They may be

23   scattered throughout my career as well.

24        Q      Has any CCRB complaint been

25   sustained against you?
```

1                       M. J. Rosiello                29

2    ten-year span already.

3          Q      Did anyone at the NYPD ever refer

4    you to poor performance monitoring?

5          A      Not that I recall.

6          Q      Did anyone at the NYPD ever

7    discuss with you your work performance at the

8    NYPD?

9                     MR. WEINER:  Objection.

10                    Go ahead.

11         A      Not that I recall.

12         Q      Okay.  Were you ever entered into

13   any monitoring program by the NYPD?

14         A      Monitoring program?

15         Q      Yeah.

16         A      No.

17         Q      Were you ever referred for

18   retraining by the NYPD?

19         A      The only training that I was

20   referred to was I had to go for a course

21   after I had discharged my weapon.  That was

22   -- that was the only type of training that I

23   had been besides pre-qualifying at the range

24   every six months.

25         Q      Okay.  And the course that you

```
1                     M. J. Rosiello              37
2    GO -- or let me ask you.
3              Who was at your GO-15 for this
4    incident?
5         A    For this incident I believe I had
6    -- it was at the time PBA representation and
7    then I believe it was a lieutenant who did my
8    GO-15.
9         Q    Have you ever had a GO-15 outside
10   of this incident?
11        A    Not that I recall.
12        Q    Okay.  And so a GO-15, as I
13   understand it, is after a significant
14   incident you're brought in and there are
15   superiors there -- right? -- lieutenants,
16   captains, deputy inspectors, correct?
17        A    Correct.
18        Q    And they ask you questions about
19   what happened that night, correct?
20        A    Correct.
21        Q    And before you go in there, you
22   have access to representation, correct?
23        A    Correct.
24        Q    And the representation is
25   provided by your union, the PBA, correct?
```

```
1                    M. J. Rosiello              38

2       A     Correct.

3       Q     Okay.  And in this case, you

4  actually had an attorney with you that night

5  to represent you, correct?

6       A     I don't believe so.  I believe it

7  was my union delegate.

8       Q     Okay.  And who is your union

9  delegate?

10      A     At the time it was either one of

11 two people that came with me.  It was either

12 Officer Trana [ph] or Officer Stark [ph].

13      Q     And you met with your union

14 delegate and discussed the incident before

15 you went in for your GO-15, correct?

16      A     Well, I met with my union

17 delegate and told them that I had a GO-15 and

18 -- I mean, there's really nothing, you know,

19 to discuss before -- beforehand.

20      Q     Okay.  And you had your GO-15

21 when?

22      A     I -- I don't know.  I don't

23 recall.

24      Q     Was it the night of the incident?

25      A     No.  It was -- I -- I believe
```

```
1              M. J. Rosiello                39
2    like a -- like a year later.
3         Q     And do you know why it took so
4    long to get your GO-15 done a year later?
5         A     To my knowledge, I believe that
6    -- you know, they -- throughout their
7    investigation and then that's -- that's
8    basically them closing the end of their
9    investigation.
10        Q     Okay.  So they do the
11   investigation and right before they close it,
12   they get your GO-15 done so they can just
13   check that box for it to be done?
14        A     To my knowledge, that's how it
15   works.
16        Q     And at your GO-15 you answered
17   questions, correct?
18        A     Correct.
19        Q     And were those questions
20   truthful?
21                  MR. WEINER:  Question --
22              objection.
23                  MR. ABOUSHI:  I'll fix it.
24              I'll fix it.
25        Q     Were your answers truthful?
```

M. J. Rosiello                              40

1

2      A      You -- you cut in a little bit.

3      Q      Okay.  I'll back up.  At your

4  GO-15 you were asked questions, correct?

5      A      Correct.

6      Q      Okay.  And in response to those

7  questions, did you provide answers?

8      A      Correct.

9      Q      Okay.  And your answers were

10  truthful, correct?

11      A      Correct.

12      Q      And complete, correct?

13      A      Correct.

14      Q      Okay.  How long did your GO-15

15  last?

16      A      I don't recall an exact time

17  frame.

18      Q      Half an hour?  An hour?  Two

19  hours?  A tour?

20      A      It definitely wasn't a whole

21  tour.  I mean, less than four hours, I can

22  tell you that.  I mean, I -- I -- I don't

23  want to lock myself into saying, "Oh, it was

24  three hours."

25      Q      That's okay.  Look -- that's

```
 1                    M. J. Rosiello              45

 2              THE WITNESS:  No problem.

 3              MR. ABOUSHI:  Let's -- it's

 4         10:40.  See everyone at 10:50.

 5              MR. WEINER:  10:50.  Okay.

 6              THE WITNESS:  10:50.  All

 7         right.

 8              (Whereupon, a short recess

 9         was taken.)

10    BY MR. ABOUSHI:

11         Q    When you were first hired as a

12    police officer by the NYPD, you received

13    training, correct?

14         A    Correct.

15         Q    Okay.  Where did you receive your

16    training?

17         A    At the police academy.

18         Q    Okay.  And what did that training

19    consist of?

20         A    It basically taught us, you know,

21    about the law.  It taught us, you know, how

22    to, you know, arrest people, you know, things

23    we -- you know, you're looking for, driving,

24    shooting, tactics.

25         Q    Okay.  Have you ever received the
```

```
 1                    M. J. Rosiello                46

 2      patrol guide?

 3           A     Yes.

 4           Q     Okay.  When did you receive it?

 5           A     In the police academy.

 6           Q     Outside of the police academy,

 7      was it provided to you?

 8           A     No.

 9           Q     Have you ever received training

10      in search and seizure?

11           A     Yes.

12           Q     At the academy?

13           A     Yeah.  They go through, like, you

14      know, the preliminaries of everything.

15           Q     Okay.  Outside of the academy,

16      have you ever received training regarding

17      search and seizure?

18           A     No.

19           Q     Okay.  Have you ever received

20      training in use of force?

21           A     Yeah, throughout -- I mean, in

22      the academy they -- they go over, you know,

23      all that stuff.  That's all, you know, stuff

24      following their protocol.

25           Q     Got you.  Outside of the academy,
```

<pre>
 1                    M. J. Rosiello                47
 2      have you received any training for use of
 3      force?
 4           A     No.
 5           Q     Okay.  Have you ever received
 6      training for search warrants?
 7           A     Yes.
 8           Q     Okay.  When was that?
 9           A     That was -- I mean, when you say
10      "search warrants" -- I mean, we execute our
11      own search warrants now so I was -- you know,
12      about three years ago I went to -- you know,
13      it was like a week-long class of, you know,
14      executing search warrants and stuff like that
15      if that's -- if that's what you mean.
16           Q     Okay.  And where did you take
17      that class?
18           A     That was in Brooklyn at the --
19      there's like -- they have another, like, hub
20      over there, like the Grand Army Terminal over
21      there.
22           Q     Okay.
23           A     That's where, like, the tactical
24      unit trains everybody.
25           Q     Okay.  Have you ever been taught
</pre>

```
 1              M. J. Rosiello              48

 2   to shoot someone who is running away from a

 3   police officer?

 4              MR. WEINER:  Objection.

 5              That -- you can answer if you

 6              understand that question.

 7       A    I mean, can you embrace on it a

 8   little bit more?

 9       Q    Yeah.  Have you ever been taught

10   that it's okay to shoot someone who's running

11   away from you?

12              MR. WEINER:  Objection.

13              Incomplete hypothetical.

14              You can answer.

15              MR. ABOUSHI:  It's not an

16              incomplete hypothetical.

17              MR. WEINER:  It absolutely

18              is an incomplete --

19              MR. ABOUSHI:  And -- and --

20              and you're doing an improper

21              speaking objection.

22              MR. WEINER:  You're asking a

23              misleading and confusing

24              question.

25              MR. ABOUSHI:  No, that's not
```

```
 1                    M. J. Rosiello                49
 2           misleading and confusing.  It's a
 3           very straight forward question.
 4                MR. WEINER:  It
 5           absolutely --
 6                MR. ABOUSHI:  And you can't
 7           -- you can't do this.  You can't
 8           do this.  You can't make speaking
 9           objections.  You already coached
10           him once --
11                MR. WEINER:  Okay.
12                MR. ABOUSHI:  -- so just
13           stay away from it.
14                MR. WEINER:  Okay.
15                MR. ABOUSHI:  Just let him
16           answer the question.
17                MR. WEINER:  I didn't
18           realize that you were the
19           authority on coaching a witness
20           all of a sudden.
21                MR. ABOUSHI:  Okay.  So he
22           can answer and you can stop
23           interrupting.
24                MR. WEINER:  Okay.
25                MR. ABOUSHI:  It's
```

```
 1                    M. J. Rosiello                50

 2              inappropriate and you know it.

 3       Q     Please answer the question.

 4       A     Restate the question again.

 5              MR. ABOUSHI:   Tania, can you

 6              please read it back for us?

 7              Thank you.

 8                   (Whereupon, the requested

 9              portion was read back by the

10              reporter.)

11       A     No.

12       Q     The fact that someone is running

13  away from you, is that in and of itself an

14  illegal act?

15              MR. WEINER:   Objection.

16       Q     You can answer.

17       A     No.

18       Q     Okay.  Do civilians have any

19  obligations to talk to the police?

20       A     No.

21       Q     If a civilian is talking to you,

22  the civilian has a right to stop talking to

23  you at any time, correct?

24              MR. WEINER:   Objection.

25              You can answer.
```

M. J. Rosiello                    51

1

2        A     Correct.

3        Q     Unless Mr. Weiner tells you not

4    to answer, you can answer the question.

5    Okay.  Because he's -- he's making his

6    objection and there's very, very limited

7    circumstances he could tell you not to

8    answer.  So he's making his objections to

9    preserve the record.  It's not necessarily to

10   inhibit your answer.  Okay?

11       A     Okay.

12       Q     So is it illegal for a civilian

13   to refuse to speak to an officer?

14                 MR. WEINER:  Objection.

15       A     No.

16                 MR. WEINER:  Go ahead.

17       Q     Is that a crime if someone

18   doesn't want to speak to the police?

19       A     No.

20       Q     Would you agree with me that in

21   the execution of your job functions,

22   Detective Rosiello, that you have to make

23   determinations regarding when to use force?

24       A     Yes.

25       Q     Would you agree with me that

```
1                    M. J. Rosiello               52

2      throughout your career you've had to make

3      that determination on a regular basis as a

4      police officer when to use force?

5            A      Yes.

6            Q      You probably make that

7      determination or you have to make that

8      determination on a daily basis, correct?

9            A      Correct, depending on, you know,

10     daily functions, correct.

11           Q      And not only do you have to make

12     a determination about force but you have to

13     make a determination if you're going to use

14     force, correct?

15           A      Correct.

16           Q      And then once you decide that

17     you're going to use force, you have to make a

18     determination about how much force you're

19     going to use, correct?

20           A      Correct.  We call it the level of

21     force, correct.

22           Q      And throughout your career as a

23     police officer, that's something that you

24     have to decide on pretty much a daily basis,

25     correct?
```

```
 1                    M. J. Rosiello            53

 2          A      Correct.

 3          Q      Okay.  And, similarly, throughout

 4   your career as a police officer, you have to

 5   make determinations regarding probable cause,

 6   correct?

 7          A      Correct.

 8          Q      And you also have to make

 9   determinations throughout your career almost

10   on a daily basis as to when to arrest

11   someone, correct?

12          A      Correct.

13          Q      Do you know what probable cause

14   is?

15          A      Yes.

16          Q      What is probable cause to you?

17          A      I'm sorry.  What did you say?

18          Q      I said what's probable cause to

19   you?

20          A      To me, probable cause is -- you

21   know, it -- basically if I see something and

22   I know that I'm within -- acting within the

23   scope of my job, basically moving in on that.

24          Q      Were you taught about probable

25   cause in the academy?
```

M. J. Rosiello                                63

1

2      line, and then a 25-yard line.

3           Q     Okay.  And is it accurate to say

4      that you have to hit the targets at least

5      77 percent of the time in order to qualify

6      for your weapon?

7           A     Yeah.  I mean, I -- I thought it

8      was a little bit higher, but yeah.

9           Q     Okay.

10          A     Who knows?

11          Q     Well, it's good that you don't.

12     It means you have a good aim.

13                So when you -- when you're

14     shooting at these targets, you are taught to

15     aim at center mass, correct?

16          A     Correct.

17          Q     Okay.  And if someone is facing

18     you, what would be center mass?

19          A     Center mass would be the chest.

20          Q     Okay.  Essentially from the

21     neckline to the waistline, would that be

22     center mass?

23          A     Correct.

24          Q     Okay.  And if someone's back is

25     to you, center mass would be from the neck to

```
 1                    M. J. Rosiello               64
 2      the lower back, correct?
 3           A     Correct.
 4           Q     To the waistline essentially,
 5      correct?
 6           A     Correct.
 7           Q     And in order to qualify for your
 8      weapon, you have to hit center mass from
 9      various distances a certain amount of the
10      time, correct?
11           A     Correct.
12           Q     Have you ever been disqualified
13      for your weapon?
14           A     Have I ever been what?
15           Q     Have you ever been deemed not
16      qualified to carry your weapon?
17           A     No.
18           Q     Now, when you were taught use of
19      force, you were taught use of deadly force as
20      well, correct?
21           A     Correct.
22           Q     Okay.  Were you ever taught to
23      shoot someone simply because they have a gun?
24                    MR. WEINER:  Objection.
25                    Go ahead.
```

```
1                   M. J. Rosiello              93

2           stop --

3                MR. WEINER:  I'm not getting

4           angry.  I just don't think it's

5           appropriate for you to laugh.

6                MR. ABOUSHI:  Stop

7           obstructing.  And it's not

8           appropriate what you're doing

9           now.

10               MR. WEINER:  Okay.

11               MR. ABOUSHI:  So don't

12          mischaracterize what I'm doing.

13               MR. WEINER:  Okay.

14               MR. ABOUSHI:  I know I'm

15          getting somewhere when you're

16          trying to obstruct.

17       Q    So, Detective Rosiello, you

18   testified that he was focused -- Mr. Benbow

19   was focused on what was going on behind him

20   as he was running towards you; is that

21   correct?

22       A    Correct.

23       Q    Okay.  And that based off your

24   observation, he didn't even know that you

25   were there, correct?
```

```
 1                M. J. Rosiello                94

 2               MR. WEINER:  Objection.

 3               Go ahead.

 4        A     At the time he did not know I was

 5   there.  But we're also talking about him

 6   still running away from where they are not

 7   knowing that I'm on the sidewalk.

 8        Q     Okay.  And so did he ever stop

 9   and he point his gun at you with two hands?

10        A     He pulled his gun out of his

11   waistband and his other hand -- he had a

12   glass in his other hand.

13        Q     Okay.  And so did he ever

14   directly point the gun at you or was it just

15   the sweeping motion you described where he

16   pulled it out of his waistband and it was in

17   his hand -- the sweeping motion where he

18   pulls it out of his waistband and it goes

19   across his body?

20        A     He pulled the gun out of his

21   waistband.  And then once he made eye contact

22   with me and saw I was there and he couldn't

23   run down the sidewalk anymore, he had swept

24   across me with the gun.  Me alerting the rest

25   of my team that there was a gun and then me
```

M. J. Rosiello                    97

1

2      Q      Okay.  But you don't recall what

3  he was doing in terms of how he was running,

4  correct?

5      A      Yeah.  I don't believe his arms

6  were -- were pumping like he was doing a

7  triathlon.

8      Q      Okay.  What happened to the glass

9  that was in his hand?

10     A      I don't recall.

11     Q      Was the glass in his left hand or

12 his right hand?

13     A      I don't recall.

14     Q      Was the gun in his left hand or

15 his right hand?

16     A      I don't recall.

17     Q      Did he ever point the gun

18 directly at you?

19              MR. WEINER:  Objection.

20     A      It -- it came across to me.

21     Q      It came across as he was running,

22 correct?

23     A      I don't know what someone is

24 going to do with a gun.

25     Q      Well, I didn't ask you what he

```
1                    M. J. Rosiello              99

2        Q      Detective Rosiello, I just need

3   you to focus on what I'm asking.

4               Did he or didn't he stop and

5   point a gun at you?

6                    MR. WEINER:  Objection.

7        A      No.

8        Q      You can answer.

9               Okay.  Did he ever directly point

10  the gun at you?

11                   MR. WEINER:  Objection.

12               Objection.

13       Q      You can answer.

14       A      Not directly.

15       Q      Okay.  And so when you fired,

16  where was Sergeant Diab?

17       A      Sergeant Diab I believe at the

18  time was still with the other male.

19       Q      Okay.  Where was Officer Minucci?

20       A      I believe also with the other

21  male.

22               Q      And where was Officer Mitchell?

23       A      I believe all three of them were

24  -- were still over there.

25       Q      Okay.  And where is Officer
```

```
 1                    M. J. Rosiello              101

 2          A    Because that was all I felt was

 3     needed to -- for -- for that scenario.

 4          Q    Okay.  And your -- your testimony

 5     is that -- by the way -- strike that.

 6               After you shot Mr. Benbow, did

 7     you say anything to him?

 8          A    No.

 9          Q    Did he say anything to you?

10          A    Not -- not that I recall, no.

11          Q    Did Officer Anderson say anything

12     as Mr. Benbow was running down the sidewalk?

13          A    Wait.  Say that again.

14          Q    Did Officer Anderson say anything

15     as Mr. Benbow was running down the sidewalk?

16          A    I -- yeah.  I mean, he may have

17     yelled the same thing, like "police" too but

18     I -- I don't --

19          Q    I don't want you to guess.

20          A    I don't know then.  I don't know.

21          Q    Okay.  Did Officer Feeley say

22     anything as Mr. Benbow was running down the

23     sidewalk?

24          A    I don't -- I don't recall.

25          Q    Do you know if anyone else
```

M. J. Rosiello                              105

1

2      A      Yes.

3      Q      Okay.  As a police officer you're

4   trained in cover, correct?

5      A      Correct.

6      Q      Okay.  What does cover mean to

7   you as a police officer and a detective?

8      A      Cover to me means someone hiding

9   behind and concealing themselves.

10     Q      Okay.  Did Mr. Benbow try to take

11  cover before you shot him?

12     A      No.

13     Q      Did he crouch or try to hide in

14  any way?

15     A      Not that I recall.

16     Q      Did he bend back or twist in any

17  direction?

18     A      Not that I recall.

19     Q      Before or after you shot him, did

20  he bend back or twist in any direction?

21     A      No.  I don't really recall.

22     Q      Did you see Mr. Benbow on the

23  ground after you shot him?

24     A      Yes.

25     Q      Where was he?

M. J. Rosiello                          116

MR. WEINER:  Objection.

A    I mean, that could -- that could just be, you know, him -- him seeing a hole to escape through, honestly.

Q    Okay.  So you didn't get the impression that he saw you and then broke to the right, he was just running away?

A    I --

MR. WEINER:  Objection.

Q    You can answer.

A    It -- it was more or less the fact of once he realized who we were that he was trying to get away.

Q    Okay.  What -- what I'm trying to understand is based off what you saw.  Okay?

A    Mm-hmm.

Q    At some point he's running in your direction, correct?

A    Correct.

Q    Okay.  Before he gets to you, he breaks to the right in between two cars, correct?

A    I mean, pretty much where I was but okay.

M. J. Rosiello                    138

1

2      Q     Okay.  But when he -- but when he

3   turned, was the gun physically pointed in

4   your direction?

5      A     Yes.

6      Q     Okay.  And I want to ask about

7   when -- when you fired -- when you fired the

8   shots.  Okay?  Or the shot --

9      A     Yes.

10      Q     -- that you fired.

11      A     Yes.

12      Q     Did you fire -- did you fire at

13   Mr. Benbow -- is it fair to say that you

14   fired at Mr. Benbow while he was turning or

15   was it after he had turned or was it before

16   he turned?

17      A     It -- it was -- it was almost

18   like mid-stride.

19      Q     Okay.  But was he -- where was --

20   you said that he had turned at some point.

21                MR. ABOUSHI:  No.  He didn't

22                say that.  He said he shot him

23                before he turned.  You're

24                mischaracterizing --

25                MR. WEINER:  Well, I'm

```
1                    M. J. Rosiello              140

2            prohibited so I don't --

3                 MR. ABOUSHI:  Look --

4                 MR. WEINER:  -- understand

5            that.

6                 MR. ABOUSHI:  -- this is

7            your witness.  You can't put

8            words in his mouth and change the

9            testimony that he gave under oath

10           just an hour ago.

11                MR. WEINER:  I'm asking to

12           clarify his testimony.

13                MR. ABOUSHI:  That's not a

14           clarifying question.

15       Q    Detective Rosiello, do you

16   remember whether you shot Mr. Benbow as he

17   was turning or before he had turned or after

18   he had turned?

19       A    It was -- it was pretty much as

20   he was turning.

21       Q    Okay.  Do you know where you hit

22   Mr. Benbow?

23       A    If I had to guess, I would say

24   the side.  I still to this --

25       Q    I don't want you to guess.
```

```
 1              M. J. Rosiello              166
 2              MR. WEINER:  No.  That's --
 3         that -- he answered the question.
 4         He said he -- that -- you can't
 5         keep asking him the same question
 6         when he's already answered it.
 7              MR. ABOUSHI:  And your
 8         speaking objections are noted and
 9         inappropriate.
10    Q    Please answer the question,
11  Detective.
12              MR. WEINER:  You can answer
13         this -- you can -- go ahead.  Go
14         ahead.
15    A    Like I said before, I don't know
16  where Officer Feeley was.
17    Q    Okay.  And so your testimony is
18  you did observe Mr. Benbow point a gun at
19  Officer Feeley or you did not observe it?
20              MR. WEINER:  Objection.
21    Q    We understand you already
22  testified that you didn't know where Officer
23  Feeley was, right --
24    A    Yeah.
25    Q    -- throughout the shooting?
```

```
                        M. J. Rosiello                    167
 1
 2          A      Yes.

 3          Q      That's correct?

 4                 Okay.  So we're good on that

 5     part.

 6                 My question to you is:  Did you

 7     ever see with your own eyes Mr. Benbow point

 8     a gun at Officer Feeley?

 9          A      Physically, no.

10          Q      Okay.  Now, your counsel asked

11     you questions about excessive force.  Do you

12     remember that?

13          A      Yes.

14          Q      What is excessive force?

15                     MR. WEINER:  Objection.

16          A      Too much -- like abuse of force,

17     too much force.

18          Q      What does that mean?

19          A      It means using an unnecessary

20     amount of force.

21          Q      And what's an unnecessary amount

22     of force?

23          A      Depending on the circumstances --

24     I'll use an example, like, you know,

25     entailing an arrest.  Like, you know, the
```