# EXHIBIT 12

Joseph A. Pollini
Police Expert, Inc.
107-24 71 Road, PH2C
Forest Hills, New York 11375

Case of:                           <u>Benbow v. Feely, et. al</u>
                                    Civil Case No. 1:17-CV-6457

Aymen Aboushi, Esq.,
The Aboushi Law Firm
1441 Broadway, Fifth Floor
New York, N.Y. 10018

Dear Mr. Aboushi,

1.      I am submitting a summary of my opinions, within a reasonable degree of professional
certainty, regarding the actions and procedures employed by members of the New York City
Police Department as well as the NYPD's actions with respect to the supervision of their officers,
in connection with this matter.  This summary is based on:

        A.  A review of the documents provided;
        B.  My experience, training education and professional background, which are described
below.

2.      I am a retired member of the NYPD, having served on the force for more than 33 years.
During my tenure, I held the ranks of Police Officer, Investigator, Sergeant, Lieutenant, and
Lieutenant Squad Commander.  I served in numerous capacities including patrol officer;
investigator; patrol sergeant; detective squad sergeant; Lieutenant Squad Commander of the
Brooklyn Robbery Squad, 81 Detective Squad and the Cold Case Homicide Squad.  Over the
years I responded to, investigated and made arrests in connection with more than a thousand
cases of assault, robbery, kidnapping, homicides and other crimes.  I served as a member of the
Hostage Negotiating Team for 17 years, and I trained members of the FBI on kidnapping
investigations tactics.  I testified in court numerous times, which included testimony pertaining
to criminal matters and proper police procedures.  My rate is $250.00 per hour for preparing
reports and consulting with attorneys.  My rate for court testimony or deposition testimony, is
$2,500 per day, plus travel expenses.

During the past four years I have provided either deposition, and or trial testimony in the
following cases:

        a.      Ahmad Manzoor v. City of New York, NYS Supreme Court, New York, New
York-Qualified as a police procedures expert.  Trial Testimony-Testified on 3/10/2017.
        b.      Hanson Cuthbert v. The State of New York-June 18, 2019, New York Court of
Claims, New York, New York.

      c.     Brian Pettiford v. City of Yonkers, et al., S.D.N.Y., Docket No. 14-cv-06271 (JCM), 1/6/2021.

      d.     Jamar Smythe v. City of Yonkers et al. 7:16-cv.02451-CS-JCM 9/17/18.

3.     Since my retirement from the NYPD, I have been a member of the faculty at John Jay College of Criminal Justice for 25 years, where I have taught undergraduate and graduate level courses in police science and criminal justice. I have served as Deputy Chairperson and Police Studies Coordinator for the past 15 years.

4.     The following is a list of materials pertaining to the incident and individuals involved that have been provided for my review thus far:

      a.     Second Amended Complaint and Jury Demand
      b.     DEF 0001 to DEF 2378
      c.     DEF 2387 to DEF3787
      d.     CCRB, IA, and lawsuit histories of Rosiello, Feeley, and Diab,
      d.     New York City Police Department Patrol Guide, Procedure 203-12, Deadly Physical Force.
      e.     New York City Police Department Patrol Guide, Procedure 202-17, Patrol Supervisor.
      f.     New York City Police Department Patrol Guide, Procedure 202-18, Supervisor of Anti-Crime Patrol.
      g.     Deposition testimony of the officers.

## SUMMARY OF FACTS

5.     At approximately 0027 on March 7, 2015 Officer Rosiello, Officer Feeley and Officer Anderson were told to "10-2" as per Sergeant Diab, who was supervising their Conditions Unit that evening. Sergeant Diab advised that they would be following him to the confines of the 84 Precinct to make an apprehension. Sgt Diab was working with 77 Precinct Anti-Crime Officers Minucci and Mitchell. Sergeant Diab arranged for the 77 Precinct Conditions Unit consisting of Police Officer Rosiello, Police Officer Feeley and Police Officer Anderson to follow his Anti Crime Unit consisting of Police Officer Minuci and Police Officer Mitchell over to 189 Bridge Street. Mr. Benbow and Mr. Bradley left the location and walked north on Bridge Street turning right onto eastbound Nassau Street. Officer Mitchell followed the males in the unmarked vehicle taking the same path of travel. Mr. Benbow and Bradley proceed to walk past eyewitnesses CM and AF while they were seated inside a vehicle parked at the curbside. As Officer Mitchell reached mid-block on Nassau Street, he engaged them. Sergeant Diab exited the passenger side and Mr. Benbow doubled back, running in the direction of Officers Feeley, Rosiello and Anderson. Upon seeing Sergeant Diab exit his vehicle, Officers Feeley, Officer Rosiello and Officer Anderson had exited their vehicle and ran east bound toward Mr. Benbow.

Mr. Benbow ran westbound toward Officer Rosiello and Officer Anderson on the sidewalk. Officer Feeley was standing near his police car in the street. Officer Anderson claims that Mr. Benbow was running with a gun in his hand, but he did not point it at them. No officer fired at Mr. Benbow as he ran down the sidewalk. Before reaching the officers standing on the sidewalk, Mr. Benbow turned north and ran between two parked vehicles towards the street. Officer Feeley discharged his service weapon three times at Mr. Benbow, striking him twice, once in the arm and once in the back. Officer Rosiello discharged his weapon one-time, striking Mr. Benbow in his back.  Mr. Benbow sustained three gunshot wounds.  Mr. Benbow was removed to Kings County Hospital in stable condition.
(DEF 0143)

6.      On July 15, 2016. Police Officer Brian Feeley was interviewed under the provisions of Patrol Guide procedure 206-13.  The substance of his interview was that on March 7, 2015 when the officers arrived at the intersection of Bridge Street and Nassau Street, Sergeant Diab directed Officer Feeley to position his vehicle on the north west corner of Bridge Street and Nassau Street facing west.  When Officer Feeley first observed the Mr. Benbow, he was walking with another man (later identified as Eric Bradley) north on Bridge Street toward Officer Feeley's vehicle. Officer Feeley observed them make a right (eastbound) onto Nassau Street.  Officer Feeley made a U-Turn and was now traveling eastbound when he observed Sergeant Diab's vehicle stop almost parallel with the individuals.  Mr. Benbow turned and ran westbound on the sidewalk on Nassau Street toward Bridge Street.  Mr. Benbow then turned and ran between two parked vehicles at which time Officer Feeley then discharged his service weapon three times, two hand supported, in a level directional at Mr. Benbow. Mr. Benbow fell forward after he was shot.

7.      On July 19, 2016, Police Officer Matthew Rosiello, was interviewed under the provisions of Patrol Guide procedure 206-13.  The substance of his interview was that on March 7, 2015, he was assigned to 77 Precinct Conditions with Officer Feeley and Officer Anderson.  Upon their arrival at the intersection of Bridge Street and Nassau Street, the Conditions Officers took up a position. Officer Feeley, the operator of RMP 649, made a U-Turn and followed eastbound on Nassau Street.  Upon Sergeant Diab exiting his RMP all the Officers in RMP 649 exited with Officer Rosiello and Officer Anderson on the sidewalk while Officer Feeley was in the street. Mr. Benbow turned and ran westbound toward Officer Rosiello and Officer Anderson on the sidewalk.  Mr. Benbow then turned north to the street. Officer Rosiello discharged his weapon one time, two hand supported without the use of his sights, shooting Mr. Benbow in his back. Mr. Benbow fell forward.

8.      On March 7, 2015, Detective Lamoglia and Detective Burns responded to Kings County Hospital and spoke to the attending physician, Dr. Dennhy, regarding the guns shot wounds that were sustained by Mr. Benbow.  Dr. Dennhy told the detectives that preliminary examinations and CAT scan revealed that the Mr. Benbow sustained two holes in his lower back torso.  The bullet fragments were close to his spine.  There was also a graze wound to his left forearm.

9.      On February 6, 2018, Police Officer Matthew Rosiello, was interviewed by the Civilian Complaint Review Board in connection with the shooting of Mr. James Benbow, on March 6, 2015, by Police Officer Matthew Rosiello and Police Officer Brian Feeley, both assigned to the Conditions Team of the 77 Precinct. The substance of Officer Rosiello's statement was as follows: On March 6, 2015, P.O. Rosiello, P.O. Feeley and P.O. Anderson was stationed on the corner of Nassau Street and Bridge Street in proximity to Sgt. Diab's vehicle. Officers observe two males exit the restaurant on 189 Bridge Street and walk north on Bridge Street towards Nassau Street. P.O. Rosiello said he observed nothing unusual about Mr. Benbow and Mr. Bradley walking, and said they did not appear to observe the unmarked vehicles. Mr. Benbow held a cup in his left hand. As second car, with Sgt. Diab, P.O. Minucci and P.O. Mitchell, went east against traffic on Nassau Street to follow Mr. Benbow and Mr. Bradley as they walked east on the south sidewalk of Nassau Street. The first car followed the second car east on Nassau Street from a distance of four or five car lengths behind. The second car stopped in the middle of Nassau Street and the first car stopped at the corner of Bridge Street and Nassau Street.

Sgt. Diab, P.O. Minucci and P.O. Mitchell exited the second car and approached Mr. Benbow and Mr. Bradley. P.O. Rosiello, P.O. Anderson and P.O. Feeley exited their vehicle at the same time as the officers from the second car, and P.O. Rosiello and P.O. Rosiello walked onto the south sidewalk of Nassau Street facing east toward the stop. P.O. Rosiello was not aware of where P.O. Anderson and P.O. Feeley were.

Mr. Benbow walked backwards on the sidewalk, west towards Bridge Street, then turned around and ran west on the sidewalk. P.O. Rosiello said of Mr. Benbow's demeanor at the time, "I don't think he realized we were there," referring to the officers from the first car farther west on Nassau Street. Ten feet from P.O. Rosiello's positioned on the sidewalk, Mr. Benbow turned right and ran north into the street between two parked cars. According to P.O. Rosiello, Mr. Benbow did not directly point the gun at P.O. Rosiello. When asked if he knew where P.O. Feeley was at this moment, P.O. Rosiello said, "No, I didn't." P.O. Rosiello had last seen P.O. Feeley's position in the car.

P.O. Rosiello fired one shot at Mr. Benbow as he ran north into the street, between the sidewalk and the parked cars. P.O. Rosiello claimed that he fired upon Mr. Benbow because he claimed that he was protecting Officer Feeley, but stated that at the time he fired, he didn't see Anderson or Feeley at any point, so he didn't know if they were behind him or in the street still. P.O. Rosiello claims to have fired his weapon without knowing where any other officer was. There were no additional reasons P.O. Rosiello fired at Mr. Benbow. P.O. Rosiello could not see the officers from the second car farther east on Nassau Street when he fired.

10.     On June 7, 2020, P.O. Feeley was interviewed by the Civilian Complaint Review Board. On March 6, 2015, at approximately 12:27 a.m., P.O. Feeley was ordered back to the 77 Precinct station house and me with Sgt. Diab in the parking lot to discuss a situation with Sgt. Diab. Sgt. Diab told P.O. Feeley and his partners to follow him to the location. There was no pre-tactical meeting before the vehicles departed the 77 Precinct station house. P.O. Feeley drove his vehicle along with P.O. Rosiello in the passenger seat and P.O. Anderson in the backseat and followed the other vehicle, which included Sgt. Diab, P.O. Minucci, and P.O. Mitchell, to 189 Bridge Street at the intersection of Bridge Street and Nassau Street in the confines of the 84 Precinct.

At approximately 12:48 a.m., P.O. Feeley's vehicle arrived at 189 Bridge Street and parked on the corner of Bridge Street and Nassau Street. Sgt. Diab's vehicle parked south of P.O. Feeley's vehicle on another corner. Approximately, five minutes after P.O. Feeley arrived on scene, two men exited the bar and turned right, walking north toward P.O. Feeley's vehicle. P.O. Feeley could not recall whether either of the men was holding anything when they exited the bar or what their demeanor was. Sgt Diab's vehicle began driving north on Bridge Street toward Nassau Street and turned right, headed east, onto Nassau Street. P.O. Feeley made a U-turn and also turned right, headed east, on Nassau Street, now driving behind Sgt. Diab's vehicle. Mr. Benbow ran west on the south sidewalk of Nassau Street toward P.O. Feeley's car. P.O. Feeley had exited the car, walked east on Nassau Street, passed the front bumper of the rear vehicle and was standing on the street. P.O. Anderson and P.O. Rosiello had both also exited the car.

Mr. Benbow ran into Nassau Street between two parked cars. P.O. Feeley fired three rounds at Mr. Benbow. P.O. Rosiello fired one shot at Mr. Benbow. Mr. Benbow fell forward on to his stomach. P.O. Minucci stated that Mr. Benbow was shot as he was in the middle of the street. He also stated that he did not point his weapon at Mr. Benbow or fire at him, despite having a clear line of sight to him. P.O. Anderson, who was standing a few steps away from Rosiello, also did not fire his weapon.

11. P.O. Minucci testified at his deposition that Mr. Benbow did not point a weapon at him or any of the officers. P.O. Anderson testified that Mr. Benbow was not pointing a weapon at any officer when Rosiello shot Mr. Benbow. P.O. Rosiello testified that the gun was not pointed at any officer when he fired his weapon at Mr. Benbow.

## SUMMARY AND OPINION

The following opinions, summaries, and statements are made to a reasonable degree of professional certainty based upon my expertise, experience, and the materials reviewed:

### 12.   Failure to adhere to Police Department guidelines when using deadly physical force and use of excessive force.

a.      Immediately before shooting Mr. Benbow, P.O. Rosiello stated that he was unaware of where P.O. Feeley and P.O. Anderson were located. Mr. Benbow walked backwards on the sidewalk, west towards Bridge Street, then turned around and ran west on the sidewalk. P.O. Rosiello and Mr. Benbow's demeanor at the time, "I don't think he realized we were there," referring to the officers from the first car, father west on Nassau Street. During the incident, P.O. Rosiello claimed that Mr. Benbow held the gun chest-level in a continuous running motion. He also stated that Mr. Benbow did not directly point the gun at P.O. Rosiello. When asked if he knew where P.O. Feeley was at this moment, P.O. Rosiello said, "No, I didn't". P.O. Rosiello last seen P.O. Feeley's position in the car. P.O. Rosiello explained that he feared for P.O. Feeley's and P.O. Anderson's safety because he "didn't see them at any point, so he didn't know

if they were behind me or in the street still". P.O. Rosiello fired one shot at Mr. Benbow as he ran north into the street.

b.    According to P.O. Rosiello, at no point did Mr. Benbow point his firearm at P.O. Rosiello or try to shoot P.O. Rosiello. Mr. Benbow was running away from the officers, which is not a legitimate justification for the use of deadly force. P.O. Rosiello said that Mr. Benbow held his firearm at chest-level, while in a continuous running motion. Officer Rosiello said that Mr. Benbow never pointed the gun at him. P.O. Rosiello claimed that he shot Mr. Benbow to protect Officer Feeley. Yet when Officer Rosiello was asked if he knew where Officer Feeley was at that moment, Officer Rosiello said, No, I didn't."

c.    P.O. Rosiello admits that Mr. Benbow never pointed or fired his weapon at P.O. Rosiello. P.O. Rosiello claims he was trying to protect P.O. Feeley from being shot, when he did not even know where Officer Feeley was at the time. A reasonable officer would not have fired his weapon to protect his partner when he did not know where his partner was.

d.    Based on the above facts, P.O. Rosiello had no justification to use deadly physical force to stop or terminate Mr. Benbow. His use of force was outside of NYPD Guidelines, unjustified, and excessive. Also, based on the doctor's report, that treated Mr. Benbow, he was shot twice in the lower back and also had a graze wound to his left arm. (DEF 0179). It is clear that Mr. Benbow's back was to Officer Rosiello when he was shot as indicated by the bullet wounds in Mr. Benbow's back. Given that Mr. Benbow had ran past Officer Rosiello and was running away, there was no lawful reason to use force against Mr. Benbow. Indeed, officer Minucci stated that Mr. Benbow was in the middle of the street when he was shot, and at that point there could not have been any threat that justified the deadly use of force. There was no apparent reason or justification to shoot Mr. Benbow in the back as he was fleeing from the scene.

e.    Officers are taught to aim for center mass when they fire their weapons. If Mr. Benbow was facing either Officer Feeley or Officer Rosiello, he would have wounds to the front of his body, in his torso. Instead, the documents reveal that Mr. Benbow was shot in his back, which indicate that the center mass, his back, was facing the officers when they shot him.

13.    The New York City Police Department, Patrol Guide, Procedure 203-12, Deadly Physical Force, states in part: The New York City Police Department recognizes the value of all human life and is committed to respecting the dignity of every individual. The primary duty of all members of the service is to preserve human life. The most serious act in which a police officer can engage is the use of deadly force. The power to carry and use firearms in the course of public service is an awesome responsibility. Respect for human life requires that, in all cases, firearms be used as a last resort, and then only to protect life. Uniformed members of the service should use only the minimal amount of force necessary to protect human life. Where feasible, and consistent with personal safety, some warning, such as "POLICE - DON'T MOVE", should be given. Deadly force is never justified in the defense of property. Above all, the safety of the

public and uniformed members of the service must be the overriding concern whenever the use of firearms is considered.

Officer Anderson stated that at no point in time did either Officer Rosiello or Officer Feeley give any commands to Mr. Benbow. Officer Feeley also states that he did not give Mr. Benbow any commands. Officer Anderson also stated that he was standing next to Officer Rosiello, but did not fire at Mr. Benbow. Given that Mr. Benbow was fleeing from the officers, and his back was to them when he was shot, there was no justification for the use of deadly force. Finally, that Officer Rosiello stated that he did not know where Officer Feeley was standing when he shot Mr. Benbow in the back, any claim of shooting Mr. Benbow to allegedly protect Officer Feeley is unreasonable and is an unlawful and excessive use of force. Officer Rosiello's actions were also dangerous because he was shooting at Mr. Benbow without knowing where Officer Feely was, and thus could have shot Officer Feeley. No reasonable officer would discharge his weapon at a person fleeing police officer under these circumstances, particularly without knowing where their partners were.

14.     a.     Police Officer Feeley was interviewed by the Civilian Complaint Review Board and the NYPD, in connection with this shooting incident. P.O. Feeley said that he did not know if Mr. Benbow pointed his weapon at P.O. Rosiello or P.O. Anderson, but said that Mr. Benbow held the gun forward in his hand as his hands were pumping from running. P.O. Feeley fired three rounds at Mr. Benbow. Mr. Benbow fell forward onto his stomach, and a firearm fell in front of them. P.O. Feeley claimed that that as Mr. Benbow raised his firearm and pointed in Officer Feeley's "direction," Officer Feeley fired 3 times. P.O. Feeley inexplicably could not provide any detail regarding the alleged actions of Mr. Benbow other then repeating the generic allegation that Mr. Benbow pointed a gun in his "direction."

        c.     ██████████████████████████████████████

This would indicate that Officer Feeley shot Mr. Benbow in the back as he was running away. This is consistent with the bullet wounds as well as the diagrams that each officer marked regarding the shooting. Officer Feeley was only several feet away from Mr. Benbow when Officer Feeley fired. Street lighting conditions were good at the time. It is highly unlikely that Officer Feeley did not know his bullets struck Mr. Benbow in the back. In addition, if Mr. Benbow was pointing a weapon at Officer Feeley when Officer Feeley shot him, Mr. Benbow would have gunshot wounds to his front torso, instead of his back.

        d.     It is apparent Mr. Benbow was fleeing when he was shot and posed no threat to the officers that warranted them shooting him. At no time did he discharge his weapon at the pursing officers. This coupled with the fact that Mr. Benbow was shot in the back, would indicate that the officers used unnecessary and excessive force to apprehend Mr. Benbow. The use of force violated NYPD guidelines on use of deadly force. Additionally, the location of the wounds establishes that Officer Feeley did not have a legitimate basis to discharge his weapon at Mr. Benbow. Further, Officer Minucci stated that Mr. Benbow was shot when he was in the

middle of the street, placing Mr. Benbow well past where Officer Feeley was standing, and thus posing no threat to Officer Feeley. No reasonable officer would have shot Mr. Benbow under these circumstances.

15.   **Failure of the Police Department to properly monitor its officers' conduct.**

As part of my review of this case, I reviewed the CCRB and other records for Police Officers Feeley, Rosiello, and Sergeant Diab. The following is what I determined;

    a.   Police Officer Feeley-

Based on the history for Officer Feeley, he should have been placed on Level I, Performance Monitoring. One of the criteria for Level I monitoring is that the officer received 6 or more complaints in a 5-year period, (Supervisor's Guide Monitoring and Assistance Programs-DEF 3738). Moreover, Officer Feeley was also subject to several lawsuits that indicated a pattern of conduct that required interdiction. At no point in time did anyone at the NYPD discuss any of the many complaints, lawsuits, or IA issues with Officer Feely. His files are also incomplete with lawsuit history. These actions and omissions constitute a failure to supervise and deliberate indifference to the pattern exhibited by P.O. Feeley that should have been detected and interdicted, such that he would not have been in a position to be in uniform working in an active unit, to the point where he shot Mr. Benbow. Additionally, should P.O. have been counseled and monitored, he would likely have been more cognizant of supervision and consequences of his actions, and not used excessive force against Mr. Benbow. It is well established that officers who know they are being supervised and scrutinized because of a complaint history are less likely to use excessive force and violate the rights of citizens. Conversely, where, as here, there is a complete lack of intervention-to the point where no one from the NYPD even spoke to the officers regarding their lengthy records-likely encourages the officers to use excessive force and continue their pattern as they believe they will not be held accountable.

    b.   Police Officer Rosiello

Officer Rosiello's Resume Report reveals that he received numerous complaints for force and other issues before the incident with Mr. Benbow, placing the NYPD on notice of the need to supervise, monitor, and interdict his conduct. He also was being sued in Eastern District Federal Court, Case of <u>Joseph Davis v. City of New York</u>. The substance of the charges were deprivation of rights, False arrest/imprisonment, excessive force, and malicious prosecution. Moreover, there is a lack of record keeping for all complaints and lawsuits, thereby depriving the NYPD and City of New York from meaningfully reviewing the records to intervene and interdict a pattern of unlawful behavior. Officer Rosiello should have been in the performance monitoring program as well, which likely would have stopped him from using unlawful force. Similar to P.O. Feeley, the NYPD failed to properly supervise and monitor P.O. Rosiello and prevent him from shooting Mr. Benbow in the back as Mr. Benbow was running away. The NYPD had notice of P.O. Rosiello's history and could have avoided this situation where P.O. was placed in a position to work in an active unit that placed P.O. in a likely position to continue to violate the

rights of citizens and here, predictably use excessive force and unjustifiably shoot Mr. Benbow in the back.

      c.    Sgt. Diab-

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ This reveals that the NYPD does not take the monitoring of problematic officers seriously. Just as important is that members of the NYPD do not appear to take serous the monitoring system. Furthermore, the deposition revealed a lack of supervisors on the night of the incident as both the Conditions unit and the street crimes unit were without supervisors as their designated supervisor, Sgt Diab, stayed in his office at the 77th precinct studying for an exam. A senior officer should have seen officer Diab's lack of supervision and stopped it.

      None of these officers should have been on the street that night, or left to their own devices. The NYPD had notice of the Defendant's propensities and were indifferent to the risks posed by these officers that they would violate the rights of Mr. Benbow. By NYPD's own metric, Officer Feeley and Officer Roseiello should have been in Level I monitoring at a minimum, which would have subjected them to increased supervision, and likely prohibited them from being on the street that night. They should not have been on patrol that night in light of their lawsuit, IA, and CCRB history. Despite the obvious need to do so, the NYPD failed to discipline, monitor, and supervise these officers such that they predicably used excessive force when presented the opportunity to do so. Officer who show a pattern such as these officers usually modify their behavior to comply with the law and usually avoid using excessive force when they know they are being scrutinized by supervisors. In addition, the NYPD's record keeping was also deficient in that not all complaints were accounted for in relationship to the officers. These complaints would add on to the numerous complaints regarding the Defendant officers that is known to the NYPD. Without proper record keeping, the NYPD cannot be said to meaningfully supervise and monitor their officers as there is no way to fully account for their activities. In any event, they should have not been on the street that night or placed in a position to shoot Mr. Benbow. Finally. Sgt. Diab's history should have disqualified him from being in command of these officers during this situation. The failure to supervise and monitor Sgt. Diab led to him leading a ill fated and defective mission with officers who should not be on the street into a situation where they unlawfully shot Mr. Benbow.

## CONCLUSION

16.    Officers Rosiello and Feeley used unwarranted and excessive force against Mr. Benbow when they shot him.

17.    No reasonable police officer could have concluded that deadly physical force was necessary to apprehend Mr. Benbow.

18.    Officers Feeley and Rosiello violated New York City Police Department, policy and procedures, including, Patrol Guide Procedure 203-12, Deadly Physical Force, and used excessive force when they shot Mr. Benbow in the back.

19.    The NYPD failed to properly monitor, supervise, and discipline their officers and had the NYPD properly done so, Sgt. Diab, Officer Feeley, and Officer Rosiello would not have been in the position to violate the rights of Mr. Benbow and shoot him unnecessarily.

Joseph A. Pollini

*Joseph A. Pollini*
*Police Expert, Inc.*
*107-24 71 Road-PH2C*
*Forest Hills, New York 11375*

**Education:**

- 1995 – MA Criminal Justice.  John Jay College of Criminal Justice, C.U.N.Y.
- 1992 – BS Degree – Police Science.  John Jay College of Criminal Justice, C.U.N.Y.

**Professional Experience:**

For over 33 years, I served as a member of the New York City Police Department.  During this time I served the department in the following ways:

- As a patrol officer
- As an undercover narcotics investigator.  I was also designated to train incoming narcotics investigators.
- Assigned as a bomb and explosives investigator.  During this time I played an integral role in the investigation of terrorist bombing incidents.
- Assigned as a homicide investigator in the Brooklyn North and Brooklyn South Homicide Units.
- Served the department as a patrol supervisor.
- Commander of a unit within the School Program to Educate and Control Drug Abuse.  This was a pilot project where members of the police department educated students in the New York City Public School System on the detriments of narcotics use.  This program was evaluated by John Jay College and as a result of their report, the program was instituted citywide.
- Assigned as an investigator and subsequently as a Detective Sergeant and Detective Lieutenant Commander in the Major Case Squad.  In this unit, I investigated, directed, and supervised bank robbery investigations, truck hijackings, kidnappings, assaults on police officers, and confidential investigations for the Chief of Detectives and the Police Commissioner.
  I participated in and supervised the execution of many search warrants.
  I also trained members of the FBI on kidnapping investigative tactics.
- Served as a member of the Hostage Negotiation Team for 17 years.
- Served the department as a precinct detective squad commander and robbery squad commander.
- Commander the Cold Case Homicide Squad, Special Projects Unit.  I was designated to command this unit from it's inception in 1996.  In this unit I worked very closely with federal investigators and federal prosecutors to develop cases against violent gangs.  I

was also designated by the department during this time to develop an investigative plan to identify and eradicate violent gang activity. This plan was subsequently implemented and is still used today to combat gang violence.

**Honors and Recognition:**

During my career in the New York Police Department, I received numerous citations for outstanding police service and bravery. I was also given an award for not reporting sick during my entire 33 year career.

**Professional Training:**

The following is a list of training courses that I attended while a member of the New York City Police Department:

- Police Academy Recruit Training Course
- 1972 – Narcotics Identification and Undercover Operative Training
- 1974 – Criminal Identification Course
- 1977 – FBI Bomb/Explosives Investigators Course
- 1978 – Arson Investigators Course
- 1979 – Photography Course (Nikon)
- 1980 – Homicide Investigators Course
- 1981 – Sex Crimes Investigators Course
- 1982 – Auto Crime Investigators Course
- 1984 – BMOC-Sergeants Training Course
- 1984 - Dignitary Protection Course
- 1985 – Methods of Instruction Course
- 1985 – Hostage Negotiation Course
- 1989 – Lieutenants Training Course

**Service at John Jay College:**

For over 24 years, I have had the opportunity to serve the college in many ways, including:

- Deputy Chair Person – Law/Police Science/ Criminal Justice Administration (2008-present).
- Police Studies Coordinator - Law/Police Science/Criminal Justice Administration (2008-present).
- Full Time Faculty – Lecturer- CCE– Department of Law/Police Science/Criminal Justice Administration.
- Served as a Substitute Assistant and Adjunct Assistant teaching in the Department of Law, Police Science and Criminal Justice Administration, where I have taught a total of 18 undergraduate and 5 graduate level courses.

- As an instructor in the Office of Special Programs.
- As an instructor and coordinator for the policing program to upgrade policing in the Dominican Republic. I also acquired and supplied the program with training manuals from the New York City Police Department to teach officers at the Dominican Republic Police Recruit Training School.
- As an instructor in the program operated in the New York City public schools, which seeks to explain police operations to students and faculty.
- Being quoted in numerous local, national and international news media on police and investigative subject matters.
- Serve as a media representative for the college on police related matters
- Represented the college during a seminar at the New York Bar Association as an expert on interrogation.
- Served as the Coordinator for the John Jay College, Criminal Justice Society.
- As a freshman advisor, course fair advisor and as a faculty member who has been cited by Dean's List students and the Student Council for providing outstanding support and advice.
- Serve as a liaison with numerous national and international police agencies. I also meet regularly with representatives from various international police agencies and provide them with guidance in various police related matters.
- Serve as a police consultant for many of my college colleagues.
- I have developed courses for the Graduate Studies Program dealing with policing and investigations.
- Assisted the United States Marine Corps in developing a community policing program that was utilized in Iraq to foster better relations between the Marines and the Iraqi people.

**Expert Witness**

- I have testified on numerous occasions in Federal and State Court as a police officer. I am also qualified as a police procedures expert in Federal and New York State Courts.

I have testified in the following cases, within the past 4 years

Ahmad Manzoor v. City of New York, NYS Supreme Court, New York, New York. Qualified as a police procedures expert. Testified at trial-3/10/2017.

Hanson Cuthbert v. The State of New York-June 18, 2019
NYS Court of Claims, New York, New York

Jamar Smythe v. City of Yonkers, et al. S.D.N.Y. 7:16 - cv. 02451-CS-JCM  9/17/18

Brian Pettiford v. City of Yonkers, et al. S.D.N.Y. Docket No. 14 - cv. 06271 (JCM)

1/6/21

**President of J. Pollini Investigative and Security Consultants, Inc., since 2002.**
Specializing in criminal and civil investigations.
Provided official reports, concerning premise security measures.