1              UNITED STATES DISTRICT COURT

2            EASTERN DISTRICT OF NEW YORK

3    JAMES BENBOW,                 .    Docket No.
                                   .    1:17-cv-06457-EK-JRC
4         Plaintiff,               .
                                   .
5         v.                       .    Brooklyn, New York
                                   .    Monday, July 25, 2022
6    OFFICER BRIAN W. FEELY, ET    .
     AL.,                          .
7                                  .
          Defendants.             .
8    . . . . . . . . . . . . . .  .

9

                   TRANSCRIPT OF MOTION HEARING
10          BEFORE THE HONORABLE JAMES R. CHO
                UNITED STATES MAGISTRATE JUDGE
11
     APPEARANCES:
12
     For the Plaintiff:          The Aboushi Law Firm
13                               AYMEN A. ABOUSHI, ESQ.
                                 1441 Broadway
14                               Fifth Floor
                                 New York, New York  10018
15                               212-391-8500

16   For the Defendants:         New York City Law Department
                                 Special Federal Litigation
17                               Division
                                 ZACHARY KALMBACH, ESQ.
18                               100 Church Street
                                 Suite 3-228
19                               New York, New York  10007
                                 212-356-2322
20

21
     Transcription Service:      Superior Reporting Services LLC
22                               P.O. Box 5032
                                 Maryville, TN 37802
23                               865-344-3150

24

     Proceedings recorded by electronic sound recording;
25   transcript produced by transcription service.

1      P R O C E E D I N G S

2           THE COURT:  Good afternoon, everyone.  We're here

3      for a hearing on Defendant's motion for summary judgment in

4      Benbow versus Feely, case number 17-cv-6457.  Can the parties

5      state their appearances for the record starting with

6      Plaintiff?

7           MR. ABOUSHI:  Good afternoon, Your Honor.  Aymen

8      Aboushi on behalf of the Plaintiff.

9           MR. KALMBACH:  And Zachary Kalmbach from

10     Corporation Counsel on behalf of Defendants.

11          THE COURT:  All right.  Good afternoon, everyone.

12     And I do note for the record that parties -- or the Court did

13     receive Docket Number 111, which was Plaintiff's submission,

14     which was filed yesterday.  All right.  Mr. Kalmbach, this is

15     your motion.  Do you want to be heard?

16          MR. KALMBACH:  Yes, Your Honor.  Thank you.  So as

17     Your Honor is aware, Plaintiff filed this lawsuit alleging a

18     number of claims, and I'll just address those claims in

19     order.

20          First, Your Honor, Plaintiff alleges an excessive

21     force claim against all of the Defendants.  Centrally, his

22     excessive force claim is against Officers Feely and Rosiello,

23     who fired their -- or discharged their firearms in response

24     to Plaintiff running with a firearm towards Detective Feely

25     and refusing orders to drop his firearm.  Now, really the

1    central issue is whether or not Plaintiff was holding a

2    firearm.  Plaintiff denies that he was possessing a firearm

3    at the time, and the -- really, the motion turns on that

4    fact, Your Honor.

5              And even though Plaintiff now denies it, for

6    purposes of defeating our summary judgment motion, he under

7    oath during a plea allocution hearing admitted to, in fact,

8    possessing the firearm.  The fact that this Plaintiff's

9    criminal case was thereafter dismissed or vacated has no

10   bearing on whether or not Plaintiff was actually possessing

11   that firearm.  Here, the Court will take -- or should take

12   judicial notice of the fact that Plaintiff -- or Plaintiff's

13   testimony in the plea allocution hearing, he is now

14   judicially estopped from arguing otherwise.

15             And just to clarify, too, the Appellate Division's

16   reversal of Plaintiff's criminal case had to do with whether

17   there was reasonable suspicion to stop Plaintiff in the first

18   place.  It doesn't have anything to do with whether Plaintiff

19   was actually possessing a firearm.  So there's no genuine

20   dispute that Plaintiff was holding a firearm.  Now, Plaintiff

21   now argues that he --

22             THE COURT:  Well, let me stop you for a minute

23   there, Mr. Kalmbach.  I want to be precise.  So at the

24   allocution, he admitted to possessing the handgun, right?

25   What you just said was there's no dispute that he was holding

1    the handgun.  I want to be precise, though.  Do you have

2    evidence other than the testimony that I assume from your

3    officers that he was holding the gun, I don't think Plaintiff

4    ever admitted he was holding it.  Or am I misreading the

5    record?

6              MR. KALMBACH:  Well, to possess it, I believe he

7    would have to be holding it.  I guess I'm not understanding

8    how --

9              THE COURT:  Look, I think the argument you're

10   raising is that he had this gun in his hand and pointed it at

11   the officers, right?

12             MR. KALMBACH:  Correct.

13             THE COURT:  But if he had the gun in his back

14   pocket, that's a different story; isn't it?

15             MR. KALMBACH:  Well --

16             THE COURT:  All right.  You can possess it, but it

17   can be in your back pocket.  He's not pointing it at the

18   officers at that time, right?  I just want to be precise

19   because -- unless you don't think we need to be that precise

20   in dealing with this motion, right?  If he just had it on his

21   body, are you saying that's sufficient for defeating the

22   excessive force claim?

23             MR. KALMBACH:  I think it would be sufficient for

24   at least on qualified immunity grounds to be running with a

25   firearm and the officer telling him to drop the firearm,

1　essentially, and -- but it any event, I don't think Plaintiff

2　in opposition argues whether or not -- so for -- Plaintiff

3　doesn't say, okay, well, he was holding -- or he possessed

4　the firearm but he wasn't holding it.  That's not the

5　position Plaintiff's taking in opposition to our motion.  His

6　position is that Plaintiff did not have a firearm at all,

7　which is really -- and because if he did possess the firearm,

8　now that's -- it's a different story because now we have our

9　officers who already testified that they saw him holding the

10　firearm.

11　　　　　THE COURT:  Okay.  So what you're saying though,

12　then, is the fact that Plaintiff is denying that he ever had

13　the firearm does not create a genuine issue of material fact.

14　Is that what you're saying?

15　　　　　MR. KALMBACH:  Correct, Your Honor.

16　　　　　THE COURT:  Even though your officers disagree?

17　　　　　MR. KALMBACH:  Yes.  But we think that Plaintiff,

18　his pre-allocution together with the fact that Plaintiff does

19　not argue in opposition that there's any distinction between

20　whether if he was possessing the firearm that it was in his

21　back pocket or anything like that warrants -- or means that

22　there's no genuine issue or fact that Plaintiff was holding

23　the firearm.  And even assuming for the purposes of argument

24　that he possessed -- so say, in this hypothetical situation,

25　which -- again, there's kind of two situations here, one,

1  Plaintiff did not have the firearm or two, Plaintiff had the

2  firearm and was holding the firearm.

3          No party is arguing that there's anything in

4  between.  But just for the sake of argument, if Plaintiff was

5  running at officers with a firearm, they would still be

6  entitled to qualified immunity on that -- on those grounds,

7  and also -- well, I'll leave it there on that point.  And

8  then I do want to make more qualified immunity arguments

9  whenever the time's appropriate.

10          THE COURT:  Understood.

11          MR. ABOUSHI:  Your Honor, may (indiscernible), or

12  are you going to do it by --

13          THE COURT:  Yeah.  Mr. Aboushi, I will turn -- I

14  will give you plenty of opportunity to respond at the

15  appropriate time, but why don't we hear from Mr. Kalmbach

16  first.

17          MR. ABOUSHI:  Thank you.

18          THE COURT:  Mr. Kalmbach, since we're talking about

19  the allocution, is it your view -- I assume this is the

20  case -- that notwithstanding the Second Department's decision

21  that the court -- this Court should still take into account

22  his allocution.  Is that your position?

23          MR. KALMBACH:  Yes, Your Honor, based on the

24  doctrine of judicial estoppel and the fact that the Appellate

25  Division's reversal had nothing to do with whether Plaintiff,

1 in fact, possessed the firearm or did not possess the

2 firearm.

3      THE COURT:  Understood.  Does that also mean the

4 Court should take into account that Plaintiff is arguing he

5 was coerced and felt pressured to allocate the way he did --

6      MR. KALMBACH:  Well, in his --

7      THE COURT:  -- or --

8      MR. KALMBACH:  A, there's no evidence of that.

9 Plaintiff says that -- in his 56.1 that his parents or

10 family -- I can't remember who -- was pleading with him to

11 take it, but there's no actual evidence of that that

12 Plaintiff cites to, and B, in the allocution, he actually

13 says under oath that he was not forced into taking this plea

14 agreement.  And it's just, like, as a matter of policy being

15 able to say later in civil suits, oh, well, I was coerced,

16 when there's no actual evidence of that beyond just the fact

17 of taking a plea deal, which is a part of everyday criminal

18 process isn't -- I guess as a matter of policy doesn't really

19 make sense.

20      But in any event, he said under oath that he was

21 not forced into taking it.  So our position is that the Court

22 should disregard Plaintiff's now convenient claims that he

23 was somehow coerced, which is a strong word considering what

24 Plaintiff's actual claims are in this case.

25      THE COURT:  I understand that.  But do you know,

1  then, why he appealed the judgment to the Second Department?

2          MR. KALMBACH:  It was based on -- well, I guess I

3  don't have his moving papers but reading the Second

4  Department's opinion, which Plaintiff attaches to his motion,

5  it's the thrust -- actually not what the -- the whole opinion

6  is about whether -- and this is actually -- it looks -- seems

7  to be a mistake, but the Second Department really discusses

8  the standard for whether an anonymous tip can create

9  reasonable suspicion and then the issue was -- so the Court

10  found no in that case, and therefore, the firearm should've

11  been suppressed.  So it was based on suppression, not

12  whether -- not actual possession.

13          THE COURT:  I understand that.  But if someone is

14  pleading guilty, why would they appeal, then?  Because

15  they've already plead guilty.

16          MR. KALMBACH:  I mean, maybe afterwards they talked

17  to a lawyer, who gave them a second opinion on something or

18  they talked to -- they went to the law library and found out

19  about -- read about reasonable suspicion.  There's a plethora

20  of reasons why somebody would appeal and considering -- just

21  to, like, take another kind of crack at the apple if you

22  will -- but --

23          THE COURT:  Okay.  Or maybe he felt coerced into

24  pleading guilty and decided to appeal.  Is that a possibility

25  as well?

1    MR. KALMBACH:  It's just such extreme conjecture at

2 this point, Your Honor, when we have -- he testified under

3 oath that he was not forced into pleading guilty.

4    THE COURT:  Understood.  Okay.  Go ahead.

5    MR. KALMBACH:  And so under the forced claims as

6 well and also -- I'm not sure if Your Honor has viewed the

7 security cam footage, but it does show Plaintiff also

8 removing what appears to be a firearm from his waistband of

9 his pants.

10    THE COURT:  Okay.

11    MR. KALMBACH:  So Plaintiff, then, argues that, oh,

12 well, he was shot in the back, so he must have been running

13 away from the officers, whereas, if you actually look at the

14 photos of Plaintiff's injury, he was not actually shot

15 directly in the back.  The location of his injuries is

16 consistent with the officer's testimony.  But notwithstanding

17 that, Your Honor, Plaintiff's argument also is that, okay, so

18 I was running directly away from Officers Feely and Rosiello,

19 and he submits this report by his purported experts that

20 shows, like, an arrow purporting to be the direction that

21 Plaintiff was running.  That direction where he was running

22 was directly where the other officers were standing; that's

23 not disputed here.

24    So under the objective qualified immunity standard,

25 it was, in that situation -- actually, even setting aside

1  qualified immunity, in that situation, it would still have

2  been objectively reasonable to fire at Plaintiff when he was

3  running towards fellow officers with a firearm, even if it

4  wasn't and the Court doesn't find that that was -- or does

5  find that that was -- by itself would've been excessive

6  force, here there's no clearly established law that in a

7  situation where an individual is running towards police

8  officers when in possession of a firearm, it is not

9  objectively reasonable to use lethal force on that person.

10        In fact, just a couple weeks after this motion was

11  fully briefed, the Supreme Court issued two more decisions

12  strongly reiterating that when viewing -- or when analyzing

13  qualified immunity, the analysis has to be very specific to

14  the facts.  Any that is to be -- for the law to be clearly

15  established, the facts have to closely match up and the

16  Supreme Court repeatedly again and again instructs courts to

17  not define clearly established law at a level of generality

18  but rather to analyze the -- or to match up these specific

19  facts.

20        So at a minimum, our position is that the officers

21  were entitled to qualified immunity on the excessive force

22  claims.  As to Plaintiff's excessive force claim against the

23  other Defendant, our position is that those claims are

24  abandoned.  We argued that they were not personally involved;

25  they did not use force; that's Defendants Anderson, Minucci,

1   Diab, and Mitchell, so Plaintiff's excessive force claim

2   against those Defendants should be dismissed.

3           With regard to Plaintiff's false arrest claim, the

4   collective knowledge doctrine applies here.  The proper

5   inquiry there is whether the arresting officer acted

6   reasonably as opposed to whether probable cause actually

7   existed or the vouching officer acted reasonably.  Here,

8   there was a tip from Officer Marshall (ph.) that Plaintiff

9   possessed a firearm.  At a minimum, even if that didn't rise

10  to the level of probable cause and is setting aside the fact

11  that Plaintiff has already under oath said that he did, in

12  fact, possess a firearm, which that by itself is enough to

13  defeat Plaintiff's false arrest claim.

14          But even setting that aside, the officers were

15  entitled to rely on the tip from Marshall and at a minimum,

16  that would provide the officers reasonable suspicion to stop

17  Plaintiff, and upon finding the firearm, at that point, there

18  was probable cause to arrest Plaintiff.  That same analysis

19  applies to Plaintiff's malicious prosecution claim.  Probable

20  cause also defeats such claims, and there's no evidence here

21  that the probable cause officiated between the time the

22  Plaintiff was arrested and arraigned.

23          Also, Plaintiff was indicted in this case.  And

24  indictment creates a presumption of probable cause, and

25  Plaintiff has failed to overcome that, here.  In addition,

1    Plaintiff has failed to satisfy the malice element of

2    malicious prosecution claims.  So for those reasons -- and

3    again, this -- the central reason for why Defendant should be

4    granted summary judgment for Plaintiff's malicious

5    prosecution and false arrest claims is because he did, in

6    fact, possess the firearm, which is -- satisfies the element

7    of the crime by itself, so there was probable cause to arrest

8    him.

9         With regard to Plaintiff's failure to intervene

10   claim, our position is that it was impossible for the other

11   officers to intervene in the use of lethal force.  Obviously,

12   Officers Feely and Rosiello can't intervene in their own uses

13   of force, so these claims are really against the other

14   officers.  And based on where Plaintiff admits that their

15   positioning was, just based on the fact that there was only

16   a few shots fired and we can't expect the officers to somehow

17   jump in front of a bullet to stop this use of force,

18   Plaintiff's failure to intervene claims clearly fail.

19   Lastly --

20        THE COURT:  Mr. Kalmbach, let me stop you for a

21   minute.  I have a question regarding the failure to

22   intervene.  Now, how long do you think the shooting took

23   place?  Clarify your view.  Is it 20 to 30 seconds, or is it

24   the 2 minutes?  Is it the shorter or longer, or does it not

25   matter?

1    MR. KALMBACH:  No.  It was shorter.  Our position

2  is that it was just a matter of seconds.  And Officer Feely,

3  he said that there was -- in a testimony he mentioned the 20

4  to 30 seconds, which I believe was between the first and last

5  shot, if I'm remembering correctly.  And even after that, he

6  said -- he clarified that it was a boom, boom, boom, and that

7  he had trouble estimating the times.  Another officer who

8  testified said that it was just two or three seconds.  So our

9  position is that it was shorter, but even if it was, it maxed

10  20 to 30 seconds.

11    But still based on where the other officers

12  would've been standing, based upon the intensity of a

13  situation which warrants lethal force and which lethal force

14  was used, it is just not practical for the officers to have

15  an opportunity, a realistic opportunity to actually stop the

16  force.  But our position is when actually looking at Officer

17  Feely's testimony, it is a boom, boom, boom kind of situation

18  here.

19    THE COURT:  Now, your friend on the other side says

20  it could have been a longer episode, almost two minutes,

21  right?  You saw that argument, correct?

22    MR. KALMBACH:  Yes.  That just -- even if --

23    THE COURT:  Now, let's assume that -- we're on

24  summary judgment, so let's assume it -- the duration of the

25  shooting was, in fact, two minutes.  Would your failure to

1  intervene argument still stand?  Assuming it were two

2  minutes, do you think you still have a valid failure to

3  intervene motion and you think -- and your position should be

4  that should still be dismissed, even if it were the longer

5  duration?

6       MR. KALMBACH:  Yes.  It would still be -- accepting

7  that premise, which I think, again, looking at the actual

8  evidence that that isn't possible.  But accepting that

9  premise is true, there was still a very -- there wasn't -- I

10 think just practically for an officer to stop a gunshot is

11 just not practical.  Again, Your Honor, it's a premise that

12 we just don't think is -- should be accepted in this case.

13      THE COURT:  I understand that.  But are you also

14 saying, then, given the location of Anderson, Diab, Minucci,

15 and Mitchell that even if it were two minutes, they weren't

16 in a position to be able to intervene.  Is that your argument

17 or something else?

18      MR. KALMBACH:  Yes, Your Honor.  That would be

19 correct.

20      THE COURT:  Okay.  Is it because your view is that

21 they were not close enough to Feely and Rosiello to have done

22 anything?  Is that your position?

23      MR. KALMBACH:  Is that and -- these kind of failure

24 to intervene claims, Your Honor, they typically give rise in

25 a situation where -- for example, if there's -- if there's

1   like a continuous beating of a arrestee who's in handcuffs,

2   right? So there's a beating that allegedly goes on for say,

3   like, two minutes, that's a much different situation

4   where -- than here where the use of force is just a few gun

5   shots.

6          THE COURT: Okay. I hate to do this, but I have a

7   follow-up question on your excessive force claim. And maybe

8   I've mired in the weeds, so maybe I shouldn't, but let's

9   assume it's true what your -- what the Plaintiff is saying

10  now that he did not have a gun with him. He did not possess

11  a gun at that time. If that were the case, what happens to

12  the excessive force claim? If he did not have a gun, does

13  that mean any force used by your officers would have been

14  accepted or not necessarily, if he did not have the gun?

15          MR. KALMBACH: It would --

16     (Simultaneous speech)

17          THE COURT: Again, assuming his testimony that he

18  did not have a gun.

19          MR. KALMBACH: Yeah. If the Court accepts his

20  testimony that he did not have a gun as true --

21          THE COURT: Yeah.

22          MR. KALMBACH: -- it's a more difficult case for us

23  in that case, Your Honor.

24          THE COURT: I understand, okay, but I got to --

25          MR. KALMBACH: Yeah.

1          THE COURT:  Okay.  Understood.  Go ahead.  Anything

2    else?

3          MR. KALMBACH:  The last point is on Plaintiff's

4    Monell claim.  Many of his contentions on this claim as far

5    as, like, how many lawsuits there were, how many complaints

6    there were against the officers, things like that are just

7    wrong.  They're just, like, not factually correct, even

8    looking at the evidence that Plaintiff cites.  And it really

9    just boils down to the fact that a Monell claim can't be

10   premised on just a couple lawsuits and really can't be

11   premised on lawsuits that don't result in liability, which

12   here, there's no evidence that these officers were ever found

13   to be liable in a lawsuit.

14          And then, I guess I have -- I said one more but one

15   more after that is just Plaintiff's claim for assault and

16   battery and negligence also fail assault and battery for the

17   same reasons as Plaintiff's excessive force claim and

18   negligence because Plaintiff can't simultaneous assert

19   negligence and intentional conduct.

20          THE COURT:  Okay.  Mr. Aboushi, you've been very

21   patient.  I'll hear from you now.

22          MR. ABOUSHI:  Thank you, Your Honor.  And if you

23   get to know me, you'll realize how hard that was.  Thank you

24   for the opportunity, Your Honor.  First and foremost, I want

25   to incorporate by reference our opposition and submissions

1 therein to this oral argument and the points raised. Diving

2 into the points raised by my colleague on the other side, I

3 think the Court astutely noted the difference between possess

4 and point, and I'd even take it one step further. There's

5 nothing in the, I would say, deficient allocution that says

6 he possessed it at that time or during his interactions with

7 these officers. And so the record before the Court mandates

8 that the Court deny the Defendant's summary judgment on this

9 particular issue especially in addition to the others.

10 And you know, taking a step back, Your Honor, the

11 Defendants only win this motion for summary judgment if you

12 flip the standard for summary judgment on its head and take

13 everything that they said is true and give them all

14 reasonable inferences, which we all know that's not what the

15 Court's supposed to do. So in nearly every argument made by

16 defense counsel, he's saying the facts say this and the fact

17 say that. And frankly, he didn't write the moving brief, but

18 when I read the moving brief, the term undisputed was used so

19 many times, I was flabbergasted because you can call this

20 record many things, Your Honor. One thing that you cannot

21 call it is undisputed, and only a jury can resolve these

22 issues.

23 So even assuming that the allocution is

24 valid -- and I'm going to get into that in a second -- or

25 that the guilty plea is valid -- and I'm going to get into

1   that in a second -- there's still too far a bridge between

2   allocating to possessing a gun and possessing a gun during an

3   incident, an encounter with police.  And even going a step

4   further, which Your Honor would necessarily have to do to

5   grant summary judgment, which is not only to say, okay, you

6   possessed the gun during your encounter with the police, but

7   you would also have to find, Your Honor, again, on summary

8   judgment, that the Plaintiff pointed the gun at these

9   officers.

10          And you know, that's just impossible given this

11  record.  Not only the witness -- the Plaintiff's testimony,

12  but you have officer testimony at the scene that they never

13  saw a gun, you have forensic information that reconstructs

14  the shooting and flatly lays out to Your Honor that Plaintiff

15  could have been in no position whatsoever other than running

16  away from them in order to sustain the injuries that he

17  sustained in his lower back, those bullet wounds.  And my

18  colleague on the other side, defense counsel, is a very

19  capable lawyer, but one thing he's not is a doctor, nor is he

20  a forensic reconstructionist, nor is a police practices

21  expert.  And you would need all of those things just to begin

22  to surmount the issues of disputed fact, the genuine material

23  issues of disputed fact and grant the Defendant's summary

24  judgment.

25          Now, talking to the point regarding the guilty

1   plea, it's a bit frustrating to hear defense counsel talk

2   about what his witnesses have said and actually embellish

3   upon what his witnesses have said in some respect but then

4   tell Your Honor there's nothing in the record to support

5   coercion.  There's a lot in the record to support a coerced,

6   unfair, and erroneous plea of guilt.  One you have the

7   witness -- the Plaintiff's very testimony, two, you have his

8   actions, which -- in which he appealed it.  Two, you have

9   the -- three, you have the transcript that shows the colloquy

10  between him and the judge and his family was in the room and

11  they're making noise.  And by the way, Your Honor, all this

12  is aptly laid out in the transcript in the testimony.

13          Additionally, Your Honor, you have the fact that

14  the very -- Plaintiff testified on pages 56 of his transcript

15  and 57 regarding the coercion that he was faced with, and he

16  even talked about his attorney.  It wasn't me, Your Honor,

17  for Your Honor's edification.  But on page 57, he's asked a

18  follow-up question and I'll note without any objection from

19  me.  This goes on for pages where defense counsel's allowed

20  to ask him these questions.  And one of the final questions

21  that he's asked is, so was it your testimony that you were

22  coerced into pleading guilty to having a gun by the Judge?

23          Again, their own question, Your Honor, says to

24  having a gun, not pointing a gun at the police, not having it

25  during the encounter, not anything to do with the facts of

1  this case, and the answer is, yes, I was coerced.  I was

2  coerced by the lawyer.  I filed ineffective assistance with

3  counsel and all of that.  Yes.

4          So Your Honor doesn't have someone standing before

5  the Court for the first time saying that there was coercion

6  or challenging on conviction.  You have someone that said it

7  at the hearing and on allocution, which Your Honor has plenty

8  of experience giving these.  I'm sure my colleague on the

9  other side has read the transcript.  I've done it.  That was

10 a very tortured allocution, if you want to call it that.

11 I've never seen a gallery infect an allocution the way it did

12 in this time where you have friends and family and someone's

13 mother crying out from the galleries to tell them to take a

14 plea.  I've never seen the sort of promises that were made in

15 this case.  I've never seen someone faced with situation

16 appeal it then also obtain relief by way of the Appellate

17 Division.

18         So Your Honor doesn't just have someone in the

19 abstract saying for the first time at the end of a lawsuit

20 that they were coerced.  Your Honor has his testimony, which

21 in and of itself is sufficient, Your Honor.  It creates a

22 genuine issue of material fact.  Then, you also have

23 supporting evidence that buttresses his statement.

24         Then defense counsel referenced the video.  If Your

25 Honor hasn't watched the video, don't bother.  It's at best

1  inconclusive, at worst shows the Plaintiff simply running.

2  It's a grainy video that shows the Plaintiff begin to run.

3  Now, obviously, the defense would want Your Honor to believe

4  that that video shows him pulling out a gun out of his

5  waistband, even though you can't see it on the video.  But

6  again, that would also flip the standard for Rule 56 on its

7  head.  You would have to, Your Honor, take all favorable

8  inferences in favor of the Defendant and look into that video

9  a gun.

10         But even if there was a gun, Your Honor -- and I

11  want to get this out there because I think it's important as

12  well -- Defendants, I think, have to argue that there was a

13  gun at the scene in order to justify this unjustifiable

14  shooting.  But possession of a gun in and of itself is not

15  authority to use excessive force, Your Honor.  This is a

16  highly, highly fact specific, only a jury can decide this

17  issue that needs to proceed internally can't be decided on

18  summary judgment.  Even assuming arguendo that the Plaintiff

19  possessed a gun in his pocket and he sees the police and he

20  runs away, that doesn't permit them to shoot him,

21  particularly in his back as he's running away.

22         Even if I would go so far as to argue, Your

23  Honor -- and I'm not submitting that that's the case

24  here -- Plaintiff was running with a gun in his hand away

25  from the police.  That's still not a license carte blanche

1  authority under our law to observe him running away, pull out

2  a gun, and shoot him in his back.  And mind you, Your Honor,

3  while the defense picks and chooses what they want you to

4  believe from their testimony, make no mistake about it, the

5  Defendants can't agree on what happened.  You have officers

6  saying, oh, I shot --

7  THE COURT:  Mr. Aboushi, let me interrupt you for a

8  second.  I want to ask you a question about something you

9  just said.  Again, we're just assuming for purposes of the

10 motion, let's assume he did have a gun in his hand and was

11 running away from the two officers, Feely and Rosiello.  It

12 seems to be Defendants' contention is perhaps they're running

13 towards the other officers.  Now, if that were the case,

14 would your view be different that perhaps excessive force was

15 not so excessive after all if, in fact, he had a gun in his

16 hand and was running toward the other officers, the

17 nonshooting officers?

18 MR. ABOUSHI:  Thank you for that question, Your

19 Honor.  So I haven't heard the defense arguing, and it's

20 nowhere in their papers that he had a gun in his hand and he

21 was running towards these other officers.  From what the

22 evidence shows, Your Honor, there were officers on the

23 sidewalk, there -- and there was an officer in the street,

24 and when Plaintiff was running, he was running away from both

25 where the officers in the street were and the officer on the

1　sidewalk was.　He was running in the opposite direction.　So

2　we don't even have a situation here where there's a realistic

3　threat that he has a gun in his hand -- again, which is not

4　something the Plaintiff concedes or is even undisputed in

5　this case, but let's --

6　　　　　THE COURT:　Understood.

7　　　　　MR. ABOUSHI:　-- just play some hypotheticals.　He

8　has a gun, he's running, and he's not running in the

9　direction of any officer, Defendants would still be wrong.

10　And here in this case, that's exactly what it shows.　And I

11　think the shooting reconstructionist is very, very valuable,

12　Your Honor, in addition to the medical expert reports, which

13　show the location of the injuries.　You don't get those

14　injuries unless you're shot in the back.　And it lines up

15　with exactly the way the Plaintiff testified to and Your

16　Honor -- and the way the Defendants testified to.

17　　　　　If you look at the expert reports, these aren't

18　one-sided expert reports that, you know, some hacks are paid

19　to write.　These are expert reports that take into account

20　the mutual evidence at the scene, forensic evidence, for

21　example, location of shell casings and other things, and they

22　take into account what the Defendants said happened. So

23　putting all that together, Your Honor, it shows that the use

24　of force was improper, that they did not have probable cause

25　to arrest him, and under no circumstances were they entitled

1   to shoot him in his back as he ran away from them.

2          Next, Your Honor, in terms of -- I think my

3   colleague next talked about qualified immunity for a brief

4   moment, the law is well established about the usage of

5   excessive force and the use of deadly force.  So that the

6   Supreme Court recently came out with decisions a few months

7   ago -- I don't know what they were because it wasn't

8   referenced -- does not change the fact that, you know, use of

9   excessive force is clearly established, shooting someone

10  who's running away from the police and/or unarmed is also

11  clearly established.

12         I don't see the Defendant's arguing that nor could

13  they because there's been plenty examples in the city of New

14  York where you have unarmed individuals or people running

15  away from police have been shot in the back, and those -- I

16  believe those lawsuits were able to proceed.  And I can't

17  think of the case off the top of my head, but I do remember

18  reading at least one.

19         Now, in terms of Marshall, the disgraced security

20  officer/auxiliary police officer that the Defendants

21  referenced in trying to manufacture an argument for -- let me

22  see what it was -- selective knowledge.  So first, Your

23  Honor, that doctrine's inapplicable.  But even if the

24  Defendants are able to convince Your Honor to say, okay, you

25  should at least undergo this analysis, that analysis fails

1  because they failed to show that anyone other than Diab spoke

2  to Marshall.

3         Under the collective knowledge doctrine, the

4  officers have to speak and communicate with each other.  That

5  didn't happen here.  The only person in the record that may

6  have spoken with Marshall was Diab.  And guess what, Diab

7  wasn't one of the people that shot the Plaintiff.  So in

8  terms of probable cause and the collective knowledge

9  doctrine, I think that fails.

10         Next, Your Honor, is the failure to intervene.

11  Again, you would have to accept the Defendants' version of

12  events completely however absurd they are -- and I'll get to

13  that in a minute -- as true in order to grant summary

14  judgment on this claim.  The reason why I say however absurd

15  is because now defense counsel -- and again, I know he's

16  doing the best he can, but defense counsel is now telling

17  Your Honor what he thinks his deponent said because his own

18  witness testified in a manner that precludes summary judgment

19  on this claim to intervene.  Their witnesses testified about

20  30 seconds about 2 minutes.  This isn't the Plaintiff.  This

21  is their witnesses that are testifying to it.

22         So Your Honor can -- is not in a position to rule,

23  and I respectfully submit it would be improper to grant

24  summary judgment on this without the fact finder having heard

25  the testimony, observed the witnesses, looked at the

1  evidence, and decided whether or not -- how long the shooting

2  occurred.  And again, they would have to think that their own

3  officers were wrong in what they testified to.  It almost

4  reminds of our -- the argument we made about the bullet that

5  makes a U-turn because that's the only way that what they're

6  saying is true and Plaintiff can be shot in the back.

7        Well, this is the same sort of thing with the

8  testimony regarding intervention.  You would have to reverse

9  engineer the Defendants' own testimony to truncate the amount

10 of time the shooting took place in order to grant summary

11 judgment on the failure to intervene.

12       Additionally, Your Honor brought up some questions

13 regarding how to intervene and then opportunities to

14 intervene.  Clearly, these officers were within distance of

15 each other.  They saw each other.  I believe Anderson was

16 standing on the sidewalk with another officer.  All of these

17 officers could've intervened in a bunch of ways.  And I went

18 over this in their depositions, Your Honor.  This isn't news

19 to anyone.  They could have verbally instructed each other

20 not to shoot just like some of the other officers on the

21 scene did not discharge their weapon, right?  Allegedly you

22 have this guy running down the street, pointing a weapon at

23 police officer, and only two officers out of, I believe, six

24 or seven on the team fire, right?

25       So whether or not they had an opportunity to

1    intervene, what they could've done to intervene, including

2    giving verbal commands, including the officer who's standing

3    next to -- one of the shooters could've put his hand on his

4    shoulder or said something to him or something else.  All

5    these are within the province of a jury, Your Honor, and it

6    is not ripe for summary judgment.

7              THE COURT:  Mr. Aboushi, question -- and some of

8    this is a question I asked your friend on the other

9    side -- does timing matter whether it was 20 seconds boom,

10   boom, boom or 2 minutes in terms of the duration of the

11   shooting?  Does it make a difference on their motion for

12   failure to intervene?  In other words, if it were only a

13   matter of seconds, would that have precluded these other

14   officers from intervening?  Whereas if it were two minutes,

15   they probably had a better chance to intervene.  Is that

16   something the Court needs to focus on, the timing, or does it

17   not matter?

18             MR. ABOUSHI:  Well, I think on this disputed

19   record, Your Honor, you're required to deny summary judgment

20   on this because the jury needs to determine the time.  I do

21   think that time matters, Your Honor.  If it was a split

22   second, then I think under the law, the officer wouldn't have

23   an opportunity to intervene, right?  And I think that's

24   fairly straightforward, and I'm willing to concede that part

25   of the hypothetical.

1     But we don't have that here, Your Honor.  We need

2 the jury to sit down and say, okay, was this a two -- did

3 this occur over 2 minutes; did this occur over 30 seconds,

4 which frankly is still enough time to intervene.  And if it

5 did occur 30 seconds or 2 minutes as they say, was there a

6 meaningful opportunity to intervene with the officers

7 standing around their fellow officers who were shooting at an

8 individual who was running away with them and we submit was

9 unarmed?

10     So you know, your question and your point is well

11 taken, Your Honor.  I think if it was a split-second

12 decision, a split-second event, I think that does not

13 implicate failure to intervene.  I don't even think we get

14 that far down the hypothetical, Your Honor, because of the

15 disputed facts that require a jury to really determine what

16 happened, who was where, what opportunity did they have, who

17 was in who's line of sight.  These are the sorts of the

18 things that I think the jury will focus on in the failure to

19 intervene.

20     THE COURT:  Okay.  Understood.  All right.  Go

21 ahead.

22     MR. ABOUSHI:  Thank you, Your Honor.  Next, you

23 know, I wrote down the word typical when my colleague on the

24 other side was speaking because I don't think any failure to

25 intervene case is typical.  IT may be typical in his

1  experience, but failure to intervene cases run the gamut from

2  police shootings to police beatings to police chases, all of

3  those situations.  So I would not -- I would vehemently

4  disagree with the characterization that in a police shooting,

5  there's never an opportunity to intervene, and certainly no

6  claim for failure to intervene can lie in a police shooting

7  case.  That's just not true, Your Honor.

8         And then, I believe the next point that was raised,

9  Your Honor, is the Monell argument.  I think defense counsel

10 does a good job of seeking to minimize the record as to the

11 Monell claims, but the facts are the facts, Your Honor.  And

12 this Court has been very clear in terms of what it takes to

13 attach Monell liability, and frankly, there's more than

14 necessary here to attach Monell liability.

15        We have, first and foremost, officers who are

16 involved in lawsuits that, one, either don't know about them

17 or -- more devastatingly for the Defendant -- they're not

18 memorialized.  How can you supervise and monitor your

19 officers when you don't know when they're being sued and no

20 one's keeping track?  We also understand that possibly both

21 but at least one of the shooters should have been in a

22 program to monitor their performance strictly on metrics

23 basis.  That didn't happen.

24        You also had the number of complaints against these

25 officers that are in and of themselves, Your Honor, to

1  inspire Monell liability and at the very minimum put it

2  before a jury and have a jury decide that when these officers

3  qualify for an early intervention program, have a certain

4  amount of complaints lodged against them, have a -- are

5  involved in a certain amount of lawsuits, should these

6  officers have been on the street that night?  Should these

7  officers have received additional training?  Should these

8  officers have received additional supervision?

9          The bar for Monell is not as high as my colleague

10  on the other side would suggest.  And I'm looking for the

11  case now -- I believe you cited it -- but it seems recently

12  out of the Eastern District -- and I believe it was Judge

13  Dearie that wrote it -- upholding and denying summary

14  judgment for a Monell claim and sending it to the jury -- the

15  case settled, but where an officer had less complaints than

16  the officers we have here, there were less lawsuits than the

17  officers that we have here, and none of the officers in that

18  case were subject to increased monitoring, which the officers

19  in this case should have been subject to.

20          Then finally maybe defense counsel ran out of

21  steam.  I don't blame him.  This is all the argument.  But I

22  heard some things but not much about assault and battery and

23  state law claims.  Clearly, Your Honor, the use of excessive

24  force dovetails from an assault and battery.  The Plaintiff

25  testified as to the elements of those claims.  Obviously,

1  there was contact made with the Plaintiff.  The Defendants

2  shot him.  He was conscious of that.  He did not consent to

3  it.  He was put in imminent fear by the officers pulling out

4  their guns, pointing at them and then shooting him.  And so I

5  believe that addresses the arguments raised by the

6  Defendants.

7          And Your Honor, in closing, I just would like to

8  say that the parties could not be further apart on what

9  happened in this case, and I think that's why summary

10 judgment gets denied and it moves to a trial.  You have the

11 Plaintiff's testimony.  You have the Defendant's testimony

12 that supports what the Plaintiff says and goes against what

13 some of the other officers are saying.  You have forensic

14 testimony, Your Honor, that analyzes the forensics at the

15 scene, analyzes the testimony.  And according to the science,

16 according to cold science establishes what the Plaintiff has

17 been saying:  I was shot in the back as I was running away.

18         And so in light of the foregoing, Your Honor, we

19 respectfully request that Your Honor report and recommend

20 that the motion for summary judgment should be denied.  And I

21 really thank Your Honor for taking the time to have us today

22 and to also ask the important and thoughtful questions that

23 you have posed.

24         THE COURT:  Mr. Aboushi, I do have another question

25 for you.  Do you agree that your claims of excessive force

1  against the nonshooters, Anderson, Diab, Minucci,

2  Mitchel -- are you not pursuing those; is that correct?

3          MR. ABOUSHI:  That's correct, Your Honor.

4          THE COURT:  Okay.

5          MR. ABOUSHI:  Anyone that did not use force, we

6  cannot establish claim of excessive force with.

7          THE COURT:  I'm sorry.  I missed that last part.

8  Could you say that one more time?

9          MR. ABOUSHI:  I said anyone who did not use force

10  against the Plaintiff, we would not be able to establish a

11  claim for excessive force.

12          THE COURT:  Okay.  Understood.  Mr. Kalmbach, I'll

13  give you the last word.  Anything else you'd like to add on

14  your end?

15          MR. KALMBACH:  Yes, Your Honor, just a few points

16  on Plaintiff's argument.  First, I think just as a general

17  manner, what it sounds like is kind of happening right now is

18  that Plaintiff's starting to assert alternative theories of

19  liability here, whereas I would caution the Court against

20  allowing Plaintiff to now argue on the one hand that he never

21  had a gun, but then, if I did have a gun, then I wasn't

22  actually holding it at the time.  Plaintiff cannot assert

23  alternative theories of liability, here.  I just want to make

24  that point.

25          As to qualified immunity, I just wanted to

1    reiterate that in order for the Court to deny qualified

2    immunity, it would have to find a case at the Second Circuit

3    or higher that found excessive force under a

4    factually -- specifically, factually similar circumstances.

5    That's just kind of a small point.  As Plaintiff was making

6    his argument, I looked through our papers, and I just want to

7    clarify that Officer Feely, my understanding is that he was

8    asked how much time elapsed between the first and last shot,

9    not between shots so just wanted to clarify that.

10           As to our Monell claim, I do just want to

11   reiterate, too, that these points about, like, performance

12   monitoring, things like that, they're just wrong.  Even based

13   on Plaintiff's -- if you look at the documents that Plaintiff

14   attaches in support of his complaint -- for example, he

15   attaches a document, which purports to set the standards for

16   monitoring, and the Defendants just don't even meet that

17   here.  So I wanted to clarify that.

18           And then, lastly, as to coercion, I'm not aware of

19   any case law that says that -- or that holds that these

20   circumstances rise to the level of coercion to invalidate a

21   plea agreement nor is there -- just the fact that Plaintiff

22   has appealed doesn't necessarily indicate that he appealed

23   based on some alleged coercion argument.  So that's it for

24   the points as to our motion.

25           THE COURT:  All right.  Thank you.  Mr. Aboushi, I

1  have another question for you.  Mr. Aboushi, what do you want

2  the Court to consider?  Do you want the Court to consider the

3  plea allocution or to disregard it or credit his testimony

4  that he did not have a gun or all of the above?  In other

5  words, how do I reconcile the testimony now that he did not

6  have a gun with the testimony from the allocution?  Or do I

7  not need to reconcile the two?  How do address that

8  inconsistency?

9        MR. ABOUSHI:  Well, Your Honor, just -- and to put

10  a period on something my colleague said, you know, in our

11  statement of fact and in our brief, it's clear that Plaintiff

12  did not point -- and I'm quoting Plaintiff, did not point at

13  anyone or present a gun to anyone.  That's clear, right?  So

14  this whole thing that we're asserting alternative theories is

15  just not true.

16        But to answer your question, Your Honor, I think

17  the fact that Plaintiff testified that he did not have a gun

18  and he was coerced, if this is sufficient to overcome the

19  Defendants' claims and put this before a jury.  And the

20  allocution is -- I think buttresses that statement, but

21  that's up to Defendants to present to a jury, and the jury

22  can resolve what Defendants' claims are conflicting

23  statements because that's what really this comes down to,

24  Your Honor.  The Defendants are saying, look, you said X and

25  you said Y, and in that situation, a jury needs to reconcile

1  that.

2      So I think there's more than ample evidence to show

3  the invalid -- that the plea of guilt is invalid as a result

4  of coercion, again, you have the appeal, you have the record

5  itself.  But I don't think Your Honor needs to go that far in

6  terms of picking one over the other.  I think the fact that

7  the question of fact remains, and there's more than enough

8  evidence to substantiate, at this stage, Plaintiff's claim

9  about coercion.  I think Your Honor doesn't need to do

10  anymore heavy lifting on that.

11      THE COURT:  Understood.  But at the same time, as

12  you're aware, the Plaintiff himself cannot manufacture issues

13  of fact, right?  In other words, the Plaintiff himself cannot

14  create inconsistencies to defeat summary judgment.  Is it

15  your position -- if you're able to answer it, let me know, is

16  it going to be that he did not have a gun or did he have a

17  gun, or do you not know?

18      MR. ABOUSHI:  Well, for what purposes, Your Honor?

19  Because in terms of the shooting --

20      THE COURT:  Yeah.

21      MR. ABOUSHI:  -- our position and the Plaintiff's

22  position is very clear.  When he was shot by the police, he

23  did not have a gun, and he certainly --

24      THE COURT:  Okay.

25      MR. ABOUSHI:  -- didn't point a gun at any officer.

1   And I think that's critical, Your Honor, because like I said,

2   just possessing a gun in and of itself is not a license for

3   officers to shoot you.  They have to, obviously, meet the

4   standard of threat and -- to themselves, imminent deadly

5   threat against themselves or another officer.  And so you

6   know, respectfully, I would say that we're going a bit afield

7   on whether or not he possessed the gun because you still have

8   to go through a whole other analysis as to whether or not he

9   presented that gun to the police officers at the scene that

10   night, he pointed the gun at the officers that night and in

11   doing so caused a threat such that would justify the deadly

12   use of force against him.

13        And we would submit, Your Honor, whether or not he

14   had a gun is not dispositive of the second part of analysis

15   where he was running from the police and posed no threat to

16   them.  And again, Your Honor, I think that the Plaintiff's

17   testimony, the Defendants' testimony, the forensics, the

18   doctors, the Monell expert, the evidence that Your Honor

19   could look at just by looking at crime scene photos and

20   location of items all tell you that even if, you know -- even

21   just putting aside whether or not he plead guilty to a gun,

22   the use of force that night was woefully unjustified.

23        THE COURT:  Okay.  Understood.  Thank you for that.

24   What I want to do is go off the record for a minute.  Hold on

25   one second.

1        (Off the record.)

2        THE COURT:  Case number 17-cv-6457.  We have

3   counsel for both parties on the line.  We went off the record

4   for a minute.  The Court wanted to inquire -- ask for any

5   recent summary discussions.  We are back on the record now.

6   The Court will take the motion under advisement and rule

7   quickly.  Is there anything else we need to address for

8   Plaintiff today, Mr. Aboushi?

9        MR. ABOUSHI:  No, Your Honor.  Thank you for your

10  time and attention.

11       THE COURT:  Okay.  Anything else for Defendant, Mr.

12  Kalmbach?

13       MR. KALMBACH:  Yes, one procedural matter, Your

14  Honor.  Plaintiff filed this letter yesterday, eight months

15  after the motion was fully briefed.  I guess I'm just

16  wondering what Your Honor would prefer.  Can we respond to

17  that?  Should we respond to that?

18       THE COURT:  It's up to you.  If you want to

19  respond, feel free to respond.  If you're going to respond,

20  how much time do you think you'll need?

21       MR. KALMBACH:  Three days, Your Honor, would be --

22       THE COURT:  Okay.  So if you're so inclined, you

23  can file a response by July 28th, okay?

24       MR. KALMBACH:  Thank you, Your Honor.

25       THE COURT:  All right.  With that, we are

1  adjourned.  Have a nice day, everyone.

2         MR. KALMBACH:  You, too.

3         MR. ABOUSHI:  Thank you, Your Honor.

4         THE COURT:  Bye.

5      (Proceedings adjourned.)

6

7                TRANSCRIBER'S CERTIFICATE

8         I certify that the foregoing is a correct

9  transcript from the electronic sound recording of the

10 proceedings in the above-entitled matter.

11

12                              July 29, 2022

      *Natalie C. Webb*
13

14 _____    _____

15 Natalie C. Webb                         DATE

16 Legal Transcriber

17

18

19

20

21

22

23

24

25

Superior Reporting LLC
P.O. Box 5032 Maryville, TN 37802
transcripts@superiorreporter.com