UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------x

JAMES BENBOW,

                       Plaintiff,

             -against-

POLICE OFFICER BRIAN FEELEY; POLICE
OFFICER MATTHEW ROSIELLO,

                       Defendants.

--------------------------------------x

**MEMORANDUM & ORDER**
17-CV-6457(EK)(JRC)

ERIC KOMITEE, United States District Judge:

Following a two-week trial, a jury found Officers Brian Feeley and Matthew Rosiello liable for the use of excessive force, assault, and battery against plaintiff James Benbow.  The jury awarded Benbow $190,000 in compensatory damages.  Now before the Court are the parties' post-trial motions.  Defendants move for judgment as a matter of law or, in the alternative, a new trial.  Plaintiff moves for a new trial as to damages only.  For the following reasons, both motions are denied in their entirety.

## I.   Background

The Court presumes the parties' familiarity with the procedural and factual background of this case, as set forth in Judge Cho's report and recommendation (R&R) on defendants' motion for summary judgment and the Court's order adopting the R&R in large part.  *See Benbow v. City of New York*, No. 17-CV-

6457, 2022 WL 22902936 (E.D.N.Y. Aug. 31, 2022) (report and recommendation); *Benbow v. City of New York*, No. 17-CV-6457, 2024 WL 5165073 (E.D.N.Y. Dec. 19, 2024) (order).

Trial on Benbow's Section 1983 excessive force claim and state assault and battery claims commenced on October 27, 2025. The trial was bifurcated into liability and damages phases. During the first phase, the jury found Feeley and Rosiello liable on all counts. *See* Verdict Form 1-2, ECF No. 213-6.[1]

Defendants then requested, and the Court agreed, to pose certain special interrogatories to the jury that defendants argued were relevant to their defense of qualified immunity. *See* Defs.' Nov. 4 Ltr., ECF No. 203. Those interrogatories read as follows:

> Did Officer Feeley reasonably believe, even if mistaken, that Mr. Benbow was holding a firearm in his hand at the time Officer Feeley fired at him?
>
> Did Officer Rosiello reasonably believe, even if mistaken, that Mr. Benbow was holding a firearm in his hand at the time Officer Rosiello fired at him?
>
> Did Officer Feeley reasonably believe, even if mistaken, that Mr. Benbow was moving in the general direction of any other person at the time Officer Feeley fired at him?
>
> Did Officer Rosiello reasonably believe, even if mistaken, that Mr. Benbow was moving in the general

---

[1] Page numbers in citations to transcripts and briefs refer to internal pagination. Page numbers in citations to all other record documents refer to ECF pagination.

direction of any other person at the time Officer Rosiello fired at him?

Verdict Form 3-4.  The jury answered, "No," to each question. *Id.*

During the damages phase, the jury awarded Benbow $190,000: $133,000 from Feeley and $57,000 from Rosiello.  *Id.* at 6.

Defendants now move for judgment as a matter of law under Federal Rule of Civil Procedure 50 or, in the alternative, a new trial pursuant to Rule 59.  Plaintiff seeks a new trial as to damages only.

## II.  Legal Standard

Under Federal Rule of Civil Procedure 50, "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue," the district court may:

> (A) resolve the issue against the party; and
>
> (B) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

Fed. R. Civ. P. 50(a)(1).  If a party moves for judgment as a matter of law before the case is submitted to the jury under Rule 50(a), and the Court declines to grant that motion, they

may renew it up until 28 days after the entry of judgment.  *See* Fed. R. Civ. P. 50(b).

Motions for judgment as a matter of law "should be granted cautiously and sparingly," *Meloff v. New York Life Ins. Co.*, 240 F.3d 138, 145 (2d Cir. 2001),[2] and only if

> there exists such a complete absence of evidence
> supporting the verdict that the jury's findings could
> only have been the result of sheer surmise and
> conjecture, or the evidence in favor of the movant is
> so overwhelming that reasonable and fair minded
> persons could not arrive at a verdict against it.

*Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 133 (2d Cir. 2008).  In deciding a Rule 50 motion, the Court "must give deference to all credibility determinations and reasonable inferences of the jury, and may not . . . consider the weight of the evidence."  *Id.*

A district court may also "grant a new trial on all or some . . . issues" under Federal Rule of Civil Procedure 59(a). "Unlike judgment as a matter of law, a new trial may be granted even if there is substantial evidence supporting the jury's verdict.  Moreover, a trial judge is free to weigh the evidence himself, and need not view it in the light most favorable to the verdict winner."  *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 134 (2d Cir. 1998).  But the "court should only grant such

---

[2] Unless otherwise noted, when quoting judicial decisions this order accepts all alterations and omits all citations, footnotes, and internal quotation marks.

a motion when the jury's verdict is egregious." *Id.; see also*

*Ali v. Kipp*, 891 F.3d 59, 64 (2d Cir. 2018) (district court

should only grant new trial if "it is convinced that the jury

reached a seriously erroneous result or that the verdict is a

miscarriage of justice").

### III. Discussion

**A.   Defendants' Motion for Judgment as a Matter of Law or, in the Alternative, a New Trial**

Defendants' motion is denied on all counts.

1.   The Verdict Was Not Against the Weight of the Evidence

Defendants argue that, even viewing the trial evidence

in the light most favorable to Benbow, they are entitled to

judgment as a matter of law.  In the alternative, they argue

that a new trial is warranted under Rule 59(a) because the

jury's verdict was against the weight of the evidence.  Defs.'

Mot. 2, 10, ECF No. 217-1.  "[W]e focus on Rule 59(a), which has

a less stringent standard than Rule 50."  *Manley v. AmBase

Corp.*, 337 F.3d 237, 245 (2d Cir. 2003).  But even under that

more lenient standard, the Court sees no miscarriage of justice

in the jury's verdict.  *See Ali*, 891 F.3d at 64.

The jury's finding that defendants used excessive

force was not against the weight of the evidence.  The Court

properly instructed the jury that "the use of deadly force is

unreasonable, unless the officer had probable cause to believe

that the person posed a significant threat of death or serious physical injury to the officer or to others at the time the force was used." Trial Tr. 1109:4-8, ECF No. 221; *see also O'Bert ex rel. Estate of O'Bert v. Vargo*, 331 F.3d 29, 36 (2d Cir. 2003) (articulating standard). Defendants did not, and do not, contest this instruction. *See* Proposed Jury Instr. 8-9, ECF No. 158 (proposing the inclusion of this instruction). And the jury's responses to the special interrogatories clearly manifested its finding that, under this standard, the use of deadly force was unreasonable. The jurors did not simply conclude that Benbow was not *pointing* a gun at anyone; they found that it would have been unreasonable for defendants to believe that Benbow was "*holding* a firearm in his hand" or even that he was "moving in the general direction of any other person" when they fired. Verdict Form 3-4 (emphasis added).

Defendants place much emphasis on the evidence suggesting that Benbow had a gun on his person. *See* Defs.' Mot. 3-4. But again, even assuming he had a gun, the jury clearly rejected the notion that Benbow was *threatening* anyone with a gun. And that conclusion was not "seriously erroneous." *Ali*, 891 F.3d at 64.

Whether Benbow pulled a gun on defendants and their colleagues was, at trial, ultimately a matter of his word versus theirs. And the jury's conclusion that he did not pull a gun on

6

the officers can be located within the range of reasonable outcomes here. Though defendants raised questions about Benbow's credibility, the officer defendants' testimony was also (unsurprisingly) self-serving.[3] The only objective evidence to support the officers' claim that Benbow pulled a firearm from his waistband was grainy video footage of Benbow's initial encounter with, and flight from, the officers. *See* Pl.'s Ex. H. That footage stops before the shooting and, as the Court noted at summary judgment, the video is ambiguous. *Benbow*, 2024 WL 5165073, at *9.

Moreover, plaintiff presented sufficient evidence to support the jury's finding that he was not facing the officers when Feeley and Rosiello shot him. The medical records showed that Benbow received two bullet wounds to his back. *See, e.g.*, Pl.'s Exs. 36, 38; *see also* Trial Tr. 580:3-584:6, 595:20-597:21, 602:1-7, ECF No. 228 (Dr. Drukteinis's testimony regarding the location of Benbow's external and internal injuries). While defendants presented evidence to support their claim that they did not shoot Benbow in the back, the jury may reasonably have rejected the testimony on this point from the defendants' ballistics and crime-scene reconstruction expert,

---

[3] One other (non-party) officer testified in a manner supportive to the officer-defendants' testimony. *See* Trial Tr. 426:13-23, ECF No. 227 (Anderson). But the answers to the special interrogatories necessarily indicate that the jury rejected this testimony, too.

George Krivosta.  Mr. Krivosta testified that a single bullet hit Benbow's belt buckle, passed through his jacket, sweatshirt, and the skin of his left lower back, struck his spine, and embedded in the skin of his right lower back, somehow losing speed at the end and failing to exit his body.  Trial Tr. 906:14-907:21, 930:2-22, ECF No. 229.  It may not have aided Mr. Krivosta's credibility that he is not a medical doctor, *id.* at 919:4-8, has never inspected the body of a live gunshot victim, *id.* at 927:21-928:4, and adopted an argumentative tone with counsel and the Court.  *See, e.g.*, *id.* at 909:14-24; 921:25-922:2, 926:12-15.

Defendants argue that plaintiff's expert witnesses, Dr. Dan Drukteinis and Mr. Howard Ryan, "acknowledged" that the medical evidence was consistent with "defendants' version of events regarding plaintiff's bullet wounds."  Defs.' Mot. 4. But, viewed holistically, that is not the fairest or best reading of the testimony at issue.  *See* Trial Tr. 607:11-20, ECF No. 228 (Dr. Drukteinis: there were "metallic fragments that were through the body that would not have been on that alleged path that [defense counsel is] describing."); *id.* at 699:21-700:6 (Mr. Ryan: "I agree with the scenario [defense counsel is] setting up that would put him here, but we still have a bullet inside that wound that's unaccounted for.").  And neither expert agreed that the wounds to Benbow's back were necessarily caused

by a single bullet.  *Id.* at 616:10-14 (Drukteinis); Trial Tr. 1001:4-15, ECF No. 221 (Ryan).

Defendants also point to the ways in which Benbow's recitation of the events on the night of the shooting did not entirely align with his expert evidence.  Defs.' Mot. 2-3.  But those discrepancies are not fatal, especially as regards a layman's recitation of the location of his bullet wounds.[4]

Ultimately, "where, as here, a verdict is predicated almost entirely on the jury's assessments of credibility, such a verdict generally should not be disturbed . . . ."  *Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 418-19 (2d Cir. 2012).  Defendants' motion for a new trial based on the weight of the evidence is therefore denied.

2.   Defendants Are Not Entitled to Judgment as a
     <u>Matter of Law</u>

Because defendants' Rule 59 motion fails, so too does their Rule 50 motion for judgment as a matter of law.  *See Manley*, 337 F.3d at 245; *see also Giles v. Rhodes*, 171 F. Supp. 2d 220, 229 n.5 (S.D.N.Y. 2001) ("Having failed to meet the more relaxed requirements of Rule 59(a), which allows me to consider credibility and the weight of the evidence . . .  it is

---

[4] Defendants devote much of their briefing to Benbow's arguably uncredible explanation for *why* he ran from the officers.  *See* Defs.' Mot. 3. But that testimony is irrelevant except to the extent that it undermined his credibility more generally.

axiomatic that [defendants] cannot satisfy Rule 50(b)'s standards.").

> 3.    <u>Defendants Are Not Entitled to Qualified Immunity</u>

Defendants also argue that the Court should grant their Rule 50(b) motion because they are entitled to qualified immunity.[5]  This difficult question turns on the details of the special interrogatories and certain important trial decisions by the defense.  Ultimately, the Court disagrees that either defendant is entitled to qualified immunity.

Qualified immunity shields police officers, like all state officials, from a suit for damages unless the officers (1) "violated a statutory or constitutional right" (2) that was "clearly established at the time of the challenged conduct." *Terebesi v. Torreso*, 764 F.3d 217, 230 (2d Cir. 2014).  Here, because the jury determined that the officers used excessive force against Benbow, thereby violating his Fourth Amendment rights, the key question is whether those rights were clearly established as of March 7, 2015.  The Supreme Court has repeatedly cautioned that courts should not "define clearly established law at a high level of generality, since doing so

---

[5] Defendants moved for judgment as a matter of law before the case was submitted to the jury, arguing that "no reasonable jury could find for plaintiff" and "the individual defendants are entitled to qualified immunity."  Trial Tr. 959:16-960:14, ECF No. 230.  Accordingly, they preserved their ability to now renew that motion under Federal Rule of Civil Procedure 50(b).  *See Tolbert v. Queens Coll.*, 242 F.3d 58, 70 (2d Cir. 2001) ("The posttrial motion is limited to those grounds that were specifically raised in the prior motion for JMOL.").

avoids the crucial question [of] whether the official acted reasonably in the particular circumstances that he or she faced." *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014).

Citing *Tennessee v. Garner*, 471 U.S. 1, 11-12 (1985), plaintiff contends that it was clearly established as of March 2015 that "a police officer could not use deadly force to seize someone who did not pose a significant threat of death or serious physical injury to the officer or to others." Pl.'s Opp'n 7, ECF No. 220. The Supreme Court has rejected similar formulations of clearly established law, holding that they frame the right at issue at too high a level of generality. *See, e.g., Mullenix v. Luna*, 577 U.S. 7, 12-13 (2015). On *its* facts, however, *Garner* clearly establishes that a police officer may not use deadly force to apprehend an unarmed, fleeing suspect. 471 U.S. at 3-4.[6]

Both of those facts — whether Benbow was fleeing and whether he was unarmed — were disputed at trial. And if there is a dispute "as to the material historical facts," those "factual questions must be resolved by the factfinder." *Zellner v. Summerlin*, 494 F.3d 344, 368 (2d Cir. 2007); *see also Jones*

---

[6] In *Hemphill v. Schott*, the Second Circuit clearly established that police cannot shoot a suspect who is surrendering and obeying the officers' commands, even if they reasonably believe him to be armed. 141 F.3d 412, 417 (2d Cir. 1998). We have surfaced no case involving a suspect who (1) was fleeing; and (2) had a gun on his *person*; but (3) was not pointing it at anyone or even holding it in his hand.

11

*v. Treubig*, 963 F.3d 214, 225 (2d Cir. 2020) ("[I]f there are unresolved factual issues which prevent an early disposition of the [qualified immunity] defense . . . , the jury should decide these issues on special interrogatories."). Although step two of the qualified immunity analysis — which assesses "the reasonableness of an officer's view of the law" — is the province of the court, factual questions "may dictate whether any reasonable officer would have understood that his conduct was unlawful." *Jones*, 963 F.3d at 231, 232-33. And "the reasonableness of an officer's perception of the facts (whether mistaken or not) is the province of the jury." *Id.* at 231.

The jury's special interrogatory responses resolved the question of whether the officer defendants could have reasonably perceived Benbow to be running toward them or their colleagues (rather than fleeing) but not whether they could have reasonably believed him to be armed. The jurors concluded that neither officer could have "reasonably believe[d], even if mistaken, that Mr. Benbow was moving in the general direction of any other person" when they shot him. Verdict Form 4. In other words, he was clearly running away. But the jury's conclusion that the officers could not have "reasonably believe[d], even if mistaken, that Mr. Benbow was holding a firearm in his hand" when they fired, *id.* at 3, still leaves unresolved whether they could have reasonably believed Benbow was armed *at all*.

12

Defendants did not request, and the Court therefore did not pose, any special interrogatories on that question.[7]

Because defendants have the burden of proof "as to the facts necessary to establish [their] entitlement to [the] qualified immunity" defense, *Outlaw v. City of Hartford*, 884 F.3d 351, 370 (2d Cir. 2018), it was their responsibility "to request that the jury be asked the pertinent question." *Jones*, 963 F.3d at 234. Defendants did not do so here, so "we must construe the evidence most favorably to [Benbow] in conducting" the qualified immunity analysis. *Ortiz v. Stambach*, 137 F.4th 48, 69 (2d Cir. 2025); *see also Zellner*, 494 F.3d at 368 ("If the defendant does not make [the appropriate special interrogatory] request, he is not entitled to have the court, in lieu of the jury, make the needed factual finding.").

Viewing the evidence in the light most favorable to Benbow, a reasonable jury *could* have concluded that he was not armed. Whether Benbow was armed was largely a question of the officers' words versus his. And "[c]redibility determinations . . . are jury functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Here, the jury clearly accepted Benbow's version of events, at least on certain key issues. For example, through

---

[7] In fact, the Court posed the exact questions that defendants requested, *see* Defs.' Nov. 4 Ltr., modifying their phrasing only to insert the names of the defendants to which the questions were applicable.

its interrogatory responses, the jury thoroughly rejected the defendants' (and Officer Anderson's) testimony that Benbow pulled a gun on them.  *See* Trial Tr. 211:24-212:21, ECF No. 226 (Rosiello); Trial Tr. 364:4-10, 379:14-19, ECF No. 227 (Feeley); *id.* 426:13-23 (Anderson).  The jury also clearly accepted Benbow's testimony that he was running away.  *See* Verdict Form 3-4; *see also* Trial Tr. 103:19-25, ECF No. 226 (Benbow).  And we cannot second-guess the jury's credibility determinations on a Rule 50 motion.  *See Diesel v. Town of Lewisboro*, 232 F.3d 92, 203 (2d Cir. 2000).

The remaining evidence, viewed in the light most favorable to Benbow, does not undermine the conclusion that a reasonable jury could have concluded that Benbow was unarmed. The only non-testimonial evidence consisted of (1) a gun whose NYPD voucher connected it, not to Benbow, but to his companion on the night in question, Trial Tr. 346:3-347:14, ECF No. 227; (2) the grainy security footage, which we already declined to view as the officers urged at summary judgment, *see Benbow*, 2024 WL 5165073, at *9; and (3) video taken after the shooting that shows a gun on the ground several feet from Benbow, Pl.'s Ex. I. Assuming, as the jury found, that the officers' testimony was not deserving of credence, it would not have been unreasonable for the jury to question where this gun came from.  Finally, for whatever reason, defendants chose not to introduce Benbow's plea

14

allocution at trial.  So, on that score, we are left only with Benbow's testimony that he falsely admitted to possession of a firearm to avoid additional jail time.  *See* Trial Tr. 91:7-20, ECF No. 226.

Of course, Rosiello and Feeley may have believed, even if mistakenly, that Benbow was armed.  Indeed, before arriving at Amarachi Prime, the officers received a report from an auxiliary officer inside the club that a "tall male, black, wearing all black" (and accompanied by a "second male that was shorter with a bag") had a firearm.  *See* Trial Tr. 459:8-462:14, ECF No. 227 (Detective Mitchell).  But whether that tip was a sufficient basis for defendants to reasonably believe Benbow was armed when they ultimately fired their weapons was a question for the jury: "[a] mistake of fact . . . in the absence of an additional jury finding that the mistake was reasonable (when there are disputed material facts on that question) is insufficient to support an officer's claim that he is entitled to qualified immunity."  *Jones*, 963 F.3d at 228.[8]

Construing the evidence in the light most favorable to Benbow, as we must, defendants have not demonstrated "the

---

[8] Defendants point to the Court's holding, at summary judgment, that the auxiliary officer's tip "was sufficient to establish (at least) arguable probable cause to arrest plaintiff for possession of a firearm."  Defs.' Mot. 7.  But that conclusion was based on the collective knowledge doctrine, *see Benbow*, 2024 WL 5165073, at *8, and defendants have cited no case applying the collective knowledge doctrine to excessive force claims.  Accordingly, that holding is not dispositive here.

nonexistence of a clearly established right" violated by their use of deadly force. *Tellier v. Fields*, 280 F.3d 69, 84 (2d Cir. 2000). Qualified immunity does not apply.

If the Court was weighing the evidence, we might well conclude that Benbow was armed or, at the very least, that the officers could have reasonably believed that he was armed. But it is not our place to make such factual findings. *See Jones*, 963 F.3d at 234 ("Having agreed to submit the non-pertinent question to the jury, [defendants] cannot then have the district court, in addressing a Rule 50 motion, usurp the jury's role by substituting its own finding on the pertinent question.").

4.    Neither Benbow's Counsel's Violations of the Court's Pre-Trial Orders nor the Admission of Mr. Ryan's Undisclosed Opinion Warrants a New Trial

Defendants raise two further arguments in support of their motion for a new trial: that (1) plaintiff's counsel's violations of the Court's orders on the parties' motions *in limine* unduly prejudiced the jury; and (2) the erroneous admission of Mr. Ryan's undisclosed expert opinion swayed the jury. Both arguments fail.

*First*, the Court agrees that plaintiff's counsel violated our pre-trial orders on the parties' motions *in limine* by (1) asking his client about the disposition of the underlying criminal charges; and (2) asking Rosiello whether Benbow's DNA evidence was on the gun. Indeed, the Court admonished counsel

16

on the record for doing so.  *See* Trial Tr. 83:14-84:22, ECF No. 226; Trial Tr. 327:2-25, ECF No. 227.  However, those violations were not so prejudicial as to warrant a new trial.  "[A] party seeking a new trial on the basis of opposing counsel's improper statements to the jury faces a heavy burden."  *Marcic v. Reinauer Transp. Cos.*, 397 F.3d 120, 124 (2d Cir. 2005).  And "rarely will an attorney's conduct so infect a trial with undue prejudice or passion as to require reversal." *Id.*

Defendants argue that plaintiff's counsel's violations "went to the heart of one of the most important issues in the case: whether plaintiff had a gun when he was shot."  Defs.' Mot. 12.  But defendants themselves invoke what they call "the mountain of evidence . . . that plaintiff indeed possessed a gun."  *Id.* at 13.  If there is a reason the jury was unconvinced that Benbow possessed a gun on the night in question, it is likely because defendants did not sufficiently marshal that evidence.  For example, they elected not to introduce Benbow's plea allocution (in which he admitted that he had a gun) or question him about it at all.  Nor was that admission, or Mr. Benbow's own testimony about it, a point of focus during the defense summation.  *See* Trial Tr. 1053:5-7, ECF No. 221 (mentioning the plea allocution only in passing).

Any effect Benbow's testimony regarding the dismissal of the criminal charges may have had was also mitigated by the

Court's curative instruction to the jury.  Trial Tr. 90:22-91:1, ECF No. 226; *see Patterson v. Balsamico*, 440 F.3d 104, 119 (2d Cir. 2006) (no "undue prejudice or passion" where court gave curative instruction to "the jurors immediately upon their return to the courtroom").  As to counsel's question regarding the lack of DNA evidence, defendants themselves posit that "any curative would [not] have had any effect other than to draw additional attention to [the] topic."  Defs.' Mot. 13.  This was particularly true given that the question (whether "Mr. Benbow's DNA [was] recovered from [the] gun") went without answer.  Trial Tr. 326:15-25, ECF No. 227.

Defendants also argue that Benbow's testimony regarding the dismissed criminal charges might have generated undue sympathy.  In particular, they point to his subsequent testimony that he had been "locked up for four years," which they say, "unfairly and inaccurately suggested that plaintiff had been unlawfully incarcerated in connection with the incident."  Defs.' Mot. 12.  But that statement was part of Benbow's answer to why he pleaded guilty to possession of a firearm on the night in question, even though he claims he was not armed.  *See* Trial Tr. 91:7-20, ECF No. 226.  And Benbow's reasons for accepting the plea deal were clearly relevant to the weight the jury might place on his state-court allocution.

18

*Second*, the Court properly admitted Mr. Ryan's undisclosed opinion that the bullet wound to Benbow's right flank was an entry wound.  We originally struck that testimony, and later admitted it only after defense counsel opened the door by asking his own expert witness, "And in the report, Mr. Ryan opined that plaintiff was shot in the right side by Officer Rosiello, right?"  Trial Tr. 860:2-8, ECF No. 229; *cf. Ohler v. United States*, 529 U.S. 753, 755 (2000) ("If a party who has objected to evidence of a certain fact himself produces evidence from his own witness of the same fact, he has waived his objection.").  Furthermore, defendants' expert, Mr. Krivosta, was able to offer rebuttal testimony on this point, *see, e.g.*, Trial Tr. 873:24-874:21, ECF No. 229, meaning any prejudice was slight.  *See Brennan-Centrella v. Ritz-Craft Corp. of Pa.*, 788 F. App'x 799, 803 (2d Cir. 2019) (the "district court acted within its substantial discretion by permitting [defendant] to cross-examine [plaintiff's expert] on his undisclosed testimony and permitting [defendant's] expert to offer an opinion in response"); *cf. Lorme v. Delta Air Lines, Inc.*, 251 F. App'x 691, 692-93 (2d Cir. 2007) (even if expert's testimony went beyond his report, opposing counsel's decision not to call a rebuttal expert or "actively pursue other alternatives short of preclusion[] suggest[ed] the prejudice, if any, was slight").

19

**B.    Plaintiff's Motion for a New Trial**

Benbow's motion for a new trial on damages is denied.

1.    The Jury's Compensatory Damages Award Was Not
Egregiously Inadequate

Benbow first argues that a new trial on damages is warranted because the "jury's award of $190,000 in compensatory damages shocks the conscience."  Pl.'s Mot. 2, ECF No. 216.  In effect, he contends that the jury's award was inconsistent with its finding of liability given "Benbow's undisputed injuries." *Id.*  But "[w]hen a party points to an apparent inconsistency in a jury verdict," the court "must adopt a view of the case, if there is one, that resolves any seeming inconsistency, making every attempt to reconcile the jury's findings." *Singh v. Mem'l Sloan Kettering Cancer Ctr.*, No. 23-63, 2024 WL 4586396, at *1 (2d Cir. Oct. 28, 2024), *cert. denied*, 146 S. Ct. 896 (2025); *see also Ali*, 891 F.3d at 66 (similar).

Here, while there is no dispute that Benbow sustained serious injuries in the form of bullet wounds to his back, he only presented evidence of damages for pain and suffering, which — unlike medical expenses or lost wages — are highly subjective.[9] And the jury may well have accepted defendants' argument that "plaintiff has exaggerated aspects of his conditions, both in

---

[9] Benbow testified that he can no longer work in construction, but he confirmed on cross examination that that is partly because he is currently incarcerated.  Trial Tr. 1277:3-20, ECF No. 224.  And Benbow's counsel did not argue for damages arising from lost wages during his summation.

20

terms of any mental health issues he claims to have, as well as the impact the shooting has on his day-to-day, his life." Trial Tr. 1455:3-6, ECF No. 212.

During the damages phase of the trial, Benbow made certain claims regarding his condition that were undermined by other evidence. First, he denied that he had been able to run a block in 2017, even though he had admitted to doing so at his deposition. *See* Trial Tr. 1289:2-1291:4, 1293:19-1294:12, ECF No. 224. He also testified that he had experienced numbness and tingling in his legs immediately after being shot — symptoms that his medical records indicate he denied experiencing at the time. *Id.* at 1299:15-1301:24.

More importantly, the jury may reasonably have discredited the testimony of Benbow's two damages experts: Dr. Troy Caron and Dr. Jeffrey Gardere. Dr. Caron, an orthopedic surgeon, testified that the bullet fragments in Benbow's back caused "some pressure on the nerves and damage to the nerves, which resulted in weakness in his legs, pain in his back" and some level of paraplegia. *Id.* at 1376:11-13, 1382:1-3. But he was forced to acknowledge that he had not reviewed Benbow's medical records past 2019, had never examined Benbow in person, and did not know Benbow could walk until he saw him do so in court. Trial Tr. 1422:23-25, 1423:18-20, 1421:13-23, ECF No. 212. Indeed, on direct examination, Dr. Caron volunteered that

21

"at one point [Benbow] was two out of five" on the paraplegia scale based on the medical records he had reviewed, "but I've seen him walk so . . . I'm not sure what level he's at now." Trial Tr. 1382:1-3, ECF No. 224.

Dr. Caron also acknowledged that his conclusions had been undermined by the trial evidence. For example, Benbow's testimony that he did not "have any issues in terms of walking," *id.* at 1253:14-15, was inconsistent with his having "any degree of paraplegia." Trial Tr. 1425:25-1426:17, ECF No. 212. Dr. Caron also agreed that "being able to run" was inconsistent with his "understanding of the extent of [Benbow's] injury" in 2017. *Id.* at 1424:8-12.

Defendants also raised questions regarding the credibility of Dr. Gardere, Benbow's psychological expert. Dr. Gardere diagnosed Benbow with anxiety, depression, and PTSD, which he concluded were "attributable only to the police shooting of March 7, 2015." Trial Tr. 1346:22-1347:3, ECF No. 224. Later, however, he acknowledged that Benbow's time in custody and involvement — at age fifteen — in another person's death were circumstances that *could* also contribute to anxiety, depression, and PTSD. And yet those events "did not go into [his] diagnosis." *Id.* at 1347:4-1348:8, 1358:3-21. Accordingly, the jurors could reasonably have discredited his testimony in whole or in part.

To the extent the jury found Benbow's testimony — or, more importantly, that of his experts — not credible, that would "resolve[] any seeming inconsistency" between the jury's finding of liability and its decision not to award higher compensatory damages for gunshot wounds. *Singh*, 2024 WL 4586396, at *1.

Benbow cites *Dancy v. McGinley* for the proposition that we should consider "amounts awarded in other comparable cases," 843 F.3d 93, 113 (2d Cir. 2016), which he contends are significantly higher than the amount the jury awarded here. Pl.'s Mot. 4; *see also Singh v. Mem'l Sloan Kettering Cancer Ctr.*, No. 17-CV-3935, 2022 WL 17669386, at *4 (S.D.N.Y. Dec. 14, 2022), *aff'd*, 2024 WL 4586396 (applying same analysis in case where damages award was challenged as too low). Such comparisons can be useful.[10] But ultimately, we "examine each case individually as a unique set of facts and circumstances." *Dancy*, 843 F.3d at 113.

Moreover, Benbow's comparators are unpersuasive. Benbow leans heavily on cases in which (he says) the plaintiff's physical injuries were less extensive than his own, and yet that plaintiff received a larger damages award. But again, as

---

[10] Notably, Benbow does not cite any cases where the jury awarded more than nominal damages and the court concluded that those damages were too low. In fact, in several cases Benbow relies on, the court remitted the original damages award. *See, e.g.*, *Greenaway v. County of Nassau*, 327 F. Supp. 3d 552 (E.D.N.Y. 2018); *Kaczorowska v. 110 Wall St. L.L.C.*, 2005 N.Y. Misc. LEXIS 2016 (Sup. Ct. New York Co. Aug. 4, 2005).

discussed above, the severity of Benbow's injuries was disputed extensively at trial, and the jury could easily have disbelieved or discounted plaintiff's expert witnesses.  *Cf. Pizarro v. Quezada*, No. 24-2422, 2025 WL 2865251, at *3 (2d Cir. Oct. 9, 2025) ("[C]orroborating expert testimony or medical evidence of a plaintiff's distress is not *required* to sustain an award of emotional distress damages" but "district courts often point to the presence of such evidence to shore up the reasonableness of a jury award or a court's own recommended award.").  Therefore, the Court is unpersuaded that the jury's compensatory damages award was so egregious as to warrant a new trial.  *See DLC Mgmt. Corp.*, 163 F.3d at 134.[11]

> 2.    Plaintiff Was Not Entitled to an Instruction on Punitive Damages

Plaintiff next contends that he is entitled to a new trial on damages because the Court erroneously declined to instruct the jury on punitive damages.  *See* Pl.'s Mot. 12.  "[A] plaintiff is not entitled to an instruction allowing the jury to award punitive damages unless there is evidence that the defendant's conduct could be . . . characterized" as exhibiting

---

[11] Benbow also argues in passing that his "reasonable fear of death warrant[ed] a separate award of compensatory damages under New York law." Pl.'s Mot. 6.  But all he cites in support is a Court of Claims decision in which the court chose to award such damages.  *See* Korenbaum Decl. Ex. 7, at 15.  He does not cite any authority saying such damages must be awarded.  Nor did Benbow request a jury instruction to that effect.  *See* Proposed Instructions, ECF No. 158, at 14-16; *see also* Pl.'s Proposed Verdict Form, ECF No. 157.

"evil motive or intent" or "reckless or callous indifference to the federally protected rights of others." *McCardle v. Haddad*, 131 F.3d 43, 52-53 (2d Cir. 1997); *see also Cameron v. City of New York*, 598 F.3d 50, 69 (2d Cir. 2010) (similar). Here — as discussed extensively on the record as the Court crafted the jury instructions — there was no evidence from which Feeley and Rosiello's conduct could be so characterized. *McCardle*, 131 F.3d at 53; *see* Trial Tr. 1403:17-1405:9, ECF No. 212.

Evidence from which a jury could infer evil intent or callous indifference includes the use of abusive language, unprovoked violence, and evidence that the defendants knowingly committed a rights violation or engaged in a cover up. The cases plaintiff cites in support of his motion merely illustrate this point. *See Cameron*, 598 F.3d at 69 (punitive damages instruction appropriate where plaintiffs' evidence was "minimally sufficient" to support finding that defendants "*knew* that they lacked probable cause . . . but arrested [plaintiffs] anyway" (emphasis added)); *Jennings v. Yurkiw*, 18 F.4th 383, 391 (2d Cir. 2021) (punitive damages instruction appropriate where defendants engaged in "unprovoked beating" and evidence that they "falsified charging documents, false accounts of the beating, faked or exaggerated injury, and perjured trial testimony" supported inference that defendants had taken "elaborate steps . . . to cover up their misconduct"); *see also*

25

*Wilson v. Aquino*, 233 F. App'x 73, 78 (2d Cir. 2007) (case not cited by Benbow where punitive damages award was supported by plaintiff's testimony that "he was familiar with the defendants prior to the incident" and they "verbally abused him with obscenities suggesting that they were strip searching him [solely] because he was a drug dealer").[12]

Plaintiff presented no such evidence at trial. Just because the jury seemingly rejected defendants' testimony, *see* Pl.'s Mot. 13-14, does not necessarily indicate that they engaged in some (undescribed) cover up. Benbow *did* testify that "[o]ne of the officers . . . kicked the side of my body to see whether or not I was still alive." Trial Tr. 66:3-5, ECF No. 226. But, as the Court noted on the record, he did not specify *which* officer kicked him, and he gave no reason to infer that it was Feeley or Rosiello rather than one of the other officers on the scene. *See* Trial Tr. 1404:21-1405:8, ECF No. 212. And plaintiff does not invoke this testimony in his motion for a new trial.

Instead, plaintiff relies solely on the jury's responses to the special interrogatories, which he reads to mean that defendants "shot an unarmed Benbow as he ran away from them" and "without any justification." *See* Pl.'s Reply 5, 7,

_____

[12] *Bah v. City of New York*, 319 F. Supp. 3d 698 (S.D.N.Y. 2018) does not engage at all with the question of whether a punitive damages instruction was appropriate. *See* Pl.'s Mot. 13 (citing *Bah*).

ECF No. 222.  But the conclusion that an officer's use of force was *unjustified* does not establish that he acted with evil or callous intent.  *Franco v. Gunsalus*, No. 22-339, 2023 WL 3590102, at *2 (2d Cir. May 23, 2023) ("Neither an excessive use of force nor an unreasonable belief about probable cause necessarily entitles a Section 1983 plaintiff to punitive damages."); *see also Collado v. City of New York*, 396 F. Supp. 3d 265, 282 (S.D.N.Y. 2019) ("[W]hile panicking may be a basis for the finding of excessive force, it is not a basis for the imposition of punitive damages.")  Rather, the Second Circuit has "long held that the availability of punitive damages requires more than what is required for liability under Section 1983" — otherwise, a defendant would be exposed "to an award of punitive damages for any conduct not protected by qualified immunity."  *Franco*, 2023 WL 3590102, at *2.  Accordingly, the Court remains unconvinced that we should have instructed the jury on punitive damages.

## C. Conclusion

For the foregoing reasons, defendants' motion for judgment as a matter of law or, in the alternative, a new trial is denied.  Plaintiff's motion for a new trial as to damages only is also denied.  The Clerk of Court is respectfully directed to enter judgment for Benbow in the amount of $190,000

— $133,000 from Feeley and $57,000 from Rosiello — and to close this case.

SO ORDERED.


        /s/ Eric Komitee
ERIC KOMITEE
United States District Judge


Dated:    May 7, 2026
          Brooklyn, New York

28